WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020-1095
(212) 819-8200
John K. Cunningham
Thomas E. MacWright
Philip M. Abelson

Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700
Richard S. Kebrdle (*pro hac vice pending*)
Laura L. Femino (*pro hac vice pending*)

*Attorneys for Andrew Childe,*
*as Petitioner and Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | ) |
| | ) |
| | ) Case No. 18-13952 |
| Serviços de Petróleo Constellation S.A., *et al.*,[1] | ) (Joint Administration Pending) |
| | ) |
| Debtors in a Foreign Proceeding. | ) Chapter 15 |
| | ) |

**PETITIONER'S DECLARATION AND VERIFIED PETITION FOR RECOGNITION**
**OF THE BRAZILIAN RJ PROCEEDING AND MOTION**
**FOR ORDER GRANTING RELATED RELIEF PURSUANT TO**
**11 U.S.C. §§ 1515, 1517, AND 1520**

---

[1]     The Debtors in these chapter 15 cases (the "Chapter 15 Cases") and the last four identifying digits of the tax number in the jurisdictions in which they pay taxes are as follows: Serviços de Petróleo Constellation S.A. ("Petróleo Constellation") (Brazil – 01-27); Lone Star Offshore Ltd. ("Lone Star") (BVI – 9322); Gold Star Equities Ltd. ("Gold Star") (BVI – 1368); Olinda Star Ltd. ("Olinda Star") (BVI – 9761); Star International Drilling Limited ("Star Int'l.") (Cayman Islands – 6867); Alpha Star Equities Ltd. ("Alpha Star") (BVI – 0114); Snover International Inc. ("Snover") (BVI – 8260); Arazi S.à r.l. ("Arazi") (Luxembourg – 9812); Constellation Oil Services Holding S.A. ("Constellation") (Luxembourg – 6634); and Constellation Overseas Ltd. ("Constellation Overseas") (BVI – 0641).

# TABLE OF CONTENTS

Page

Preliminary Statement ................................................................................................ 2

Background ................................................................................................................... 5

A.    General Background and History ........................................................................ 5

    i.     Overview ...................................................................................................... 5
    ii.    The Company's corporate structure and offices ....................................... 6

B.    Company Operations and Assets ........................................................................ 8

    i.     Offshore Drilling Rigs and Customer Contracts ..................................... 10
    ii.    Onshore Drilling Rigs and Customer Contracts ..................................... 11
    iii.   FPSO units and FPSO services ............................................................... 12

C.    Capital Structure ............................................................................................... 12

    i.     The Company's capital stock ................................................................... 12
    ii.    Prepetition debt structure ........................................................................ 13

D.    Events Precipitating Commencement of the Brazilian RJ Proceeding ............ 15

    i.     Cyclical decline in the drilling industry and the Brazilian financial crisis ........... 15
    ii.    Negotiations with stakeholders and the PSA ......................................... 16

E.    Connections to the United States ...................................................................... 19

Jurisdiction, Eligibility and Venue ........................................................................... 20

Required Disclosures ................................................................................................. 20

Basis for Relief .......................................................................................................... 22

A.    The Brazilian RJ Proceeding is a Foreign Proceeding of each of the Debtors and the
    Petitioner is the Duly-Authorized Foreign Representative thereof and has Properly
    Petitioned This Court for Recognition ............................................................... 23

    i.     The Verified Petition satisfies the requirements of section 1515 ......... 24
    ii.    The Petitioner is the duly-appointed "foreign representative" of the Brazilian
        RJ Proceeding for each of the Debtors ................................................... 24
    iii.   The Brazilian RJ Proceeding is a foreign proceeding ........................... 25

B.    The Court Should Find that the Brazilian RJ Proceeding Is a "Foreign Main
    Proceeding" with Respect to Each of the Debtors ............................................ 27

    i.     A COMI analysis under U.S. law focuses on where a debtor's business
        interests are principally centered ............................................................ 27
    ii.    A COMI analysis for SPVs serving a larger corporate group is specially
        tailored ...................................................................................................... 31
    iii.   Substantial evidence across the Constellation Group structure shows that each
        of the Debtors has its COMI in Brazil .................................................... 33
    iv.    Entity-specific factors also show that each of the Debtors has its COMI in
        Brazil ........................................................................................................ 38

C.    In the Alternative, the Court Should Find that the Brazilian RJ Proceeding is at Least a
    Foreign Nonmain Proceeding of each of the Debtors and Grant Discretionary Relief ..... 43

    i.     The contextual and flexible factors for recognition of foreign nonmain
        proceedings under U.S. law ..................................................................... 43
    ii.    Each of the Debtors has an establishment in Brazil and therefore qualifies for
        foreign nonmain recognition ................................................................... 45

i

## TABLE OF CONTENTS

Page

    iii.    The Court should grant the discretionary relief requested for any Debtor
granted nonmain recognition ................................................................. 45

Notice..................................................................................................................48

No Prior Request..................................................................................................48

Conclusion ...........................................................................................................48

Verification of Chapter 15 Petition.....................................................................50

# TABLE OF AUTHORITIES

Page(s)

## CASES

Ad Hoc Group of Vitro Noteholders v. Vitro, S.A.B., de C.V. (In re Vitro,
S.A.B. de C.V.), 470 B.R. 408 (Bankr. N.D. Tex. 2012),
aff'd, 701 F.3d 1031 (5th Cir. 2012)................................................................26

Collins v. Oilsands Quest, Inc., 484 B.R. 593 (S.D.N.Y. 2012).....................................29

CT Inv. Mgmt. Co. v. Cozumel Caribe, S.A. de C.V., 482 B.R. 96
(Bankr. S.D.N.Y. 2012) ................................................................48

Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet),
737 F.3d 238 (2d Cir. 2013)................................................................21

In re Artimm, S.r.l., 335 B.R. 149 (Bankr. C.D. Cal. 2005)................................................48

In re Avanti Commc'ns Grp. PLC, 582 B.R. 603 (Bankr. S.D.N.Y. 2018) ...................................21

In re Basis Yield Alpha Fund (Master), 381 B.R. 37 (Bankr. S.D.N.Y. 2008) ...........................30

In re Bear Stearns High-Grade Structured Credit Strategies Master
Fund, Ltd., 374 B.R. 122 (Bankr. S.D.N.Y. 2007), aff'd, 389 B.R. 325
(S.D.N.Y. 2008) ................................................................ passim

In re Berau Capital Res. PTE Ltd., 540 B.R. 80 (Bankr. S.D.N.Y. 2015)....................................21

In re British Am. Ins. Co., 425 B.R. 884 (Bankr. S.D. Fla. 2010)........................................ passim

In re Creative Fin., Ltd. (In Liquidation), 543 B.R. 498 (Bankr. S.D.N.Y. 2016) .................31, 46

In re Fairfield Sentry Ltd., No. 10 Civ. 7311 (GBD), 2011 U.S. Dist. LEXIS
105770 (S.D.N.Y. Sept. 15, 2011)................................................30, 31, 46

In re Millennium Glob. Emerging Credit Master Fund Ltd., 458 B.R. 63
(Bankr. S.D.N.Y 2011) ................................................................ passim

In re OAS S.A., 533 B.R. 83 (Bankr. S.D.N.Y 2015) ........................................................ passim

In re Oi Brasil Holdings Cooperatief U.A., 578 B.R. 169
(Bankr. S.D.N.Y. 2017) ................................................................30, 33, 35, 37

In re Oversight & Control Comm'n of Avánzit, S.A., 385 B.R. 525
(Bankr. S.D.N.Y. 2008) ................................................................24

In re Pro-Fit Holdings Ltd., 391 B.R. 850 (Bankr. C.D. Cal. 2008)............................................24

In re SPhinX, LTD., 351 B.R. 103 (Bankr. S.D.N.Y. 2006) ...........................................31, 32, 47

# TABLE OF AUTHORITIES

Page(s)

In re Suntech Power Holdings Co, 520 B.R. 399 (Bankr. S.D.N.Y. 2014)...................................21

In re Tien Chiang, 437 B.R. 397 (Bankr. C.D. Cal. 2010) .....................................................32, 40

In re Toft, 453 B.R. 186 (Bankr. S.D.N.Y. 2011)...................................................................48

In re Tri-Cont'l Exch. Ltd., 349 B.R. 627 (Bankr. E.D. Cal. 2006) ........................................31, 32

Jaffe v. Samsung Elecs. Co., 737 F.3d 14 (4th Cir. 2013)......................................................56

Krys v. Farnum Place, LLC (In re Fairfield Sentry Ltd.), 768 F.3d 239
    (2d Cir. 2014).....................................................................................................24

Lavie v. Ran (In re Ran), 607 F.3d 1017 (5th Cir. 2010) ......................................................46

Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.), 714 F.3d 127
    (2d Cir. 2013).............................................................................31, 32, 33, 35

Phoenix Four, Inc. v. Strategic Res. Corp., 446 F. Supp. 2d 205 (S.D.N.Y. 2006)......................29

## STATUTES AND RULES

11 U.S.C. §§ 101 -1532 ("Bankruptcy Code") ..................................................... passim

11 U.S.C. § 101 ........................................................................................... passim

11 U.S.C. § 105 ...............................................................................................1

11 U.S.C. § 109 ...............................................................................................21

11 U.S.C. § 362 .................................................................................1, 45, 47, 49

11 U.S.C. § 1501 ..............................................................................................24

11 U.S.C. § 1502 ........................................................................................ passim

11 U.S.C. § 1504 ..........................................................................................21, 25

11 U.S.C. § 1509 ..........................................................................................21, 25

11 U.S.C. § 1515 ........................................................................................ passim

11 U.S.C. § 1516 ..........................................................................................29, 40

11 U.S.C. § 1517 ........................................................................................ passim

# TABLE OF AUTHORITIES

Page(s)

11 U.S.C. § 1519...................................................................................................1, 4, 47

11 U.S.C. § 1520.......................................................................................................1, 44

11 U.S.C. § 1521....................................................................................................... passim

11 U.S.C. § 1522...........................................................................................1, 47, 48, 49

28 U.S.C. §157....................................................................................................20, 21

28 U.S.C. § 1334.........................................................................................................20

28 U.S.C. § 1410.........................................................................................................21

28 U.S.C. § 1746.......................................................................................................2, 52

Fed. R. Bankr. P. 1007...........................................................................................21, 25

Fed. R. Bankr. P. 7007...............................................................................................25

## MISCELLANEOUS

H. Rep. No. 109-31, pt. 1, 109th Cong., 1st Sess. (2005).................................29, 46, 48

Jay Lawrence Westbrook, Chapter 15 at Last, 79 A.M. BANKR. L.J. 713 (2005).........................30

Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency, U.N. Gen.
Ass., UNCITRAL 30th Sess. U.N. Doc. A/CN.9/442 (1997) .................................................29

I, Andrew Childe (the "Petitioner" or the "Foreign Representative"), in my capacity as the duly-authorized foreign representative of the jointly-administered judicial reorganization (*recuperação judicial* or "RJ") proceeding (the "Brazilian RJ Proceeding") of Serviços de Petróleo Constellation S.A. and its affiliated debtors (the "Debtors") pending in the 1st Business Court of Rio de Janeiro (the "Brazilian RJ Court") pursuant to Federal Law No. 11.101 of February 9, 2005 (the "Brazilian Bankruptcy Law") of the laws of the Federative Republic of Brazil ("Brazil"), by and through my undersigned counsel, respectfully submit this declaration[2] and verified petition (the "Verified Petition") in furtherance of the forms of voluntary petition (the "Forms of Voluntary Petition") [ECF No. 1] filed concurrently herewith, and hereby request that the Court enter an order substantially in the form annexed hereto as Exhibit A (the "Proposed Order") pursuant to sections 1515, 1517, and 1520 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), effecting the following:

a) granting recognition of the Brazilian RJ Proceeding pursuant to section 1517 of the Bankruptcy Code as the "foreign main proceeding" (as defined in section 1502(4) of the Bankruptcy Code) of each of the Debtors, and all relief included therewith as provided in section 1520 of the Bankruptcy Code;[3]

b) recognizing the Petitioner as the "foreign representative" (as defined in section 101(24) of the Bankruptcy Code) of the Brazilian RJ Proceeding for each Debtor for purposes of these Chapter 15 Cases; and

c) granting such other and further relief as the Court deems just and

---

[2] The Petitioner submits this declaration in support of the Verified Petition and in support of the Petitioner's *Motion for Provisional Relief Pursuant to 11 U.S.C. §§ 1519, 1521(a)(7), 105(a), and 362* (the "Motion for Provisional Relief") [ECF No. 5]. The Petitioner's verification with respect to the factual contents of this Verified Petition and the Motion for Provisional Relief, as well as the factual contents of each of the attachments and appendices thereto, is set forth below in the section titled "Verification of Chapter 15 Petition."

[3] Alternatively, should the Court decline to recognize the Brazilian RJ Proceeding as the foreign main proceeding for any of the Debtors, the Petitioner respectfully requests that the Court recognize such proceeding as a foreign nonmain proceeding (as defined in section 1502(5) of the Bankruptcy Code) of any such Debtor, and grant appropriate relief, including pursuant to section 1521(a)(6) of the Bankruptcy Code extending any relief previously granted pursuant to section 1519(a) of the Bankruptcy Code, and finding that the interests of creditors and other interested entities, as well as the interests of the Debtors, are sufficiently protected in accordance with section 1522 of the Bankruptcy Code with respect to such relief.

1

proper.[4]

In support of this request, the Petitioner relies upon and incorporates by reference: (i) the *Declaration of Flavio Galdino Pursuant to 28 U.S.C. § 1746* (the "Brazilian Counsel Declaration") [ECF No. 4]; and (ii) the *Declaration of Samuel P. Hershey* (the "Hershey Declaration") [ECF No. 6], both of which were filed concurrently herewith. In further support of this Verified Petition, the Petitioner respectfully represents to the Court as follows:

## PRELIMINARY STATEMENT

On December 6, 2018 (the "RJ Petition Date"), each of the Debtors and certain affiliates that are not Debtors in these Chapter 15 Cases (together, the "RJ Debtors") filed a joint voluntary RJ petition (the "RJ Petition")[5] with the Brazilian RJ Court under the Brazilian Bankruptcy Law. Also on December 6, the Brazilian RJ Court entered an order formally accepting the RJ Debtors into the Brazilian RJ Proceeding (the "RJ Acceptance Order").[6] The RJ Debtors are presently operating their businesses under the judicial supervision of the Brazilian RJ Court.[7]

Debtor Constellation, together with its direct and indirect majority-owned subsidiaries, including certain non-Debtor entities (collectively, the "Company" or the "Constellation Group"),[8] own, operate, and manage one of the leading oil and gas drilling companies. The Company has its center of main interests in Brazil and operates rigs and drillships primarily in Brazilian waters.

---

[4]    In addition, and in separate motions filed contemporaneously herewith, the Foreign Representative is seeking an order directing the joint administration of these Chapter 15 Cases, and certain interim relief as set forth in the Motion for Provisional Relief.

[5]    A true and correct copy of the RJ Petition and a certified English translation of the RJ Petition are annexed hereto as Exhibit B.

[6]    A copy of the RJ Acceptance Order is attached hereto as Exhibit G; a translation of the same from Portuguese into English is in process and will be submitted to this Court as soon as possible.

[7]    See Brazilian Counsel Decl. ¶ 20 (noting that "the officers and directors of the debtor remain duly authorized to act on the debtor's behalf and to administer its assets and affairs during the RJ, in a manner similar to what my U.S. counterparts inform me is called a 'debtor-in-possession' regime in the United States").

[8]    All references to the "Company" or the "Constellation Group" herein refer to Constellation and its consolidated subsidiaries. References to the "Company" or the "Constellation Group" exclude joint ventures other than those in which the Company is a majority owner.

2

The Company's current financial distress arises from the well-publicized global decline in the international oil and gas sector, as well as the financial crisis that continues to grip Brazil. Its financial woes have recently become unsustainable as long-term charter and service contracts for seven of its eight Offshore Drilling Rigs (as defined below) either have recently expired or are scheduled to expire in the near future. The Company is actively seeking opportunities both in Brazil and abroad for such Offshore Drilling Rigs, and has recently secured contracts for its ultra-deepwater drillships with international oil and gas companies for drilling offshore of Brazil— demonstrating its stature in the industry as a top operator in Brazilian waters. Nonetheless, the offshore drilling market continues to suffer from an oversupply of rigs, and, as a result, short-term dayrates and utilization rates remain depressed. In light of these market conditions, the Company's debts must now be adjusted to allow the Company the time and liquidity needed to weather the current offshore drilling environment, obtain new contracts, and generate the revenue necessary to service its debt.

To address these concerns, the Company began to evaluate its options to restructure its debt and successfully closed an exchange offer with over 80% of its bondholders in 2017. Since that time, the Company has continued to explore further restructuring alternatives with (i) its lenders under its various project financing and working capital facilities, (ii) a group of certain holders holding a majority of its secured corporate bonds, and (iii) the Company's shareholders. Those negotiations culminated in a restructuring term sheet (the "Term Sheet") and Plan Support and Lock-Up Agreement (together with the exhibits, annexes, and schedules attached thereto, including the Term Sheet, the "PSA")[9] that is supported by certain lenders holding at least 97.5% of the combined aggregate outstanding principal amount under the Company's project financings,

---

[9]    A copy of the executed PSA is available at Hershey Declaration, Exhibit A.

3

its unsecured working capital lender (Bradesco (as defined below)), and the Company's shareholders. As discussed in greater detail below, the PSA provides for a comprehensive restructuring of the Company's debt through a pre-negotiated restructuring plan in the Brazilian RJ Proceeding. The transactions contemplated under the PSA are designed to preserve the going-concern value of the Company, provide the Company with ample liquidity to withstand adverse market conditions, and right-size the Company's debt profile.

As described further below, notwithstanding such broad creditor support, the Company remains vulnerable to creditor actions outside of Brazil, including in the United States. Given these risks, the PSA requires, as one of the conditions precedent to the implementation of the restructuring transactions, an order from this Court granting recognition of the Brazilian RJ Proceeding with respect to each of the Debtors. Accordingly, the Foreign Representative commenced these Chapter 15 Cases on December 6, 2018 (the "Chapter 15 Petition Date") to obtain recognition of the Brazilian RJ Proceeding.[10]

Indeed, Brazil is the proper venue for the main restructuring proceeding of the Debtors, as each maintains its center of main interests in that jurisdiction. The Debtors, together with their affiliates, constitute a corporate group that began its operations over 35 years ago in Brazil. Today, the Constellation Group's main operational centers and principal place of revenue-generating activity are still located in Brazil, as over 93% of the Constellation Group's workforce are related to Brazilian-located operations and up to 99% of the Constellation Group's total gross revenues available to repay the Company's debts has been generated from its Brazilian client groups in recent years. Creditors have also always been on notice that the Company could file restructuring

---

[10]   In addition, to protect the Debtors and their assets from adverse creditor actions, one of the "milestones" under the PSA requires an order from this Court granting provisional relief pending recognition of the Brazilian RJ Proceeding pursuant to section 1519 of the Bankruptcy Code within 7 calendar days of the Chapter 15 Petition Date. See PSA § 11.01(p)(viii).

4

proceedings in Brazil due to the Company's ties to that jurisdiction.[11]  For all of these reasons and as described more fully below, the Brazilian RJ Proceeding is the foreign main proceeding of each of the Debtors.

Accordingly, the Petitioner seeks recognition of the Brazilian RJ Proceeding for each of the Debtors and the grant of customary protections in aid of the comprehensive judicial reorganization now underway before the Brazilian RJ Court in the Brazilian RJ Proceeding.

## BACKGROUND

### A.    General Background and History

#### i.    Overview

1.    The Constellation Group originated in Rio de Janeiro, Brazil where Debtor Petróleo Constellation (a Brazilian oil and gas operator) was incorporated in 1980.  Since then, Petróleo Constellation's operations have primarily centered on providing services to the Petrobras group ("Petrobras"), Brazil's semi-public, multinational oil & gas group and the Company's largest client.  Initially providing onshore drilling services to Petrobras in the north of Brazil, the Company expanded to offshore opportunities in the 1990s, and then to ultra-deepwater operations in 2006.

2.    Today, the Company's operational and economic activities remain primarily concentrated in Brazil.  Its tripartite business enterprise consists of (i) offshore drilling, (ii) onshore drilling, and (iii) investments in several joint ventures and associated entities related to the operation of floating production storage and offloading ("FPSO") units.  It has consistently ranked among the safest, highest-performing, and most cost-effective offshore drilling companies

---

[11]    For example, the Exchange Offer Supplement (as defined below) for the 2024 Notes (as defined below) identified Brazil as a possible forum for a restructuring: "it may include . . . Brazil where certain decisions of the Company are made, certain members of the Company's management are located and the location of substantially all of the Company's business is conducted (and, therefore, from which substantially all of the operating revenues that may be available to service the Company's obligations under the [2024] Notes are currently derived)."  Exchange Offer Supplement at S-16; see also infra ¶ 66.

operating in Brazil.  The Company's state-of-the-art and versatile fleet of Offshore Drilling Rigs and Onshore Drilling Rigs (as defined below) was constructed by some of the world's leading shipyards, is one of the largest fleets in Brazil, and is primarily composed of ultra-deepwater Offshore Drilling Rigs, including three ultra-deepwater drillships—the *Brava Star*, the *Amaralina Star*, and the *Laguna Star*—that are capable of drilling to a total depth of 40,000 feet.

3.      In addition to owning a premium fleet of Offshore Drilling Rigs and Onshore Drilling Rigs, and employing a highly experienced management team and other skilled personnel, a number of other competitive advantages have contributed to the Company's success.  For example, its lengthy track record of operating offshore drilling rigs[12] and drillships[13] in remote Brazilian waters makes it one of the few contract drillers that can offer experience in Brazil, economies of scale, and ultra-deepwater drilling expertise.

### ii.    The Company's corporate structure and offices

4.      The Company's corporate structure reflects its history of financings, expansions, strategic investments, and acquisitions, as well as the common corporate strategy of allocating specific tasks to different corporate entities.  The chart below shows, in relevant part, the Company's corporate structure and charts the role of each Debtor and related affiliates in this highly integrated corporate family.

---

[12]    Semi-submersible rigs are floating vessels supported by a submerged or partially submerged ballasting platform system that provides stability and protection against ocean conditions such as waves, winds, and currents.

[13]    Drillships are vessels resembling a typical ship built for deepwater drilling.  They typically carry larger loads than semi-submersible rigs and are self-propelled and highly mobile, making them highly effective for exploratory drilling in remote locations.



As shown above, the Debtors and their key related affiliates are composed of:

a) **The "Onshore Rig Owners"** – Debtors Petróleo Constellation and Snover own the Onshore Drilling Rigs, which are primarily located in Brazil, and Petróleo Constellation employs the majority of the Constellation Group's employees and provides operational services to Constellation Group customers;

b) **The "FPSO Entities"** – Debtor Arazi (the "FPSO Entity Debtor") and RJ Debtor Lancaster Projects Corp. ("Lancaster") participate in the Constellation Group's investments in FPSO units as special-purpose holding and financing companies;

c) **The "Offshore Rig Owners"** – Debtors Alpha Star, Gold Star, Olinda Star, Lone Star, and Star Int'l. (together, the "Offshore Rig Owner Debtors"), as well as RJ Debtors Amaralina Star Ltd. ("Amaralina Star"), Laguna Star Ltd. ("Laguna Star"), and Brava Star Ltd. ("Brava Star"), each own an Offshore Drilling Rig, which it contracts through intercompany charters to an affiliated bareboat charterer entity in the Constellation Group (for further chartering to Constellation Group customers); and

d) **The "Constellation Group SPVs"** – Debtors Constellation and Constellation Overseas (together, the "Constellation Group SPV Debtors") serve the Constellation Group as special-purpose holding and financing companies.

5.    As shown above, the Company is an economically and operationally integrated global group, whose joint operational activities are principally focused on Brazil. Indeed, the

Constellation Group's primary operational activities are in Brazil, as are its primary operational management centers, located in Rio de Janeiro, Brazil (the "Rio Office") and Rio das Ostras (the "Rio das Ostras Office" and, together with the Rio Office, the "Brazilian Offices").  The Rio Office maintains Company staff in charge of operational matters as well as the Constellation Group's legal, human resources, and research and development teams, and the Rio das Ostras Office houses members of the Constellation Group's operations management team.

6.    The Company also maintains operational bases in other locations across Brazil, including Manaus in the state of Amazonas and Nova Mutum in the state of Mato Grosso, each in connection with its onshore drilling segment.  As a global corporate group, the Company has also established offices in international markets, including: (i) London, England, where several members of the Company's senior management team are based;[14] (ii) Luxembourg, where certain executives hold board meetings; (iii) Paraguay, where an operational base is located; and (iv) Panama City, Panama, which office provides treasury and financial services to certain companies in the Constellation Group.  In addition, the Company maintains project offices in India and other locales as part of its focus on strategic markets such as India, West Africa, and the Gulf of Mexico.

7.    The Company employs over 1,200 individuals, with the vast majority (approximately 93%) located in Brazil.  Its strong employee base is essential to preserving operational stability, safety, and efficiency, which, in turn, are necessary to maximize and maintain the value of the Debtors over the course of the Brazilian RJ Proceeding.

**B.    Company Operations and Assets**

8.    The fleet of vessels that the Company owns or in which it holds an ownership

---

[14]    These members of the Company's senior management team are located in London and are employed by Constellation Oil Services UK Ltd., a non-Debtor affiliate organized under the laws of the United Kingdom and wholly-owned by Constellation, which provides consulting and management services to Constellation and its subsidiaries.

interest is comprised of the following:

(a) **Eight offshore rigs and drillships**, including

(1) three ultra-deepwater semi-submersible rigs (the *Alpha Star*, the *Lone Star*, and the *Gold Star*),

(2) one deepwater semi-submersible rig (the *Olinda Star*),

(3) one midwater semi-submersible rig (the *Atlantic Star*), and

(4) three ultra-deepwater drillships (the *Amaralina Star*, the *Laguna Star*, and the *Brava Star*) (such offshore rigs and drillships, collectively, the "Offshore Drilling Rigs");

(b) **Nine onshore rigs** (the *QG-I*, the *QG-II*, the *QG-III*, the *QG-IV*, the *QG-V*, the *QG-VI*, the *QG-VII*, the *QG-VIII*, and the *QG-IX*) (such onshore rigs, collectively, the "Onshore Drilling Rigs"); and

(c) **Five FPSO units** (the *Capixaba*, the *Cidade de Paraty*, the *Cidade de Ilhabela*, the *Cidade de Maricá*, and the *Cidade de Saquarema*) (together, the "JV FPSO Units").

9. The Offshore Drilling Rigs and Onshore Drilling Rigs are the Company's primary operating assets. As discussed in greater detail below, seven of the eight Offshore Drilling Rigs are presently located in Brazil, eight of its nine Onshore Drilling Rigs are located in Brazil, and all of the JV FPSO Units in which it holds an interest are located in Brazil.

10. Unlike some of its competitors, the Company does not rely on third parties to manage its fleet of Offshore Drilling Rigs and Onshore Drilling Rigs. Instead, it provides chartering and operations services on a "dayrate" contract basis to its customers through, respectively, charter agreements (the "Customer Charter Agreements") and corresponding service agreements (the "Customer Service Agreements"), each of which have historically been (and presently are) primarily governed by Brazilian law (the Customer Charter Agreements together with the Customer Service Agreements, the "Customer Contracts").

11.     The Company's current and former clients are typically large oil and gas groups (such as Petrobras, its largest customer), as well as other Brazilian-based and multinational oil and gas companies.

12.     The majority of the Company's revenues presently derive, and have historically derived, from operations and customer groups located in Brazil.  For instance, approximately 99% of the Company's total gross revenue for the years ended December 31, 2016 and December 31, 2017 was derived from Customer Contracts with Petrobras for operations in Brazil.

13.     A more detailed explanation of the Company's three operational segments is provided below.

i.     *Offshore Drilling Rigs and Customer Contracts*

14.     The chart below sets forth the eight Offshore Drilling Rigs alongside their corresponding Offshore Rig Owners, as well as the operational status of the offshore fleet as of the RJ Petition Date:

| Offshore Drilling Rig | Offshore Rig Owner | Customer |
|---|---|---|
| *Olinda Star* | Olinda Star | Under contract with a large multinational corporation for drilling in Indian waters |
| *Amaralina Star* | Amaralina Star | Operations scheduled to commence between December 2018 and January 2019 pursuant to a conditional letter of award entered into with a Brazilian subsidiary of a large multinational corporation |
| *Laguna Star* | Laguna Star | Under contract with a Brazilian oil and gas company (with operations scheduled to commence between November 26, 2018 and June 30, 2019) |
| *Brava Star* | Brava Star | Under contract with a Brazilian subsidiary of a large multinational corporation (with operations scheduled to commence between January 1, 2019 and June 30, 2019) |
| *Alpha Star* | Alpha Star | Not presently under contract |
| *Gold Star* | Gold Star | Not presently under contract |
| *Lone Star* | Lone Star | Not presently under contract |
| *Atlantic Star* | Star Int'l. | Petrobras |

15.    Through Brazilian Debtor Petróleo Constellation, the Company enters into Customer Service Agreements with its customers to operate the chartered Offshore Drilling Rigs, including providing for employees, management services, fuel, supplies, and other services.  With the exception of the *Olinda Star* rig, all Offshore Drilling Rigs have historically been or presently are under contract with Petrobras or other customers located in Brazil, or maintained in shipyards located in Brazil.

16.    In the year prior to the RJ Petition Date, Customer Contracts with Petrobras for several of the Offshore Drilling Rigs expired, including Customer Contracts for the *Gold Star*, *Lone Star*, *Laguna Star*, *Brava Star*, and *Amaralina Star*.  As many of the Customer Contracts with Petrobras have either expired or are scheduled to expire in the near future, the Company has been working diligently to obtain new offshore drilling contracts in Brazil—where it maintains key competitive advantages—as well as in international markets.  Recently, the Company won new Customer Contracts in Brazil for the *Brava Star*, entered into new Customer Contracts in Brazil for the *Laguna Star*, and signed a conditional letter of award for the *Amaralina Star* in Brazil.  The Company is currently one of the drilling contractors with the most experience in Brazil and is registered to participate in opportunities for offshore and onshore drilling units both with Petrobras and several other international oil companies.

*ii.    Onshore Drilling Rigs and Customer Contracts*

17.    The Company's fleet of Onshore Drilling Rigs features five heli-portable rigs and two of the largest onshore rigs in Brazil.  As noted, eight of the Company's nine Onshore Drilling Rigs are located in Brazil, and all of the Onshore Drilling Rigs are either owned by Petróleo Constellation or Snover.  As in its offshore operational segment, the Company charters its Onshore Drilling Rigs to oil and gas customers and provides corresponding operating services.  Given the

present industry focus on ultra-deep water activities, only one of the Company's nine Onshore

Drilling Rigs is currently under contract. The Company is seeking new customers for the

remainder of its onshore fleet.

<em>iii.     FPSO units and FPSO services</em>

18.    In addition to the Offshore Drilling Rigs and Onshore Drilling Rigs, the

Constellation Group also owns investments in five FPSO units with certain strategic partners as

co-investors. The Constellation Group's equity stake related to the operation of the respective JV

FPSO Units ranges from 5 to 20 percent and is held by either Debtor Arazi or RJ Debtor

Lancaster.[15] The Company does not directly enter into third-party customer contracts for the

chartering or the provision of operating services related to the JV FPSO Units, leaving that to the

joint venture entities that own and operate the JV FPSO Units. Debtor Petróleo Constellation,

however, does provide a limited number of employees to the JV FPSO Unit operators. The

Company also generally guarantees obligations owed to Petrobras and/or consortiums led by

Petrobras under the charter and service agreements for the JV FPSO Units, as well as the

obligations of Arazi and Lancaster under shareholders' agreements with the co-investors relating

to the ownership, commissions, and operation of the JV FPSO Units. All of the JV FPSO Units

in which the Company is invested are currently under contract in Brazilian waters with customers

located in Brazil, with the respective charter and service agreements for four of the five JV FPSO

Units expiring between 2033 and 2036 and one expiring in 2022.

**C.    Capital Structure**

<em>i.     The Company's capital stock</em>

---

[15]    Each JV FPSO Unit investment project follows a similar structure under which the Company, directly or indirectly, generally owns equity interests in (i) the joint venture or associated entity that owns the applicable JV FPSO Unit through Debtor Arazi, and (ii) the joint venture or associated entity that serves as the operator for the applicable JV FPSO Unit through RJ Debtor Lancaster.

19.     The Company's controlling shareholder is LUX Oil and Gas International S.à.r.l. ("LuxCo"), an entity organized under the laws of Luxembourg and indirectly wholly-owned by the private equity fund SUN STAR Fundo de Investimento em Participações Multiestratégia Investimento no Exterior ("SUN STAR").  As of the RJ Petition Date, LuxCo owned 74.14% of the total capital stock and 75.10% of the voting stock of Constellation, and various holding companies and limited partnerships that are affiliates of and/or ultimately managed by Capital International, Inc. ("Capital") owned the remaining 25.86% and 24.90% of the Company's total capital and voting stock, respectively.

*ii.     Prepetition debt structure*

20.     As of November 30, 2018, the Company was liable for approximately $1.5 billion in aggregate outstanding third-party financial indebtedness (including accrued interest) under four credit facilities and two bond issuances (together, the "Prepetition Debt"):[16]

(a)     secured syndicated credit facility to finance the *Amaralina Star* and *Laguna Star* drillships (the "A&L Project Loan Facility") with an aggregate principal amount of $943.9 million entered into with various banks and financial parties and governed by New York law, and secured by mortgages over these drillships, assignments of certain receivables, and other collateral;

(b)     secured syndicated credit facility to finance the *Brava Star* drillship (the "Brava Project Loan Facility" and, together with the A&L Project Loan Facility, the "A/L/B Project Financings") with an aggregate principal amount of $475 million entered into with various banks and financial parties and governed by New York law, and secured by a mortgage over the *Brava Star,* assignments of certain receivables, and other collateral;

(c)     6.25% senior unsecured notes due November 2019 (the "2019 Notes") issued by Constellation in an aggregate principal amount

---

[16]     In addition to these credit facilities and bond issuances, the Company also has additional obligations under certain bid and/or performance bonds, and letters of credit, including obligations to Bradesco (as defined below) for two standby letters of credit issued by Bradesco in the aggregate principal amount of $30.2 million (which amounts remain undrawn as of the RJ Petition Date), by order and for the account of Constellation Overseas, on behalf of RJ Debtors Brava Star and Laguna Star, respectively, under reimbursement agreements, as amended and/or restated from time to time (such obligations, collectively, the "Bradesco L/C Obligations").

outstanding of $95,432,000 under a New York law-governed indenture;[17]

(d)  9.00% Cash / 0.500% PIK senior secured notes due 2024 (the "2024 Notes") issued by Constellation in an aggregate principal amount outstanding of $604,568,000 under a New York law-governed indenture, and secured by mortgages over certain of the Offshore Drilling Rigs, pledges on certain accounts, and other collateral;[18] and

(e)  two unsecured working capital facilities under which Banco Bradesco S.A., Grand Cayman Branch ("Bradesco") made available advances in principal amount of up to $150 million (the "Bradesco I Working Capital Facility") and $75 million (the "Bradesco II Working Capital Facility" and, together with the Bradesco I Working Capital Facility, the "Bradesco Working Capital Facilities"), respectively, and which are governed by New York law.

21.    The following approximate amounts (including accrued interest) remained outstanding under the Prepetition Debt as of November 30, 2018:

| Prepetition Debt Issuance | Amount Outstanding |
|---|---|
| A&L Project Loan Facility (*Amaralina Star* tranches) | $128.9 million |
| A&L Project Loan Facility (*Laguna Star* tranches) | $133.1 million |
| Brava Project Loan Facility | $334.9 million |
| 2024 Notes | $639.3 million |
| 2019 Notes | $98.8 million |
| Bradesco Working Capital Facilities | $152.6 million |
| **TOTAL:** | **$1.49 billion** |

---

[17]    Deutsche Bank Trust Company Americas (the "2019 Notes Trustee") serves as trustee, paying agent, transfer agent, and registrar for the 2019 Notes. Prior to the Exchange Offer (defined below), the principal amount of the 2019 Notes totaled $700 million.

[18]    Wilmington Trust, National Association (the "2024 Notes Trustee" and, together with the 2019 Notes Trustee, the "Notes Trustees") serves as trustee, paying agent, transfer agent, and registrar for the 2024 Notes.

22.     Additionally, the Debtors have operating debts owed to employees and trade creditors, most of whom are located in Brazil, which are generally subject to the Brazilian RJ Proceeding, as well as certain intercompany debt obligations (as the Company is a financially integrated enterprise).

### D.     Events Precipitating Commencement of the Brazilian RJ Proceeding

#### i.     *Cyclical decline in the drilling industry and the Brazilian financial crisis*

23.     The Company's financial distress is attributable in large part to the cyclical nature of the deepwater drilling market, which, following a boom in oil and gas prices in the early years of this decade, entered a sustained down cycle and witnessed a number of major bankruptcies in the sector.  In 2012, the price of a barrel of oil had risen to over $125, expanding access to credit for oil and gas companies.  During this time, the Company, along with much of the industry, experienced tremendous growth and incurred new debt obligations to expand its operations and investments, including the A/L/B Project Financings to finance the acquisition of the *Amaralina Star*, *Laguna Star*, and *Brava Star* drillships.

24.     As has been well documented, oil prices began to decline rapidly in mid-2014, eventually reaching less than $30 per barrel in early 2016.  As a consequence, exploration and production companies reduced their capital spending, yielding an oversupply in the offshore rig industry and a corresponding decrease in dayrates and revenues generated from them.  Reduced revenues in turn damaged creditworthiness and restricted access to the credit markets for oil and gas companies.

25.     At roughly the same time as oil prices began plummeting, the Brazilian economy entered a recession.  A recent combination of political instability, record governmental budget deficits, and a contracting economy has chilled foreign investment in Brazil and frozen the

15

Brazilian capital markets. With seven of the Company's eight Offshore Drilling Rigs either no longer contracted by or soon to come off contract with Petrobras, the Company has been forced to compete with its peers amid an ever-tightening market for new work.

<em>ii.    Negotiations with stakeholders and the PSA</em>

26.    As a consequence of these operational and financial constraints, the Company began in 2017 to evaluate options for right-sizing its debt profile. In Spring 2017, the Company offered the holders of 2019 Notes new unsecured notes with essentially the same terms as the 2019 Notes (except for increases in maturity and coupon rate). Thereafter, certain of the holders of 2019 Notes formed an ad hoc group (the "2019 Group") seeking better terms for the note exchange. After multiple rounds of negotiations, the 2019 Group agreed in June 2017 to support and participate in an exchange offer (the "Exchange Offer") for all of the Company's outstanding 2019 Notes for newly-issued 2024 Notes. Through the Exchange Offer, which closed in July 2017, Constellation exchanged 86.4% of the Company's 2019 Notes for an equal aggregate principal amount of the 2024 Notes. Significantly, in exchange for their support, the 2019 Group negotiated for material concessions from the Company, including, without limitation, liens on many of the Constellation Group's assets, guaranties from additional entities, tighter bond covenants, and a higher coupon rate.[19] Thus, the terms of the 2024 Notes vastly improved the credit position and priority for the participants in the Exchange Offer.

27.    Unfortunately, the maturity extensions achieved by the Exchange Offer were not sufficient to solve all of the Company's financial issues. Thus, thereafter and through the months leading up to the commencement of the Brazilian RJ Proceeding, the Company sought to obtain a

---

[19]    Relevant excerpts from the Exchange Offer Memorandum and Consent Solicitation Statement dated April 3, 2017 (the "Exchange Offer Memorandum") and the Supplement to the Exchange Offer Memorandum and Consent Solicitation Statement dated June 28, 2017 (the "Exchange Offer Supplement") are attached as Exhibit E.

comprehensive restructuring of its debt obligations.  To that end, the Company and its advisors engaged in good faith, arms'-length negotiations with its key creditors, including Bradesco and the lenders under the A/L/B Project Financings (collectively, the "A/L/B Lenders").

28.    The Company and a substantial majority of the A/L/B Lenders reached a restructuring agreement in principle at the end of September 2018, the terms of which were then memorialized in the PSA.  These terms include, among others, such A/L/B Lenders' agreement to escrow amortization and cash sweep payments made in August and September, and to re-lend those amounts upon implementation of the restructuring transactions.  To ensure the Company has sufficient liquidity during the Brazilian RJ Proceeding,[20] to fund the maintenance of the A/L/B Lenders' collateral, certain A/L/B Lenders have agreed that during the Brazilian RJ Proceeding the Company may access and use cash held in accounts that are pledged to the A/L/B Lenders and comprise their cash collateral.[21]  Additionally, to provide the necessary runway to negotiate and execute the PSA, these A/L/B Lenders also agreed to extend the maturities under the A/L/B facilities ultimately until December 8, 2018.

29.    In parallel, since November of 2017, the Company also engaged in negotiations with Bradesco.  During the course of these discussions, on two separate occasions, the parties agreed to amendments postponing amortization payments originally due in early 2018, each for a period of three months to allow the Company greater flexibility to negotiate with its other

---

[20]    The Company's operations are heavily dependent on substantial ongoing expenditures, such as payments to its employees and service provides, which are necessary to ensure the safe operation, maintenance, and preservation of its Drilling Rigs. In summary, the Company's operations require various transactions in the ordinary course of business, such as payments to vendors of goods and services related to the operation and maintenance of the Offshore Drilling Rigs and Onshore Drilling Rigs, including specialized equipment, fuel, and maintenance services, as well as transactions related to the "stacking" of idle Offshore Drilling Rigs and Onshore Drilling Rigs, rig crewing, shared management services, payroll, benefits, and posting of bid and performance bonds.  The Company's ability to sustain its business operations and, thereby, its value as a going concern, requires sufficient liquidity to satisfy these and other ongoing expenditures.

[21]    See PSA §§ 4.01(a)(vii), 4.02; Exhibit B to the PSA.  The relevant cash collateral accounts are owned by certain RJ Debtors and non-Debtor affiliates in the Constellation Group, who are not currently seeking chapter 15 recognition at this time.

stakeholders.  Bradesco later agreed to extend the final maturity payments under the Bradesco

Working Capital Facilities on several additional occasions, in exchange for consideration

including guarantees[22] and grants of collateral,[23] thus extending the final maturity dates so that

they were coterminous with the maturities of the A/L/B Project Financings (i.e., ultimately,

December 8, 2018).  The Company reached a restructuring agreement in principle with Bradesco

in early October 2018, pursuant to which, among other conditions, Bradesco agreed to provide a

$15 million letter of credit to be utilized in the event of a liquidity shortfall.

30.     At the same time, the Company also engaged in discussions and negotiations with

certain holders who now hold a majority of the 2024 Notes (the "Ad Hoc Group") and their legal

and financial advisors.  To that end, the Company entered into multiple non-disclosure agreements

and even a short-term forbearance agreement with the Ad Hoc Group to facilitate the negotiation

of a mutually agreeable restructuring.  Such discussions with the Ad Hoc Group will continue

during the Brazilian RJ Proceeding.

31.     On November 29, 2018, the PSA was agreed and executed between the Company,

certain A/L/B Lenders holding at least 97.5% of the combined aggregate outstanding principal

amount under the A/L/B Project Financings (collectively, the "Consenting A/L/B Lenders"),

Bradesco, and the Company's shareholders, which include LuxCo and Capital as investment

manager for and on behalf of certain funds it manages.  Subject to the terms and conditions of the

PSA, the Consenting A/L/B Lenders have agreed to re-lend approximately $39 million in funds

that were escrowed in August and September of 2018, Bradesco has agreed to provide a $15

---

[22]     Constellation became a guarantor of the obligations of Constellation Overseas under the Bradesco Working Capital Facilities on July 31, 2018.

[23]     In connection with the extensions of the maturity dates under the Bradesco Working Capital Facilities, the Company granted security to Bradesco over certain collateral encumbered by existing security interests—the assets encumbered to secure the obligations under the 2024 Notes—to secure the Bradesco L/C Obligations on a first-lien, pari passu basis with the 2024 Notes.

million letter of credit, and the shareholders have agreed to invest $27 million of new money at closing, all to ensure the Company has ample liquidity to survive a prolonged downturn in the market post-restructuring.  Accordingly, the Company entered the Brazilian RJ Proceeding with a pre-negotiated restructuring deal and will seek approval of a reorganization plan consistent with the terms of the PSA in Brazil.  Additionally, given the risks to the Debtors and their assets in the United States, the PSA requires, as one of the conditions precedent to the implementation of the restructuring transactions, an order from this Court granting recognition of the Brazilian RJ Proceeding with respect to each of the Debtors.[24]

### E.    Connections to the United States

32.    The Debtors have a number of connections to the United States.  First, all of the principal documents setting forth the Debtors' Prepetition Debt obligations are governed by New York law and generally contemplate New York as a venue for disputes.[25]  Second, the Debtors have cash in U.S. bank accounts (collectively, the "U.S. Bank Accounts") principally located in Manhattan, New York.  The Debtors' U.S. Bank Accounts are part of an integrated cash management system with well-established mechanisms for the collection, concentration, management, and disbursement of Company funds.  Finally, in addition to holdings in the U.S. Bank Accounts, the Company maintains approximately $50,000 in a client trust account at White

---

[24]    Moreover, to protect the Debtors' U.S. assets from adverse creditor actions, one of the "milestones" under the PSA requires an order from this Court granting the relief sought in the Motion for Provisional Relief within 7 calendar days of the Chapter 15 Petition Date.  See PSA § 11.01(p)(viii).  The Debtors must satisfy this and other milestones or else a "Termination Right Triggering Event" will occur.  Id. §§ 11.01(p)(i)-(viii).  The occurrence of a Termination Right Triggering Event has two negative consequences.  First, either a majority of the Consenting A/L/B Lenders or Bradesco will have the right to terminate the PSA and withdraw their support from the Debtors' restructuring.  Id.  Second, the occurrence of a Termination Right Triggering Event will cut off the Debtors' right to access and use certain funds that are the A/L/B Lenders' cash collateral, see supra ¶ 28 & n.21—even if the PSA is not terminated.  See Exhibit B to the PSA §§ 2.02; 4(a).  Specifically, the Constellation Group's right to use or receive certain funds that are the A/L/B Lenders' cash collateral will be suspended upon a Termination Right Triggering Event unless and until such suspension is waived by the written consent of a majority of the Consenting A/L/B Lenders.  See id.  Thus, the failure to obtain such relief is potentially harmful to the Debtors and their restructuring.

[25]    Additionally, a majority of the Debtors have consented in various debt documents to the jurisdiction and venue of federal courts in the state of New York.

19

& Case LLP (the "Escrow Account") in New York, including sums of $1,000 in separate sub-accounts in the names of each of the Debtors.

## JURISDICTION, ELIGIBILITY AND VENUE

33.     This Court has jurisdiction to consider the Verified Petition pursuant to sections 157 and 1334 of title 28 of the United States Code, as well as the Amended Standing Order of Reference dated January 31, 2012, Reference M-431, In re Standing Order of Reference Re: Title 11, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.) (the "Amended Standing Order").

34.     These Chapter 15 Cases have been properly commenced with respect to each of the Debtors in accordance with sections 1504 and 1509(a) of the Bankruptcy Code by the filing of the Verified Petition.   This is a core proceeding pursuant to section 157(b)(2)(P) of title 28 of the United States Code.

35.     Venue is proper in this Court pursuant to section 1410(1) of title 28 of the United States Code, as the principal U.S. assets of each of the Debtors (including cash amounts maintained in the Escrow Account, with individual sub-accounts in the name of each Debtor, each containing $1,000.00) are located within New York County and thus within this District.

36.     The presence of assets within the United States renders the Debtors eligible to file these Chapter 15 Cases pursuant to section 109(a) of the Bankruptcy Code.   See In re Suntech Power Holdings Co, 520 B.R. 399, 411 (Bankr. S.D.N.Y. 2014); Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet), 737 F.3d 238, 247-51 (2d Cir. 2013) (applying section 109(a)'s local property requirement to chapter 15 cases).[26]

## REQUIRED DISCLOSURES

---

[26]     See also In re Avanti Commc'ns Grp. PLC, 582 B.R. 603, 611 (Bankr. S.D.N.Y. 2018) (finding that the "property in the United States" requirement of section 109(a) is satisfied by a New York law-governed indenture); In re Berau Capital Res. PTE Ltd., 540 B.R. 80, 84 (Bankr. S.D.N.Y. 2015) (same).

37.     The Petitioner hereby provides the following disclosures in accordance with Rule

1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"):

- the following disclosure identifies for the Court any corporation, other than a governmental unit, that directly or indirectly owns 10% or more of any class of each of the Debtors' equity interests:

  a.  74.14% of Constellation's equity is directly owned by LuxCo.

  b.  100% of LuxCo's equity is directly owned by SUN STAR.

  c.  11.05% of Constellation's equity is indirectly owned by Capital International Private Equity Fund V, L.P.

  d.  100% of Arazi's equity is directly owned by Constellation.

  e.  100% of Constellation Overseas's equity is directly owned by Constellation Star GmbH.

  f.  100% of Constellation Star GmbH's equity is directly owned by Constellation.

  g.  100% of Lone Star's equity is owned by Constellation Overseas.

  h.  100% of Gold Star's equity is owned by Constellation Overseas.

  i.  100% of Olinda Star's equity is owned by Constellation Overseas.

  j.  100% of Snover's equity is owned by Constellation Overseas.

  k.  100% of Alpha Star's equity is owned by Constellation Overseas.

  l.  100% of Petróleo Constellation's equity is owned by Serviços de Petróleo Constellation Participações S.A.

  m.  99.99% of Serviços de Petróleo Constellation Participações S.A.'s equity is owned by Constellation Overseas.

  n.  100% of Star Int'l.'s equity is owned by Hopelake Services Ltd.

  o.  100% of Hopelake Services Ltd.'s equity is owned by Constellation Overseas.

- Other than the Verified Petition, none of the Debtors has a pending petition with this Court for relief under any chapter of the Bankruptcy Code.

- The Brazilian RJ Proceeding is the only foreign proceeding, as that term is defined in section 101(23) of the Bankruptcy Code, of the Debtors presently open at the time of commencement of these Chapter 15 Cases, however, certain of the Debtors may commence additional foreign proceedings in support of the Brazilian RJ Proceeding, and updates will be provided to this Court with respect to any such proceedings.

- Aside from the Petitioner with respect to these Chapter 15 Cases (and Galdino & Coelho

21

Advogados ("G&C")  with respect to the Brazilian RJ Proceeding),[27] no other persons are presently authorized to administer foreign proceedings of the Debtors at this time.

- Debtor Constellation Overseas is presently engaged in an arbitration proceeding administered by the International Chamber of Commerce (ICC) in New York against Alperton Capital Ltd. ("Alperton"), Alperton's current shareholders and guarantors, and Alperton's former shareholders, in a dispute regarding the shareholders' agreements for RJ Debtors Amaralina Star and Laguna Star.[28]  As of the date of the filing of the Verified Petition, the Petitioner in not aware of any other pending litigation involving the Debtors in the United States.

- In conjunction with this Verified Petition, the Petitioner is also seeking provisional relief in the Motion for Provisional Relief against the entities listed on Exhibit B to the *Ex Parte Motion to Shorten Notice and Setting Procedures for Hearing to Consider Motion for Provisional Relief* [ECF No. 9] submitted substantially contemporaneously herewith.

## BASIS FOR RELIEF

38.     The Court should grant the Verified Petition and recognize the Brazilian RJ Proceeding as the foreign main proceeding for each of the Debtors.  Each of the procedural requirements of section 1515 of the Bankruptcy Code are satisfied, as is set out in section A below.  Notably, the Petitioner is the duly appointed "foreign representative" of the Brazilian RJ Proceeding with respect to each of the Debtors, and it is well-established that Brazilian RJ proceedings are considered "foreign proceedings" for the purposes of chapter 15.  Further, the center of main interests for each of the Debtors is clearly in Brazil.  Brazil is presently the situs of substantially all of the Company's core tangible assets—its Offshore Drilling Rigs and Onshore Drilling Rigs—just as Brazil is the primary source of revenue generation for the Company.  Brazil is also currently where 93% of the Company's workforce is employed and where the Company's primary operational management centers are located.

39.     A finding that each of the Debtors' center of main interests is located in Brazil also

---

[27]     In addition to appointing the Foreign Representative, each of the Debtors also authorized G&C with a power of attorney to file and take actions in the RJ on its behalf.  The address of G&C is set forth in the Notice List (as defined below).

[28]     The names and addresses of the parties to the litigation and the addresses of each are set forth in the Notice List.

aligns with the expectations of creditors under the terms of the Company's Prepetition Debt.

Further, from a pragmatic perspective, Brazil is the sole jurisdiction in which the Debtors'

businesses can be comprehensively and efficiently restructured—a restructuring effort on which

the jobs of over 1200 individuals depend.  Indeed, the very purpose of chapter 15 is to incorporate

the Model Law on Cross-Border Insolvency (1997) (the "Model Law") "to provide effective

mechanisms for dealing with cases of cross-border insolvency."[29]  This case is a paradigmatic

example of a global enterprise that requires chapter 15 relief to facilitate a logical and efficient

coordination of restructuring efforts.[30]  The rational hub of those turnaround efforts is Brazil—the

Company's principal operational center and where the Company's restructuring process is

pending.  See supra ¶¶ 26-31.

40.    Further, and in the alternative, if this Court declines to recognize the Brazilian RJ

Proceeding as the foreign main proceeding of any of the Debtors, those Debtors are eligible for

non-main recognition and relief, on the basis set out in section C below, to ensure a comprehensive

restructuring of the Company.

**A.    The Brazilian RJ Proceeding is a Foreign Proceeding of each of the Debtors
and the Petitioner is the Duly-Authorized Foreign Representative thereof
and has Properly Petitioned This Court for Recognition**

41.    Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing,

the Court shall enter an order recognizing a foreign proceeding if (i) the petition meets the

requirements of section 1515 of the Bankruptcy Code, (ii) the foreign representative applying for

recognition is a person or body, and (iii) such foreign proceeding is a foreign main proceeding or

---

[29]    11 U.S.C. § 1501(a); In re Pro-Fit Holdings Ltd., 391 B.R. 850, 857 (Bankr. C.D. Cal. 2008); see also Krys v. Farnum
Place, LLC (In re Fairfield Sentry Ltd.), 768 F.3d 239, 245 (2d Cir. 2014); In re British Am. Ins. Co., 425 B.R. 884, 899
(Bankr. S.D. Fla. 2010).

nonmain proceeding within the meaning of section 1502 of the Bankruptcy Code.  See 11 U.S.C. § 1517(a); In re Oversight & Control Comm'n of Avánzit, S.A., 385 B.R. 525, 532 (Bankr. S.D.N.Y. 2008).  These foregoing requirements are satisfied with respect to the Brazilian RJ Proceeding, the Petitioner, and the Verified Petition with respect to each of the Debtors.

> i.    *The Verified Petition satisfies the requirements of section 1515*

42.    Each of the procedural requirements of section 1515 of the Bankruptcy Code are satisfied.  First, the Petitioner properly commenced these Chapter 15 Cases with respect to each of the Debtors in accordance with sections 1504 and 1509(a) by filing the Verified Petition under section 1515.  See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122, 127 (Bankr. S.D.N.Y. 2007) (hereinafter "Bear Stearns I"), aff'd, 389 B.R. 325 (S.D.N.Y. 2008) (hereinafter "Bear Stearns II").  Second, the Petitioner has submitted all documents and other information required by section 1515(b) regarding the Brazilian RJ Proceeding and the appointment of the Petitioner as foreign representative thereof with respect to each of the Debtors for purposes of these Chapter 15 Cases, together with English translations of the same where applicable, as required by section 1515(d).[31]  Finally, the Petitioner has submitted in this Verified Petition all information required by section 1515(c) (i.e., a statement by the Petitioner regarding any other foreign proceedings with respect to each of the Debtors), together with all other required disclosures regarding each of the Debtors in accordance with Bankruptcy Rules 1007(a)(4) and 7007.1.  See supra ¶ 37.

> ii.   *The Petitioner is the duly-appointed "foreign representative" of the Brazilian RJ Proceeding for each of the Debtors*

---

[31]    See Exhibits B and D (together containing true and correct copies of the RJ Petition (and a certified English translation of the RJ Petition), and the Resolutions (as defined below in the section titled "Verification of Chapter 15 Petition") authorizing the commencement of the Brazilian RJ Proceeding and these Chapter 15 Cases, and authorizing and appointing the Petitioner to file the Verified Petition and act as the foreign representative with respect to each of the Debtors for purposes of these Chapter 15 Cases); Exhibit G (the RJ Acceptance Order).

43.    Section 1517(a) of the Bankruptcy Code also requires that a foreign representative applying for recognition be a person or body.  See 11 U.S.C. § 1517(a)(2).  Here, the Petitioner is an individual, which is included in the term "person," 11 U.S.C. § 101(41), who, with respect to each of the Debtors and pursuant to the Resolutions has been duly (i) appointed to act as the foreign representative of the Brazilian RJ Proceeding for such Debtor for purposes of these Chapter 15 Cases and (ii) authorized to commence these Chapter 15 Cases with respect to such Debtor.  As explained in the Brazilian Counsel Declaration, the Brazilian Bankruptcy Law authorizes the Debtors to administer the reorganization of their assets and affairs.  Brazilian Counsel Decl. ¶ 20.  Each of the Debtors appointed the Petitioner in conjunction with the commencement of the Brazilian RJ Proceeding for such Debtor, and thus sections 101(24) and 1517(a)(2) of the Bankruptcy Code are satisfied.  See Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief, In re Oi S.A., Case No. 16-11791 (SHL) (Bankr. S.D.N.Y. July 22, 2016), ECF No. 38; In re OAS S.A., 533 B.R. 83, 93-95 (Bankr. S.D.N.Y 2015) (holding that the Bankruptcy Code does not require the judicial authorization or appointment of the foreign representative).[32]

### iii.    The Brazilian RJ Proceeding is a foreign proceeding

44.    The Brazilian RJ Proceeding is a "foreign proceeding" with respect to each of the Debtors, as required under section 1517(a).  See 11 U.S.C. § 1517(a)(1) (requiring that as a condition to the entry of a recognition order, the Brazilian RJ Proceeding must be a foreign main proceeding or nonmain proceeding within the meaning of section 1502 of the Bankruptcy Code).

---

[32]    See also Ad Hoc Group of Vitro Noteholders v. Vitro, S.A.B., de C.V. (In re Vitro, S.A.B. de C.V.), 470 B.R. 408 (Bankr. N.D. Tex. 2012), aff'd, 701 F.3d 1031 (5th Cir. 2012) (holding that an individual appointed as foreign representative by the debtor's board in anticipation of a Mexican concurso proceeding, which contemplates self-management during the proceeding similar to that of a debtor-in-possession, fit within the scope of the Bankruptcy Code's definition of "foreign representative," and recognizing the individual as the foreign representative).

Section 101(23) defines a "foreign proceeding" as (1) a collective judicial or administrative proceeding under a law relating to insolvency or adjustment of debt, (2) pending in a foreign country, (3) in which the assets and affairs of the debtor are subject to control or supervision of a foreign court, and (4) for the purpose of reorganization or liquidation. See 11 U.S.C. § 101(23). The Bankruptcy Code defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding." 11 U.S.C. § 1502(3). The Brazilian RJ Proceeding meets this definition.

45.    First, as discussed in the Brazilian Counsel Declaration, the Brazilian RJ Proceeding is a "collective" proceeding in that it involves the treatment of multiple creditors and claims together rather than attempting to resolve two-party disputes. See Brazilian Counsel Decl. ¶ 7. An RJ restructuring plan, as contemplated by the Brazilian Bankruptcy Law, is intended to directly or indirectly benefit all creditors collectively rather than to benefit any single creditor alone. Id. ¶¶ 22, 39-42.

46.    Second, the Brazilian RJ Proceeding is a proceeding pending in a foreign country (Brazil) under a law relating to adjustment of debt. As noted above, on December 6, 2018, the RJ Debtors filed their joint RJ Petition and the Brazilian RJ Court entered the RJ Acceptance Order.

47.    Third, the assets and affairs of the Debtors are subject to the control and supervision of a foreign court (the Brazilian RJ Court) for the purpose of reorganization. See id. ¶ 7. Additionally, for a plan of reorganization to become effective, it must be approved by the Brazilian RJ Court, which also retains jurisdiction to enforce such plan, including by specific performance. Id. ¶¶ 33-34.

48.    Accordingly, it is unsurprising that every U.S. bankruptcy court to consider the question, including this Court, has found that restructuring proceedings under the Brazilian

Bankruptcy Law (and other Brazilian restructuring laws) constitute "foreign proceedings."  See, e.g., In re Oi S.A., Case No. 16-11791 (SHL) (Bankr. S.D.N.Y. July 22, 2016), ECF No. 38; In re OAS S.A., 533 B.R. at 83; In re Aralco S.A. Indústria e Comércio, et al., No. 15-10419 (REG) (Bankr. S.D.N.Y. Apr. 21, 2015), ECF No. 22.  The same conclusion applies here.

B.    **The Court Should Find that the Brazilian RJ Proceeding Is a "Foreign Main Proceeding" with Respect to Each of the Debtors**

49.    The Brazilian RJ Proceeding is also the "foreign main proceeding" of each Debtor because it is pending in Brazil, which is each Debtor's center of main interests ("COMI").  See 11 U.S.C. § 1502(4); 11 U.S.C. § 1517(b)(1) (a foreign main proceeding is the foreign proceeding subject to the petition "pending in the country where the debtor has the center of its main interests").

i.    *A COMI analysis under U.S. law focuses on where a debtor's business interests are principally centered*

50.    Neither the Bankruptcy Code nor the Model Law defines COMI.  Although the Bankruptcy Code establishes a presumption that a debtor's COMI is its "registered office,"[33] see 11 U.S.C. § 1516(c), the legislative history makes clear that this presumption is rebuttable.  H. Rep. No. 109-31, Pt. 1, at 113.  This Court once observed that:

> This presumption "permits and encourages fast action in cases where speed may be essential, while leaving the debtor's true 'center' open to dispute in cases where the facts are more doubtful." . . . This presumption is not a preferred alternative where there is a separation between a corporation's jurisdiction of incorporation and its real seat. . . . "[T]he Model Law and Chapter 15 give limited weight to the presumption of jurisdiction of incorporation as the COMI."

---

[33]    "'Registered office' is the term used in the Model Law to refer to the place of incorporation or the equivalent for an entity that is not a natural person."  H. Rep. No. 109-31, Pt. 1, 109th Cong., 1st Sess. 112-13 (2005) (citing Guide to Enactment of the UNCITRAL MODEL LAW on Cross-Border Insolvency, at 36, U.N. Gen. Ass., UNCITRAL 30th Sess. U.N. Doc. A/CN.9/442 (1997) (the "Model Law Guide")).

Bear Stearns I, 374 B.R. at 128 (internal citations omitted) (emphasis added); see also In re Tri-Cont'l Exch. Ltd., 349 B.R. 627, 635 (Bankr. E.D. Cal. 2006) (similar view).  Thus, where any "evidence to the contrary" is presented, the presumption has no role to play.  Collins v. Oilsands Quest, Inc., 484 B.R. 593, 595 (S.D.N.Y. 2012).

51.    As such, courts view COMI as a concept rooted in substance over form—the debtor's "real seat," as this Court has found.  See Bear Stearns I, 374 B.R. at 128, 130.  In short, a COMI analysis inquires as to the debtor's substantive "locus of operations"—the center of its operations, purpose, function, and activities, among others.  See Phoenix Four, Inc. v. Strategic Res. Corp., 446 F. Supp. 2d 205, 214-15 (S.D.N.Y. 2006) (internal citations and quotations omitted).  U.S. case law notes that this COMI analysis should be performed on an entity-by-entity basis.  See In re Oi Brasil Holdings Cooperatief U.A., 578 B.R. 169, 206 (Bankr. S.D.N.Y. 2017) (noting that the chapter 15 regime "require[s] COMI inquiries for each debtor entity rather than for collective corporate groups").  However, the Court should still take into account a debtor's integration into and function within an integrated corporate group, particularly where the debtor is a special-purpose vehicle ("SPV") and/or has no function independent from that of its group.  See OAS S.A., 533 B.R. at 101-02 (COMI analysis for a foreign SPV included consideration of its participation in a larger corporate group).

52.    Many courts interpret COMI to mean "principal place of business."  See In re Fairfield Sentry Ltd., No. 10 Civ. 7311 (GBD), 2011 U.S. Dist. LEXIS 105770 at *10 (S.D.N.Y. Sept. 15, 2011) ("A debtor's COMI has also been equated with the concept of a 'principal place of business.'") (citing Bear Stearns I, 374 B.R. at 129).  Indeed, courts and commentators have agreed that Congress could have invoked the same substantive inquiry with "principal place of business," but instead chose to leave unamended the "COMI" phrasing only to keep its statutory

28

text strictly uniform with the Model Law.  See In re Millennium Glob. Emerging Credit Master Fund Ltd., 458 B.R. 63, 72-73 (Bankr. S.D.N.Y 2011) ("Chapter 15 was drafted to follow the Model Law as closely as possible, with the idea of encouraging other countries to do the same . . ." (quoting In re Tri-Cont'l Exch. Ltd., 349 B.R. 627, 633 (Bankr. E.D. Cal. 2006))); Jay Lawrence Westbrook, Chapter 15 at Last, 79 A.M. BANKR. L.J. 713, 719-20 (2005) (quoted by Tri-Cont'l, 349 B.R. at 633).  It is therefore unsurprising that courts have used the terms "center of main interests" and "principal place of business" interchangeably.  Millennium Glob., 458 B.R. at 72 (citing In re Basis Yield Alpha Fund (Master), 381 B.R. 37, 48 (Bankr. S.D.N.Y. 2008)) (internal quotations omitted).

53.    Thus, many courts inquire first and foremost as to the place in which a debtor actually does business (i.e., the location of its economic activities) when determining its COMI. Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.), 714 F.3d 127, 130 (2d Cir. 2013) ("The relevant principle . . . is that the COMI lies where the debtor conducts its regular business."); In re Creative Fin., Ltd. (In Liquidation), 543 B.R. 498 at 499, 517 (Bankr. S.D.N.Y. 2016); see British Am., 425 B.R. 844, 913-14 (Bankr. S.D. Fla. 2010) (rephrasing COMI as "the hub of the debtor's business" and finding that the debtor's COMI did not lie in its jurisdiction of incorporation because the debtor "simply did not do business" there).  This analysis must sensibly be tailored depending on the nature of the debtor and the type of business in which it engages.  British Am., 425 B.R. at 911 (activity relevant to a COMI determination "depend[s] on the nature of the debtor's business," e.g., where "[a debtor] operated as an insurance company, actuarial tasks, underwriting, and claims adjustment should be considered").

54.    Courts in this Circuit have developed a list of factors a court may consider when determining a debtor's COMI where the "registered office" presumption does not govern.  These

factors include:

> "[T]he location of the debtor's headquarters; the location of those who actually manage the debtor (which conceivably could be the headquarters of a holding company); the location of the majority of the debtor's creditors or a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes." . . . [the] "principal place of business" . . . [and] the expectations of third parties [as to the] debtor's COMI.

Fairfield Sentry, 2011 U.S. Dist. LEXIS 105770 at *10 (citing Bear Stearns II, 389 B.R. at 336);

In re SPhinX, LTD., 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006); British Am., 425 B.R. at 720).

The Second Circuit added as additional possible factors "the location of headquarters, decision-

makers, assets, creditors, and the law applicable to most disputes." Fairfield Sentry, 714 F.3d at

130. These factors, the Second Circuit reasoned, are "in the public domain" and thus

"ascertainable and not easily subject to tactical removal." Id. at 136-38 (noting the "importance

of factors that indicate regularity and ascertainability"); see also British Am., 425 B.R. at 912

(finding that the "location of a debtor's COMI should be readily ascertainable by third parties").

55.    While each of the Fairfield Sentry factors serves as a "helpful guide" in assessing

a debtor's COMI, they are not exclusive, nor is any one factor required or dispositive. See Fairfield

Sentry, 714 F.3d at 137 (noting that "[c]onsideration of these specific factors is neither required

nor dispositive" and warning against a mechanical application of the factors). The factors should

be applied in light of pragmatic considerations for the "maximization of the debtor's value" and

"the reasonable interests of parties in interest," as well as creditors' support for or acquiescence to

a proposed COMI "because their money is ultimately at stake." SPhinX, 351 B.R. at 117.

56.    In determining which jurisdiction is best suited to house the main restructuring

proceeding of a debtor, a court should consider which country is most involved in the debtor's

commercial activities. In re Tien Chiang, 437 B.R. 397, 403 (Bankr. C.D. Cal. 2010) ("The

international insolvency legal regime is based on the assumption that every international entity has

a home . . ..  That country has the greatest interest in the status of the debtor and in the outcome of

the insolvency case.  That country has also the greatest interest in the debtor because that country

provides the legal regime that governs much of the debtor's commercial activities in most cases,

including many matters unrelated to insolvency law.").  Lastly, when performing a COMI analysis,

the court need not identify a particular place within a jurisdiction, e.g., a given identified office or

corporate headquarters, but only the jurisdiction generally in which the debtor's business interests

are principally centered.  Id. at 399 n.3 ("For the purposes of international bankruptcy law, it is

necessary only to determine the country where a debtor's [COMI] is located. Where it may be

located within a country is not important for these purposes.").

> ii.    *A COMI analysis for SPVs serving a larger corporate group is specially
> tailored*

57.    As noted above, courts in this district generally look at the <u>Fairfield Sentry</u> factors

to guide the analysis in determining the location of a debtor's COMI, "but consideration of [such]

specific factors is neither required nor dispositive." <u>Fairfield Sentry</u>, 714 F.3d at 137.  Indeed, the

Second Circuit instructs that the COMI analysis is a flexible one, given that Congress, in declining

to provide a definition "for a term that is not self-defining," left the text "open-ended, and invite[d]

development by courts, depending on [the] facts presented, without prescription or limitation." <u>Id.</u>

at 138.  As such, and consistent with a flexible and pragmatic approach to recognition, U.S. courts

have tailored their COMI analyses varyingly across a wide range of facts and circumstances.  When

determining the location of COMI for an SPV that is integrated with and exists only in the context

of a larger corporate group, such as a holding or financing entity, courts focus the COMI analysis

on those particular considerations most indicative of this specialized entity's "real seat." <u>See</u> <u>Bear</u>

<u>Stearns I</u>, 374 B.R. at 128.

58.    <u>First</u>, when considering the COMI of an SPV integrated with a larger corporate group, such as a holding company or financing entity, the court typically begins with a query into the SPV's role within and integration to the larger corporate group.  See <u>OAS S.A.</u>, 533 B.R. at 101 (observing that the Austrian SPV "had no other business except to pay [the notes] off," and adding that "the Brazilian [b]ankruptcy [p]roceedings provide the only realistic chance to repay [those] [n]otes"); <u>see also</u> <u>Oi Brasil</u>, 578 B.R. at 226-227 (stating that the Dutch SPV's COMI lay in Brazil where the SPVs had "no operations or business independent of the Oi [g]roup and [were] operated within the Oi [g]roup as part of a single, integrated economic unit . . .").

59.    SPVs may be considered substantially integrated for the purposes of a COMI analysis in the following situations: (i) when they have no direct employees or directly own no operational assets, as in the case of specialized holding or financing companies; (ii) where they belong to and exist only with reference to a larger corporate group with integrated operations, customers, corporate teams, marketing, research, development, strategy, human resource management, and administrative activities; and/or (iii) where the group is financially integrated and interdependent as a result of intercompany loans and cross-company guarantees.  See <u>id.</u> at 227 (finding that the COMI of a Dutch SPV lay in Brazil with its corporate group where it was "managed from the principal executive office of Oi in Rio de Janeiro, Brazil with every aspect of the Oi [g]roup's operations, finances, corporate management, employee management and payroll, and short and long-term strategic planning directed from Brazil").

60.    Even where foreign SPVs maintain registered offices in, have directors living in, hold board meetings in, and are individually directed from their jurisdictions of organization, courts have still considered the entity's corporate reality as a part in a larger, more complex organization.  See <u>id.</u> at 177 (concluding that the Dutch SPV in question had its COMI in Brazil

even though it "file[d] financial statements with the Dutch Chamber of Commerce. . . pa[id] taxes in the Netherlands. . . file[d] tax returns with Dutch authorities in the Netherlands. . . ha[d] retained various professionals and advisors in the Netherlands. . ." and had an employee in the Netherlands); see also OAS S.A., 533 B.R. at 101 (stating that while the Austrian SPV's registered office was located in Austria and the SPV satisfied the "services required under Austrian law," the SPV had no other business beyond borrowing and lending and thus its COMI lay in Brazil with that of its corporate group).

61.    Second, courts evaluating the COMI of an SPV focus special attention on the expectations of the debtor's creditors.  While creditor expectations can factor in to a COMI analysis for all debtors—see Fairfield Sentry, 714 F.3d at 130, 137—they are particularly significant for financing SPVs.  For example, in both Oi Brasil and OAS, the investors in the bonds issued by the SPV entities were advised in the offering memoranda and/or debt documentation that the entities had substantial connections in Brazil and thus, the creditors assumed the risks of investing in a Brazilian enterprise.  Oi Brasil, 578 B.R. at 228-29 (finding that the offering materials and indentures for the notes issued by the Dutch SPV made clear that "any chance of repayment stems from the revenue-producing operations in Brazil"); OAS, 533 B.R. at 103 (noting that purchasers of the notes issued by the Austrian SPV "expected to receive repayment from the cash generated by the operations of the [corporate group], and in the event of a default, might ultimately have to enforce their rights in a Brazilian bankruptcy proceeding").

      iii.    *Substantial evidence across the Constellation Group structure shows that each of the Debtors has its COMI in Brazil*

62.    Each of the Debtors in these Chapter 15 Cases has its center of main interests in Brazil.  The vast majority of the Debtors' operations have historically taken place and remain in Brazil, are performed primarily in Brazil by Brazilian-citizen employees of Brazilian Debtor

Petróleo Constellation, and derive revenues primarily from Petrobras, the Brazilian oil and gas group, as well as other customers located in Brazil, under contracts primarily governed by Brazilian law.  Although the foreign-incorporated Debtors maintain their registered offices outside of Brazil, the registered-office COMI presumption is easily rebutted and should be afforded no weight given the substantial evidence to the contrary.  See supra ¶¶ 1-18, 50.

63.    While the Constellation Group has expanded its operations in recent years to other jurisdictions, its principal economic activity—the operation of rigs and drillships—has been and continues to be in Brazil.  To be sure, each of the foreign-incorporated Debtors has a presence and complies with corporate, tax, and other laws in its jurisdiction of incorporation, but such presence does not outweigh the substantial evidence that the COMI of these Debtors is in Brazil.  See supra ¶¶ 1-18, 50, 57-61.  For instance, the Rio Office coordinates the operational management of the Constellation Group with staff in charge of operations-related finances, employees, investor relations, research, development, and marketing.  These activities speak to the existence of a shared, centralized COMI for all of the Debtors as a part of their fully integrated, shared activities.  See British Am., 425 B.R. at 911 (the location of business functions such as "financial, administrative, marketing, information technology, investment, and legal functions" speak to the location of COMI).  Moreover, day-to-day activities centered in the Rio das Ostras Office further support a finding of COMI in Brazil, notwithstanding that the boards of directors of the foreign-incorporated Debtors may meet and make decisions outside of Brazil.  Id. at 912 (noting that "[w]hile a corporate entity is overseen by a board of directors, in larger organizations the day to day management typically is undertaken by others," and finding that COMI lay not with the board of directors in the jurisdiction of incorporation, but with the location of the debtor's "day to day activity" and "primary business function[]").  The existence of multiple coordinating centers at

different places within Brazil lends substantial support to a finding of COMI in that country.  See supra ¶ 56.

64.     Additionally, as noted above, what constitutes the business operations of each Debtor, and accordingly the principal place of those business operations, depends on the type of business operations in which that Debtor engages.  British Am., 425 B.R. at 911.  Here, all of the business functions of the foreign-incorporated Debtors support the Debtors' Brazilian operations, further tying those Debtors to group and their shared COMI in Brazil.  For example, the foreign-incorporated Offshore Rig Owner Debtors, whose business is to hold rigs and drillships principally located in Brazilian waters and operated as part of a primarily Brazilian business for primarily Brazilian customers, serve a function that is inextricable from the Debtors' Brazilian-centered operations.

65.     As special-purpose holding and/or financing entities, the Constellation Group SPV Debtors should be carefully considered under the U.S.-law COMI analysis.  See supra ¶¶ 57-61. Although differing in corporate structure and global strategy, the Constellation Group SPV Debtors, like their counterparts in the Oi and OAS cases, warrant a tailored COMI analysis under the prevailing U.S. case law.  That is because each such SPV is "part of, and inseparable from, [its corporate] group in Brazil."  OAS, 533 B.R. at 103.  Each serves the Constellation Group in the capacity of a holding company and/or financing company, and each is dependent on the Constellation Group to pay back its creditors.  Moreover, none of these entities runs its own operations completely independent of those of the Constellation Group.  As such, most of the traditional factors courts rely on to identify a debtor's COMI are inapplicable to these entities.  See id. at 101; see also Oi Brasil, 578 B.R. at 225-32.

66.     With respect to these Constellation Group SPV Debtors and indeed for all the

Debtors, all obligations to creditors derive their creditworthiness and expectations of repayment

from revenue earned largely in Brazil from Brazilian client groups.  This fact was made abundantly

clear in the disclosures relating to the 2019 Notes and the 2024 Notes (together, the "Notes"):[34]

(1)    **2019 Notes**:  Bondholders of the 2019 Notes were informed in the November 5, 2012 offering memorandum (the "2019 Notes OM") that:

(a)    the Company is "a market leading Brazilian-controlled provider of offshore oil and gas contract drilling and FPSO services in Brazil."  2019 Notes OM at 1.

(b)    the Constellation Group has a "long-term track record in Brazil and [] relationship with Petrobras."  Id.

(c)    the Constellation Group has the ability to "capture a significant share of the growing offshore services opportunity in Brazil."  Id.

(d)    2019 Notes OM "Risk Factors" include the following:

(i)    "Gross revenue from Petrobras represented approximately 93% of [the Constellation Group's] total gross revenue" and "most of [the Constellation Group's] existing rigs are chartered to Petrobras" and Petrobras's failure to renew or award new contracts would have a "material adverse effect" on the Constellation Group.  Id. at 15.

(ii)   "We are a holding company that depends on dividend distributions from our operating subsidiaries."  Id. at 17.

(iii)  "The operation of our rigs requires several authorizations from Brazilian government agencies" which is a "complex, time-consuming process" and failure to obtain such authorizations would have a "material adverse effect on our results of operations . . ."  Id. at 22.

(iv)   "[T]he issuer is a holding company, and all of its assets are held by its direct and indirect subsidiaries.  Repayment of our indebtedness, including the notes, is dependent on the generation of cash flow by our subsidiaries and their ability to make available to us . . . in the event that we do not receive distributions from our subsidiaries, we may be unable to make required payments on our own indebtedness, including the notes."  Id. at 25.

(e)    The 2019 Notes OM also contains a section specifically titled "Risks

---

[34]    Excerpts from the Notes documentation cited herein are attached as Exhibit E.

Relating to Brazil" noting that because "all of our operations and customers are located in Brazil," the Constellation Group's "financial condition and results of operations are substantially dependent on Brazil's economy." Id. at 24. Notably, the 2019 Notes OM did not contain a section warning of risks relating to any specific jurisdiction other than Brazil.

(2)    **2024 Notes**: As noted, Constellation completed the Exchange Offer in 2017. The Exchange Offer Memorandum and the Exchange Offer Supplement reiterated much the same information found in the 2019 Notes OM, describing the Company in precisely the same terms and highlighting the very same risks noted above, including:

(a)    "The issuer is a holding company with no independent operations or assets and it is dependent on cash flow generated by its subsidiaries." Exchange Offer Memorandum at 34.

(b)    "As of December 31, 2016, we had a total of 1,885 employees, 99% of which were Brazilian nationals." Id. at 4.

(c)    "The Company holds investments in subsidiaries that charter and operate onshore and offshore drilling rigs and drillships for exploration and production entities operating mainly in Brazil. The [Constellation] Group currently charters onshore and offshore drilling rigs and drillships mainly to [Petrobras]." Id. at F-81.

67.    Indeed the Exchange Offer Supplement explicitly explained to investors that restructuring proceedings could be commenced in Brazil due to the Company's significant ties there, stating:

[I]n the event that we do experience financial difficulty, it is not possible to predict with certainty in which jurisdiction insolvency proceedings would be commenced or the outcome of such proceedings, but it may include, among other jurisdictions, Brazil, where certain decisions of the Company are made, certain members of the Company's management are located and the location of substantially all of the Company's business is conducted (and, therefore, from which substantially all of the operating revenues that may be available to service the Company's obligations under the [2024 Notes] are currently derived).

Exchange Offer Supplement at S-16.

68.    In sum, purchasers of the notes understood and knew that they were investing in a Brazilian-centered enterprise and that their returns would derive from operations principally taking

37

place in Brazil.

69.     Furthermore, there can be little doubt that the laws and regulations of Brazil primarily govern most of the Debtors' operations, and it is the jurisdiction with the greatest interest in the Debtors' restructuring.   The Debtors' onshore and offshore businesses, as well as the operation of the JV FPSO Units in which the Company is invested, largely take place in Brazil and are largely subject to Brazilian maritime, employment, environmental, and other legal and regulatory regimes.   The Customer Contracts are primarily governed by Brazilian law and their services are provided primarily in the Brazilian market to Petrobras, a Brazilian-controlled corporate group, as well as other clients located in Brazil.   For this reason, Brazil is the COMI of each of the Debtors and the proper home for their main restructuring proceeding.   As the Tien Chiang court noted, the jurisdiction best suited to housing a debtor's main restructuring is the "country [with] the greatest interest in the status of the debtor and in the outcome of the insolvency case," and with "the greatest interest in the debtor because that country provides the legal regime that governs much of the debtor's commercial activities in most cases, including many matters unrelated to insolvency law," such as the regime "giving sanction to [the debtor's] contracts and other commercial activities."  437 B.R. at 403-04.

> iv.     *Entity-specific factors also show that each of the Debtors has its COMI in Brazil*

### a)     *The Onshore Rig Owners*

70.     Petróleo Constellation is an entity organized under the laws of Brazil with its registered office at the Rio Office in Rio de Janeiro, Brazil and thus benefits from the presumption that its COMI lies in Brazil.[35]   See 11 U.S.C. § 1516(c); See supra ¶ 50.   A substance-over-form

---

[35]     A copy of Petróleo Constellation's registration certificate, along with a certified translation of the same from Portuguese to English, is annexed hereto as Exhibit C.

38

analysis yields the same result.  Petróleo Constellation serves the role of primary operator for the Constellation Group and participates in all three of the Constellation Group's business segments— onshore, offshore, and FPSO investments.  In the Constellation Group's offshore drilling business segment, it operates the Offshore Drilling Rigs (most of which are located in Brazilian waters), employs the majority of the Constellation Group's employees (most of whom are Brazilian and located in Brazil), and serves as the counterparty on the largely Brazilian law-governed Customer Service Agreements for the Offshore Drilling Rigs.  In the Constellation Group's onshore drilling business segment, Petróleo Constellation owns several of the Onshore Drilling Rigs, and in most cases has historically served as the operator for the Company's Onshore Drilling Rigs (most of which are located in Brazil) through Customer Contracts.  Finally, it participates in FPSO operations, including by providing a limited number of employees to JV FPSO Unit operators to be staffed on the JV FPSO Units in which the Constellation Group is invested.

71.    Snover was formed under the laws of the British Virgin Islands ("BVI") and performs activities in the BVI to comply with corporate and other applicable BVI laws and regulations, including the maintenance of its registered office in Tortola, BVI.  The evidence of a COMI in Brazil, however, is ample to rebut the presumption that COMI lies in the jurisdiction of incorporation.  Snover is a fully integrated participant in the Constellation Group's onshore drilling operations—operations that take place in Brazil, utilize Brazilian employees, and are accordingly subject to certain Brazilian legal and regulatory regimes.  Snover's creditors (holders of the 2024 Notes) were advised that their investment was an investment in Brazil.  See supra ¶¶ 66-68.  Its assets, consisting of Onshore Drilling Rigs, are all geographically located in Brazil, and its revenues ultimately derive from operations with primarily Brazilian customers[36] under Customer

---

[36]    See supra ¶¶ 9-12, 17.

Contracts which historically have been primarily governed by Brazilian law. Snover's principal place of operations is therefore in Brazil, and so is its COMI.

### b) *The FPSO Entity Debtor*

72.     FPSO Entity Debtor Arazi serves the Constellation Group's FPSO segment by holding the Company's equity interests in joint ventures and associated entities that own and operate the JV FPSO Units. Arazi is incorporated under the laws of Luxembourg and conducts activities in its jurisdiction of incorporation, including maintaining a registered office, in compliance with applicable law. There can be no doubt that the COMI of Arazi lies in Brazil, however. All of the JV FPSO Units themselves are presently chartered in Brazilian waters to Petrobras (or consortiums led by Petrobras) pursuant to contracts governed by Brazilian law. The primary tangible assets in which Arazi invests are located in Brazil and under contract with Brazilian customer groups, and revenues are therefore mainly derived from Brazil. Further, Arazi, like all of the other Debtors, utilizes and benefits from the operational coordinating activities of the Brazilian Offices, as well as utilizing employee services from Debtor Petróleo Constellation. The COMI of Arazi therefore lies in Brazil.

### c) *The Offshore Rig Owner Debtors*

73.     As discussed, each of the Offshore Rig Owner Debtors primarily exists to serve the Constellation Group's offshore drilling business by owning an Offshore Drilling Rig and ultimately chartering the same for the Constellation Group's customers. See supra ¶¶ 4, 9-12, 14. They also provide financing support for Constellation Group indebtedness by serving as primary obligors, guarantors, and/or grantors throughout much of the Company's prepetition capital structure. Each of the Offshore Rig Owner Debtors is organized under the laws of either the BVI (Lone Star, Gold Star, Olinda Star, and Alpha Star) or the Cayman Islands (Star Int'l.). All of the

Offshore Rig Owner Debtors maintain their registered offices in their jurisdictions of organization and conduct activities within those jurisdictions in compliance with applicable laws and regulations.

74.     As with the other foreign-incorporated debtors, evidence of a COMI in Brazil outweighs the registered office presumption.  First, the Offshore Rig Owner Debtors' operations are focused primarily in Brazil, where the majority of their assets (that is, the Offshore Drilling Rigs) are presently located and operated, the majority of employees who work on those Offshore Drilling Rigs are based, and their main revenue is earned.  With the exception of the *Olinda Star* rig, which is presently contracted to operate in India to an Indian company, all Offshore Drilling Rigs are now either operating in Brazilian waters under Brazilian-law contracts with Petrobras or with other customer groups located in Brazil, are in the process of completing operations in Brazil, or are being maintained in shipyards located in Brazil.  The *Olinda Star*'s engagement in India is a recent change; previously, it operated in Brazilian waters with Brazilian contract counterparties, alongside the other Offshore Drilling Rigs.  Additionally, the operational functions of the Offshore Drilling Rigs are coordinated through the Brazilian Offices.  Supra ¶ 5.  The Constellation Group's shared use of these "hubs" speak strongly to a COMI in Brazil.  See British Am., 425 B.R. at 911, 913-14 (rephrasing COMI as the "hub of the debtor's business" and noting that that debtor's administrative hub contributed to location of COMI).

### d)     *Constellation Group SPV Debtors*

75.     Although Constellation (Luxembourg) and Constellation Overseas (BVI) each has a presence in and complies with corporate, tax, and other laws in its jurisdiction of incorporation, their function in the Constellation Group is to own equity interests in other subsidiaries in the Constellation Group and engage in those activities necessary for borrowing and guaranteeing debt,

41

in each case in service of their roles as members of the Constellation Group. Constellation Overseas serves the further role of providing centralized treasury and financial services for certain companies in the Constellation Group. These active services, however, are conducted out of the Company's Panamanian office by employees of Constellation Panama Corp., a non-Debtor subsidiary organized under the laws of Panama and wholly-owned by Constellation Overseas.

76.     Each of Constellation and Constellation Overseas maintains its registered office in its jurisdiction of incorporation and performs other activities in compliance with applicable law and regulations. For example, the board members of Constellation meet at its registered office in Luxembourg. Given the specialized nature of these entities, however, the COMI presumption is easily rebutted and most of the traditional factors courts consider when assessing COMI are inapplicable. See supra ¶¶ 57-61.

77.     Each of the Constellation Group SPV Debtors is fully integrated into the Constellation Group. Each is part of an integrated drilling enterprise that is principally located in Brazil. Each benefits from the coordinated group-wide activities that take place in the Brazilian Offices. Each could not feasibly be restructured along with its affiliates in any centralized forum other than the Brazilian RJ Proceeding.

78.     Additionally, the creditors of each Constellation Group SPV Debtor have always been fully on notice that their investments would be repaid with revenues earned largely in Brazil from operations largely subject to Brazilian legal and regulatory regimes. As detailed above, the Exchange Offer Memorandum and other documentation related to the Notes provide ample evidence of objective creditor expectations that their obligors maintain a COMI in Brazil. See supra ¶¶ 66-68.

79.     Thus, for all of the foregoing reasons, the COMI of the Constellation Group SPV

Debtors lies squarely in Brazil with the rest of their corporate group.

*        *        *

80.     For all of the reasons set forth above, the Petitioner respectfully submits that all of the requirements of section 1517(a) have been satisfied.  Thus, the entry of an order recognizing the Brazilian RJ Proceeding as the foreign main proceeding of each of the Debtors is proper, and, accordingly, each of the Debtors is entitled to all of the relief provided under section 1520 of the Bankruptcy Code.

**C.     In the Alternative, the Court Should Find that the Brazilian RJ Proceeding is at Least a Foreign Nonmain Proceeding of each of the Debtors and Grant Discretionary Relief**

81.     As demonstrated above, the Brazilian RJ Proceeding should be recognized as the "foreign main proceeding" of each of the Debtors.  Nevertheless, should this Court conclude that the Brazilian RJ Proceeding is not the foreign main proceeding of any of the Debtors, the Foreign Representative submits that, in the alternative, the Brazilian RJ Proceeding should be recognized as a "foreign nonmain proceeding" within the meaning of section 1502(5) for any such Debtors pursuant to section 1517(b)(2) of the Bankruptcy Code, and that discretionary relief should be granted, namely, the application of a protective stay to the full extent set forth in section 362 with respect to any such Debtors and their U.S.-located property.  11 U.S.C. §§ 1517(b)(2), 1521(a)(6).

<em>i.     The contextual and flexible factors for recognition of foreign nonmain proceedings under U.S. law</em>

82.     Courts will recognize a foreign proceeding as a "foreign nonmain proceeding" if "the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending."  11 U.S.C. § 1517(b)(2).  Unlike COMI, chapter 15 provides no evidentiary presumption as to whether a debtor has an establishment in a particular jurisdiction. Bear Stearns II, 389 B.R. at 338.  Thus, whether an establishment exists in a particular location is

43

"essentially a factual question," id. at 338, and the petitioner bears the burden of proof.  British

Am., 425 B.R. at 915.   Importantly, section 1502 of the Bankruptcy Code defines an

"establishment" as "any place of operations where the debtor carries out a nontransitory economic

activity."  11 U.S.C. § 1502(2).

83.     The Bankruptcy Code does not define "nontransitory economic activity," and, as

this Court has noted, "[t]here is relatively little U.S. authority construing the term 'establishment'

as it is used in chapter 15."  Millennium Glob., 458 B.R. at 84.  Indeed, "[n]either [c]hapter 15 nor

its legislative history explain what it means for a debtor to have 'any place of operations' or to

have 'been carrying on a nontransitory economic activity' in a location."  Lavie v. Ran (In re Ran),

607 F.3d 1017, 1027 (5th Cir. 2010) (citing H. Rep. No. 109-31, Pt. 1, at 107).

84.     Accordingly, U.S. courts have interpreted the meaning of "establishment" in the

context of the purpose of chapter 15 and the Model Law, and by looking to the meaning ascribed

to such term by foreign courts.  See, e.g., Millennium Glob., 458 B.R. at 84 n.49; Bear Stearns I,

374 B.R. at 131 n.12.  The limited number of U.S. courts to consider the question have determined

a debtor has an "establishment" in a place where it has operations, conducts business, or otherwise

carries out a nontransitory economic activity in that jurisdiction.  See, e.g., Fairfield Sentry, 2011

U.S. Dist. LEXIS 105770 at *29-30 n.8 (describing an establishment as "a local place of

business"); Bear Stearns I, 374 B.R. at 131; Creative Fin., 543 B.R. at 520; British Am., 425 B.R.

at 916.  Several factors "contribute to identifying an establishment: the economic impact of the

debtor's operations on the market, the maintenance of a 'minimum level of organization' for a

period of time, and the objective appearance to creditors whether the debtor has a local presence."

Millennium Glob., 458 B.R. at 85.  A showing of economic impact of the debtor's activities on the

local market involves a "showing of a local effect on the marketplace," Creative Fin., 543 B.R. at

520; British Am., 425 B.R. at 915 (same), evidenced by, among other things, "engagement of local counsel and commitment of capital to local banks." Millennium Glob., 458 B.R. at 85.

> ii.    Each of the Debtors has an establishment in Brazil and therefore qualifies
> for foreign nonmain recognition

85.    In this case, even if the Court were to find that Brazil is not the COMI for any of the Debtors, the Court should still find that such Debtor has an establishment in Brazil for purposes of chapter 15 recognition.  The Petitioner submits that the foregoing evidence in support of finding that the COMI of each of the Debtors is in Brazil also provides sufficient evidence that each of the Debtors has an impact on the Brazilian marketplace and therefore maintains an establishment in that jurisdiction.

> iii.    The Court should grant the discretionary relief requested for any Debtor
> granted nonmain recognition

86.    Should the Court find that the Brazilian RJ Proceeding is a nonmain proceeding with respect to any of the Debtors, then the Petitioner requests that the Court grant discretionary relief with respect to such Debtor and its U.S.-located property pursuant to section 1521 of the Bankruptcy Code.  Specifically, the Petitioner requests that any protective relief that is the subject of the Motion for Provisional Relief be extended pursuant to section 1521(a)(6) of the Bankruptcy Code,[37] including the continued application of the section 362 stay with respect to any such Debtor and its property within the territorial jurisdiction of the United States.[38]  See 11 U.S.C. 1521(a)(6);

---

[37]    Section 1521(a) provides that, upon recognition of a foreign main proceeding or nonmain proceeding and at the request of the foreign representative, a court may grant (with exceptions not here relevant) "any appropriate relief" necessary to effectuate the purpose of chapter 15 and to protect the assets of the debtor or the interests of the creditors, including "extending relief granted under section 1519(a)." 11 U.S.C. § 1521(a)(6). Even if this Court does recognize the Brazilian RJ Proceeding as a foreign nonmain proceeding with respect to any of the Debtors, section 1521 relief is available where "the relief relates to assets that, under the law of the United States, should be administered in the foreign nonmain proceeding or concerns information required in that proceeding." 11 U.S.C. § 1521(c).

[38]    Notably, the Petitioner is entitled to the continued application of the protective stay even if the Court were to recognize the Brazilian RJ Proceeding as a foreign nonmain proceeding with respect to any of the Debtors because "chapter [15] gives the bankruptcy court the ability grant substantially the same types of relief in assistance of foreign nonmain proceedings as main proceedings." SPhinX, 351 B.R. at 116.

45

Motion for Provisional Relief ¶ 13.  The Petitioner submits that the foregoing evidence concerning the Debtors and their integral role within the Constellation Group justifies such discretionary relief which is critical for the maintenance of the status quo and the preservation of the Debtors' going-concern value.

87.    To exercise its discretionary powers under section 1521, the Court must ensure that "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected."  11 U.S.C. § 1522(a) (adopting Article 22 of the Model Law).  Relief under section 1521 will not be permitted if "it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors."  H. Rep. No. 109-31, Pt. 1, at 116.  A determination of sufficient protection requires a balancing of the respective parties' interests.  CT Inv. Mgmt. Co. v. Cozumel Caribe, S.A. de C.V., 482 B.R. 96, 108 (Bankr. S.D.N.Y. 2012); see In re Toft, 453 B.R. 186, 196 n.11 (Bankr. S.D.N.Y. 2011) ("[A] court should tailor relief balancing the interest of the foreign representative and those affected by the relief.").[39]

88.    Here, the balance of interests weighs in favor of granting the relief requested.  First, recognition and the application of the stay will allow for the efficient and orderly administration of the Debtors' assets and affairs in a centralized, organized proceeding, thus protecting the interests of creditors and maximizing the value of assets through ensuring their equitable distribution and preventing certain opportunistic creditors from circumventing the Brazilian RJ

---

[39]    The analysis of whether the relief sought provides sufficient protection requires a balancing of the interests of the debtor and other affected parties to ensure that the relief does not "impinge excessively on any one entity's interests" and that "each entity must receive at least some protection."  See Jaffe v. Samsung Elecs. Co., 737 F.3d 14, 27-28 (4th Cir. 2013) ("The analysis required by § 1522(a) is . . . best done by balancing the respective interests based on the relative harms and benefits in light of the circumstances presented, thus inherently calling for application of a balancing test").  Importantly, courts recognize that interests of the various parties are often at odds with one another and "protection of one side might well come at some expense to the other."  Id., 737 F.3d at 27.  A balancing test requires the court to consider "the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law."  In re Artimm, S.r.l., 335 B.R. 149, 160 (Bankr. C.D. Cal. 2005).

Proceeding and commencing actions in the United States at the expense of the broader process.

89.    Furthermore, interested parties will have the ability to participate in the Brazilian RJ Proceeding and assert their claims therein along with all similarly situated creditors.  As set forth more fully below and in the Brazilian Counsel Declaration, the Brazilian RJ Proceeding affords significant procedural protections to creditors and other stakeholders to ensure a fair and equitable process by providing many of the same procedural safeguards present in chapter 11 of the Bankruptcy Code.  See Brazilian Counsel Decl. ¶¶ 21, 39-47.  The stay will not bar or otherwise disenfranchise parties from participating in the Brazilian RJ Proceeding, where each creditor's right to be heard will remain unaffected.  Nor will the requested stay preclude a creditor that feels unduly burdened by the Court's grant of the requested relief to seek to lift the stay for "cause." See generally 11 U.S.C. § 362(d).  Instead, the Petitioner merely seeks to prevent creditors from attempting to end-run the Brazilian RJ Proceeding.  Accordingly, any prejudice to creditors caused by the discretionary relief requested is extremely limited.

90.    In contrast, failure to grant the discretionary relief requested will cause tremendous harm to the Debtors and their stakeholders.  As detailed more fully in the Petitioner's Motion for Provisional Relief, absent relief, the Debtors are at risk to adverse creditor action which could threaten their ability to continue as a going concern.[40]  Accordingly, the balance between the minimal harm to those seeking to bring adverse actions against the Debtors, and the potential harm to the Debtors and the orderly administration of the Debtors' assets, tips in favor of granting the

---

[40]    For example, absent the application of a protective stay, there is a risk that certain of these creditors may seek to attach, setoff, or otherwise seize funds in the U.S. Bank Accounts in New York state court.  If the discretionary relief is not granted and the Debtors are forced to face the risk of adverse creditor action, they could lose access to such funds.  Given the already limited revenues available to satisfy the Company's ongoing expenditures, the Debtors' U.S. Bank Accounts should be protected from adverse creditor actions and be available for use in the ordinary course.  Moreover, forcing the Debtors to defend themselves and their assets in litigation in numerous forums would unnecessarily deplete resources available for distribution to creditors, as well as distract the Company and its management from the more important task at hand: the implementation of the plan of reorganization through the Brazilian RJ Proceeding.

discretionary relief requested.[41]

91.     Finally, section 1521(e) provides that the standards, procedures and limitations of an injunction apply to relief sought inter alia under section 1521(a)(6).  11 U.S.C. § 1521(e).  The Petitioner has demonstrated in detail in the Motion for Provisional Relief that it meets the requirements for injunctive relief.  See Motion for Provisional Relief ¶¶ 20-33.

## NOTICE

92.     Notice of the Verified Petition has been provided to the parties (the "Notice Parties") set forth in Exhibit F annexed hereto (the "Notice List").  The Petitioner respectfully submits that no other or further notice is required.

## NO PRIOR REQUEST

93.     No previous request for the relief requested herein has been made to this or any other court.

## CONCLUSION

94.     WHEREFORE, the Petitioner respectfully requests that the Court:  (i) grant the Verified Petition and enter the Proposed Order annexed hereto as Exhibit A recognizing the Brazilian RJ Proceeding as the foreign main proceeding for each of the Debtors and granting the requested relief in connection therewith; and (ii) grant such other and further relief as the Court deems just and proper.

---

[41]     Further, the Petitioner demonstrated in detail in the Motion for Provisional Relief that all parties in interest will be sufficiently protected in the Court's grant of the discretionary relief requested.  See Motion for Provisional Relief ¶¶ 34-35.

Dated:  December 6, 2018
New York, New York

Respectfully submitted,

WHITE & CASE LLP

By:    */s/ John K. Cunningham*
        John K. Cunningham

WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020-1095
(212) 819-8200
John K. Cunningham
Thomas E. MacWright
Philip M. Abelson

Southeast Financial Center, Suite 4900
200 S. Biscayne Boulevard
Miami, Florida 33131-2352
(305) 371-2700
Richard S. Kebrdle (*pro hac vice pending*)
Laura L. Femino (*pro hac vice pending*)

*Attorneys for Andrew Childe, as Petitioner and Foreign
Representative*

## VERIFICATION OF CHAPTER 15 PETITION

Pursuant to 28 U.S.C. § 1746, I, Andrew Childe, declare as follows:

I am the authorized foreign representative of each of the Debtors with respect to the Brazilian RJ Proceeding for purposes of these Chapter 15 Cases. I declare under penalty of perjury that the factual contents of the foregoing Verified Petition and the Motion for Provisional Relief, as well as the factual contents of each of the attachments and appendices thereto, are true and accurate to the best of my knowledge, information and belief, and I respectfully represent as follows:

- I am a qualified accountant with the Institute of Chartered Accountants in England and Wales and a qualified insolvency practitioner in the Cayman Islands. I have had extensive experience managing complex cross-border litigation involving a wide range of assets and jurisdictions. I am currently a director and owner of FFP (Cayman) Limited ("FFP") in the Cayman Islands, where I specialize in providing independent board level governance and dispute resolution advice, as well as acting as a court-appointed and voluntary liquidator. The insolvency engagements that I lead often involve foreign recognition in the U.S. and around the world, and many of my director mandates have involved complex financial debt restructurings.

- Prior to joining FFP, I qualified with PricewaterhouseCoopers in the United Kingdom where I worked in the restructuring and corporate finance market, and was involved in several significant retail and banking restructurings including Northern Rock and Lehman Brothers. Accordingly, I have extensive experience across multiple jurisdictions with a range of assets and companies.

- On December 5, 2018, each of the Debtors, among other things, (i) appointed me as the foreign representative of the Brazilian RJ Proceeding for such Debtor and authorized me to file the Verified Petition and to act on its behalf in these Chapter 15 Cases (each, a "Resolution of Appointment"), and (ii) authorized the commencement of the Brazilian RJ Proceeding and these Chapter 15 Cases with respect to such Debtor (all such resolutions and other authorizations or consents, collectively, together with the Resolutions of Appointment, the "Resolutions").[42] Accordingly, I am fully authorized

---

[42] Copies of the Resolutions authorizing the commencement of the Brazilian RJ Proceeding and these Chapter 15 Cases and authorizing and appointing me to file the Verified Petition and act as the foreign representative with respect to each of the Debtors are annexed hereto as Exhibit D.

and take related action as the Foreign Representative.

Unless otherwise indicated, all facts set forth in this Verified Petition are based upon: (a) my review of relevant information, data and documents (including oral information) furnished to me by the Company (as defined below) and its legal advisors; (b) information supplied to me by the Debtors' officers, directors, employees and professionals; or (c) my analyses of the information I have received on the Debtors' operations and financial condition.  I have also been kept abreast of major discussions with stakeholders, including the Company's primary financial creditors and its shareholders.  I am an individual over the age of 18.  If I am called to testify, I will do so competently and based on the facts set forth herein.

Dated:   December 6, 2018

                                                    Respectfully submitted,

                                                    _____

                                                    *Andrew Childe*

**<u>EXHIBIT A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | ) |
| | ) |
| Serviços de Petróleo Constellation S.A., *et al.*,[1] | ) Case No. 18-13952 |
| | ) (Joint Administration Pending) |
| Debtors in a Foreign Proceeding. | ) Chapter 15 |
| | ) |

**ORDER GRANTING RECOGNITION OF FOREIGN MAIN PROCEEDING**
**AND CERTAIN RELATED RELIEF**

Upon the *Petitioner's Declaration and Verified Petition for Recognition of the Brazilian RJ Proceeding and Motion for Order Granting Related Relief pursuant to 11 U.S.C. §§ 1515, 1517, and 1520* (the "Verified Petition")[2] [ECF No. 3] dated December 6, 2018, Andrew Childe (the "Petitioner" or the "Foreign Representative"), in his capacity as the duly-authorized foreign representative of the Brazilian RJ Proceeding (as defined below) of each of the above-captioned debtors (the "Debtors") requesting this Order (the "Order") (a) granting the Verified Petition and recognizing the jointly-administered judicial reorganization proceeding (the "Brazilian RJ Proceeding") pending before the 1st Business Court of Rio de Janeiro (the "Brazilian RJ Court") pursuant to Federal Law No. 11.101 of February 9, 2005 (the "Brazilian Bankruptcy Law") of the laws of the Federative Republic of Brazil ("Brazil") as the foreign main proceeding for all of the Debtors pursuant to section 1517 of title 11 of the United States Code (the "Bankruptcy Code"),

---

[1]    The Debtors in these chapter 15 cases (the "Chapter 15 Cases") and the last four identifying digits of the tax number in the jurisdictions in which they pay taxes are as follows: Serviços de Petróleo Constellation S.A. ("Petróleo Constellation") (Brazil – 01-27); Lone Star Offshore Ltd. ("Lone Star") (BVI – 9322); Gold Star Equities Ltd. ("Gold Star") (BVI – 1368); Olinda Star Ltd. ("Olinda Star") (BVI – 9761); Star International Drilling Limited ("Star Int'l.") (Cayman Islands – 6867); Alpha Star Equities Ltd. ("Alpha Star") (BVI – 0114); Snover International Inc. ("Snover") (BVI – 8260); Arazi S.à r.l. ("Arazi") (Luxembourg – 9812); Constellation Oil Services Holding S.A. ("Constellation") (Luxembourg – 6634); and Constellation Overseas Ltd. ("Constellation Overseas") (BVI – 0641).

[2]    Capitalized terms used but not otherwise defined shall have the meanings ascribed to them in the Verified Petition.

and all relief included therewith as provided in section 1520 of the Bankruptcy Code; (b) recognizing the Petitioner as the foreign representative, as defined in section 101(24) of the Bankruptcy Code, of the Brazilian RJ Proceeding for each of the Debtors; and (c) granting such other and further relief as the Court deems just and proper; and it appearing that this Court has jurisdiction to consider the Verified Petition pursuant to sections 157 and 1334 of title 28 of the United States Code and the Amended Standing Order of Reference dated January 31, 2012, Reference M-431, In re Standing Order of Reference Re:  Title 11, 12 Misc. 00032 (S.D.N.Y. Feb. 1, 2012) (Preska, C.J.) (the "Amended Standing Order"); and this being a core proceeding pursuant to section 157(b)(2)(P) of title 28 of the United States Code; and venue for this proceeding being proper before this Court pursuant to section 1410 of title 28 of the United States Code; and this Court having reviewed (i) the Forms of Voluntary Petition, (ii) the Verified Petition, along with the exhibits annexed thereto, (iii) the *Declaration of Flavio Galdino Pursuant to 28 U.S.C. § 1746* (the "Brazilian Counsel Declaration") [ECF No. 4], (iv) the *Declaration of Samuel P. Hershey* (the "Hershey Declaration") [ECF No. 6], along with the exhibits annexed thereto, and (v) the statements of counsel with respect to the Verified Petition at a hearing before this Court (the "Hearing"); and appropriate and timely notice of the filing of the Verified Petition and the Hearing having been given; and no other or further notice being necessary or required; and this Court having determined that the legal and factual bases set forth in the Verified Petition, the Brazilian Counsel Declaration, the Hershey Declaration, and all other pleadings and papers in this case establish just cause to grant the relief ordered herein; and after notice and a hearing and due deliberation thereon;

**THIS COURT HEREBY FINDS AND DETERMINES THAT:**

A.      The findings and conclusions set forth herein constitute this Court's findings of fact

and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.     This Court has jurisdiction to consider this matter pursuant to sections 157 and 1334 of title 28 of the United States Code, and the Amended Standing Order. This is a core proceeding pursuant to section 157(b)(2)(P) of title 28 of the United States Code. Venue for this proceeding is proper before this Court pursuant to section 1410 of title 28 of the United States Code.

C.     The Petitioner is the duly appointed "foreign representative," within the meaning of section 101(24) of the Bankruptcy Code, of the Brazilian RJ Proceeding with respect to each of the Debtors.

D.     These Chapter 15 Cases were properly commenced pursuant to sections 1504, 1509, and 1515 of the Bankruptcy Code.

E.     The Petitioner has satisfied the requirements of section 1515 of the Bankruptcy Code, Bankruptcy Rules 1007(a)(4), 2002(q) and 7007.1, and Rules 2002-4 and 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

F.     The Brazilian RJ Proceeding is a "foreign proceeding" pursuant to section 101(23) of the Bankruptcy Code.

G.     The Brazilian RJ Proceeding is entitled to recognition by this Court pursuant to section 1517 of the Bankruptcy Code.

H.     The COMI of each of the Debtors is in Brazil. Accordingly, the Brazilian RJ Proceeding is the "foreign main proceeding" of each of the Debtors, as that term is defined in

3

section 1502(4) of the Bankruptcy Code, and is entitled to recognition as such pursuant to section

1517(b)(1) of the Bankruptcy Code.

I.      The relief granted hereby is necessary and appropriate to effectuate the purposes

and objectives of chapter 15 and to protect the Debtors, their creditors and other parties in interest.

J.      Appropriate notice of the filing of and the Hearing on the Verified Petition was

given, which notice is deemed adequate for all purposes, and no other or further notice need be

given.

For all of the foregoing reasons, and for the reasons stated by the Court at the Hearing and

reflected in the record thereof, and after due deliberation and sufficient cause appearing therefor,

it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Verified Petition is granted.

2.      The Petitioner is the duly appointed foreign representative of the Brazilian RJ

Proceeding with respect to each of the Debtors, within the meaning of section 101(24) of the

Bankruptcy Code, and is authorized to act on behalf of each of the Debtors in these Chapter 15

Cases.

3.      The Brazilian RJ Proceeding is granted recognition as the foreign main proceeding

of each of the Debtors pursuant to section 1517 of the Bankruptcy Code.

4.      All relief and protection afforded foreign main proceedings under section 1520 of

the Bankruptcy Code is hereby granted to the Brazilian RJ Proceeding, the Debtors, the Debtors'

property located in the United States, and the Petitioner, as applicable, including application of the

section 362 stay to bar actions against the Debtors and/or property of the Debtors located within

the territorial jurisdiction of the United States.

4

5.      Notwithstanding any provision in the Bankruptcy Rules or the Local Rules to the contrary: (a) this Order shall be effective immediately and enforceable upon entry; (b) the Petitioner is not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order; and (c) the Petitioner is authorized and empowered and may in his discretion and without further delay take any action and perform any act necessary to implement and effectuate the terms of this Order.

6.      A copy of this Order, confirmed to be true and correct, shall be served by the Petitioner within seven business days of entry of this Order by facsimile, electronic mail or overnight express delivery on the Notice Parties, and such service shall be good and sufficient service and adequate notice for all purposes.

7.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, enforcement, amendment or modification of this Order.

Dated: _____, 2018
New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE