**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

Serviços de Petróleo Constellation S.A., *et al.*,[1]

                                                    Foreign Debtors.

<u>FOR PUBLICATION</u>

Case No. 18-13952 (MG)
Chapter 15

### MEMORANDUM OPINION RECOGNIZING FOREIGN DEBTORS' FOREIGN MAIN AND FOREIGN NONMAIN PROCEEDING

*A P P E A R A N C E S:*

WHITE & CASE LLP
*Attorneys for Andrew Childe, as Petitioner and Foreign Representative*
1221 Avenue of the Americas
New York, NY 10020
By:    John K. Cunningham, Esq.
       Thomas E. MacWright, Esq.
       Gregory Starner, Esq.

WHITE & CASE LLP
*Attorneys for Andrew Childe, as Petitioner and Foreign Representative*
Southeast Financial Center
200 South Biscayne Blvd.
Suite 4900
Miami, FL 33131
By:    Richard S. Kebrdle, Esq. (*admitted pro hac vice*)
       Laura L. Femino, Esq. (*admitted pro hac vice*)

MILBANK, TWEED, HADLEY & MCCLOY LLP
*Attorneys for the 2024 Bond Noteholders*
28 Liberty Street
New York, NY 10005
By:    Mary Doheny, Esq.

---

[1]     The debtors in these chapter 15 cases (the "Chapter 15 Cases") are: Serviços de Petróleo Constellation S.A. ("Petróleo Constellation"); Lone Star Offshore Ltd. (In Provisional Liquidation) ("Lone Star"); Gold Star Equities Ltd. (In Provisional Liquidation) ("Gold Star"); Olinda Star Ltd. (In Provisional Liquidation) ("Olinda Star"); Star International Drilling Limited ("Star Int'l."); Alpha Star Equities Ltd. (In Provisional Liquidation) ("Alpha Star"); Snover International Inc. (In Provisional Liquidation) ("Snover"); Arazi S.à r.l. ("Arazi"); Constellation Oil Services Holding S.A. ("Parent/Constellation"); and Constellation Overseas Ltd. (In Provisional Liquidation) ("Constellation Overseas") (together, the "Chapter 15 Debtors"). ("Verified Petition," ECF Doc. # 7 at 1 n.1.)

PRYOR CASHMAN LLP
*Attorneys for Wilmington Trust, National Association as Indenture Trustee for the 9.00%/0.50% PIK Senior Secured Notes Due 2024*
7 Times Square
New York, NY 10036
By:    Andrew S. Richmond, Esq.
        Seth H. Lieberman, Esq.

HOLLAND & KNIGHT
*Attorneys for the Trustee to Deutsche Bank Trust Company Americas as Trustee for the 6.250% Senior Notes Due 2019*
31 West 52nd Street
New York, NY 10019
By:    Barbara R. Parlin, Esq.

SULLIVAN & CROMWELL LLP
*Attorneys for Alperton Capital Ltd.*
125 Broad Street
New York, NY 10004
By:    Andrew G. Dietderich, Esq.
        Joseph E. Neuhaus, Esq.
        Brian D. Glueckstein, Esq.

CLEARLY GOTTLIEB STEEN & HAMILTON LLP
*Attorneys for Certain Consenting A/L/B Lenders*
One Liberty Plaza
New York, NY 10006
By:    Luke A. Barefoot, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

## I.    INTRODUCTION

On December 7, 2018, Andrew Childe (the "Foreign Representative" or "Petitioner")

commenced the jointly administered Chapter 15 Cases and sought this Court's recognition of the

joint judicial reorganization (*recuperação judicial* or "RJ") of each of the Chapter 15 Debtors in

the jointly administered judicial organization proceeding (the "Brazilian RJ Proceeding")

pending in the 1st Business Court of Rio de Janeiro (the "Brazilian RJ Court") pursuant to

Federal Law No. 11.101 of February 9, 2005 (the "Brazilian Bankruptcy Law") of the laws of

the Federative Republic of Brazil ("Brazil").[2]  (Verified Petition at 7.)  The Foreign

Representative seeks recognition of the Brazilian RJ Proceeding for each of the Chapter 15

Debtors as either a foreign main proceeding or, in the alternative, as a foreign nonmain

proceeding, pursuant to chapter 15 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532

(the "Bankruptcy Code").  The Court must therefore determine the center of main interests (the

"COMI") for each Chapter 15 Debtor in the enterprise group to determine whether—and to what

extent—it should grant recognition of the Brazilian RJ Proceeding with respect to each.

When deciding whether to grant recognition of a foreign proceeding, whether as a foreign

main or foreign nonmain proceeding, the Court begins with the statutorily prescribed

presumption that the COMI of each foreign debtor entity is the place where that entity has its

registered office.  Of these Chapter 15 Debtors, two have registered offices in Luxembourg, one

has a registered office in the Cayman Islands, one has a registered office in Brazil, and six have

registered offices in the British Virgin Islands.  Because the Foreign Representative seeks

recognition of the Brazilian RJ Proceeding as main (or nonmain in the alternative), the Foreign

Representative bears the burden of providing sufficient evidence to rebut the registered office

presumption for each of the Chapter 15 Debtors that is incorporated outside of Brazil.[3]

---

[2]       Childe seeks recognition as the "foreign representative," as defined in 11 U.S.C. §§ 101(24), 1509, and 1517.  There is no dispute that Childe was properly designated as the foreign representative of each Chapter 15 Debtor.

[3]       Although nine of the ten Chapter 15 Debtors are incorporated outside of Brazil, this opinion will only determine recognition with respect to seven of them.  Since the recognition hearing, a Brazilian appellate court determined that two of the Chapter 15 Debtors should be dismissed from the Brazilian RJ Proceeding.  Until the Brazilian court determines whether these entities will proceed in the Brazilian RJ Proceeding, this Court will not make a decision on recognition of the proceeding with respect to these entities.

As a broad overview, the Chapter 15 Debtors are members of an integrated enterprise

group known as the Constellation Group.[4]  While the Constellation Group is discussed as a group

entity at times throughout this opinion's opening sections for context, it is important to bear in

mind that the Court's recognition is granted on an individual debtor by debtor basis.  The

Constellation Group's tripartite business enterprise consists of (i) offshore drilling, (ii) onshore

drilling, and (iii) investments in several joint ventures and associated entities related to the

operation of floating production storage and offloading units ("FPSOs").  The Chapter 15

Debtors are a subset of the Constellation Group.  The ten Chapter 15 Debtors along with their

direct and indirect affiliates comprise the Constellation Group ("Constellation Group"), and the

Chapter 15 Debtors along with their affiliates that are debtors in the RJ Proceeding are referred

to as the RJ Debtors ("RJ Debtors").

The Constellation Group's current financial distress is attributable, in large part, to the

cyclical nature of the deepwater drilling market, which entered a sustained down cycle and

created a number of major bankruptcies in the sector.[5]  By the time of filing, seven of the

Constellation Group's eight offshore drilling rigs were either no longer contracted or soon to

come off contracts.  As of November 30, 2018, the Constellation Group was liable for

---

[4]      The United Nations Commission on International Trade Law's Working Group V (Insolvency Law) has
met multiple times and issued several updates regarding the drafting of an addition to the Model Law that would
apply to and address issues specifically related to enterprise groups.  Recent drafts suggest that the enterprise group
law will maintain the concept of COMI for each individual enterprise within a group enterprise.  Working Group V
has defined "enterprise group" as "two or more enterprises that are interconnected by control or significant
ownership."  *See* A/CN.9/WG.V/WP.158 Facilitating the cross-border insolvency of enterprise groups: draft
legislative provisions, UNCITRAL: Working Group V (Feb. 26, 2018),
http://www.uncitral.org/uncitral/en/commission/working_groups/5Insolvency.html.

[5]      Major recent bankruptcies in the industry include *Ocean Rig* (*see In re Ocean Rig UDW Inc.*, Case No. 17-
10736 (Bankr. S.D.N.Y. 2017)), *Seadrill* (*see In re Seadrill Ltd.*, Case No. 17-60079 (Bankr. S.D. Tex. 2017)), and
*Pacific Drilling* (*see In re Pacific Drilling S.A.*, Case No. 17-13193 (Bankr. S.D.N.Y. 2017)).

4

approximately US$1.5 billion in aggregate outstanding third-party financial indebtedness (including accrued interest) under four credit facilities and two bond issuances.

On January 29, 2019, Alperton Capital Ltd. ("Alperton"), a contingent creditor of one of the ten Chapter 15 Debtors (Constellation Overseas), filed its *Limited Objection of Alperton to the Petition for Recognition of the Brazilian RJ Proceeding*.  ("Alperton Objection," ECF Doc. # 35.)  Alperton's limited objection contends that the Chapter 15 Debtors "have not satisfied their burden of proof that the location of the Debtors' [COMI] is in Brazil and Alperton objects to recognition of the RJ Proceeding as a foreign main proceeding."  (*See id.* ¶ 8.)  In support of the Alperton Objection, Alperton submits and incorporates by reference the Declaration of Andrew G. Dietderich, which was filed concurrently therewith.  ("Dietderich Decl.," ECF Doc. # 36.)  On February 4, 2019, counsel for Alperton filed the Second Declaration of Andrew G. Dietderich. ("Second Dietderich Decl.," ECF Doc. # 44.)  Additionally, the Chapter 15 Debtors and Alperton agreed to a *Joint Stipulation of Undisputed Facts*, dated February 5, 2019, in lieu of cross-examination of the Debtors' declarants.  ("Stipulation," ECF Doc. # 46.)

On February 5, 2019, the Court held the hearing on the Chapter 15 Debtors' Petition (the "Recognition Hearing").  (*See* "Hr'g Tr.," ECF Doc. # 59.)  At the Recognition Hearing, the Court received evidence and heard oral argument regarding the Verified Petition.[6]  The Court reserved judgment on recognition of the Verified Petition and directed the parties to submit proposed findings of fact and conclusions of law regarding recognition of the Brazilian RJ Proceeding.[7]  (*See id*. at 74:2-7, 156:11-25.)

---

[6]    The Court accepted into evidence Petitioner's exhibits 1 through 19 ("Pet'r Ex.") and the Second Dietderich Decl.  (Hr'g Tr. 38:11-17.)  The Verified Petition is in evidence as Pet'r Ex. 14.

[7]    The Foreign Representative's corrected proposed findings of fact ("FRFOF") are located at ECF Doc. # 57 and Alperton's proposed findings of fact ("Alperton FOF") are located at ECF Doc. # 54.

Alperton does not object to recognition of the Brazilian RJ Proceeding as a foreign

*nonmain* proceeding.  (*Id*. at 15:7-11 ("[W]e have no objection to the recognition of the Brazilian

RJ as a foreign non-main.").)  Rather, Alperton argues that the COMI for the entire Constellation

Group is not in Brazil.  (*Id*. at 15:24–25 ("[W]e believe COMI is not in Brazil for the group.").)

It argues that the "COMI for all ten foreign debtors in the international group is Luxembourg."

(*Id*. at 96:3-4.)  Additionally, Alperton asks that "the Court allow the Brazilian court in the RJ

Proceedings the opportunity to decide the question of COMI, and recognize the RJ Proceeding in

these Chapter 15 Cases for the time being as *either* a foreign non-main proceeding or a foreign

main proceeding . . . ."  (Alperton Objection ¶ 9.)[8]

The Brazilian Court of Appeals recently announced a decision to dismiss the RJ

Proceeding with respect to two of the Chapter 15 Debtors—Arazi and Olinda Star—and an

additional RJ Debtor—Lancaster Projects Corp.  The Foreign Representative informed the Court

that it intends to seek a clarification of this judgment, implying that the Brazilian Court of

Appeals' dismissal is not final.  However, until the Brazilian Courts determine whether the

Chapter 15 Debtors Arazi and Olinda Star are proper parties in the Brazilian RJ Proceeding, this

Court will not decide whether the proceedings are main or nonmain with respect to them.  If any

other Chapter 15 Debtors are subsequently dismissed from the Brazilian RJ Proceedings, the

Court may modify its present decision regarding recognition respecting those entities pursuant to

section 1519(d).

---

[8]        Alperton also argued at the Recognition Hearing and in its later proposed findings of fact that "[i]n
practice, U.S. courts may accord less deference to foreign representatives of foreign nonmain proceedings than they
typically accord to representatives of main proceedings under section 1521.  Alperton points to no specific provision
that *requires* this Court . . . to provide the Brazilian Proceeding, once recognized as a foreign main proceeding for
each Chapter 15 Debtor, with more deference than the Court would provide the Brazilian Proceeding if only
recognized as a foreign nonmain proceeding." (Alperton FOF ¶ 137.)  Nonetheless, Alperton goes on to note that it
worries that a recognition as a foreign main proceeding "for each of the Chapter 15 Debtors" might prejudice their
future rights.  This concern seems to be the root of Alperton's objection.

6

At the Recognition Hearing the Court also questioned Alperton's standing to object to recognition of any of the Chapter 15 Debtors other than Constellation Overseas, an entity with which it is a contingent creditor based on a pending arbitration claim. (Hr'g Tr. 22:16-19, 23:8-10.) Alperton requested the opportunity to brief the issue, but ultimately conceded that based upon the facts in the record, it did not have standing with respect to any Chapter 15 Debtor other than Constellation Overseas. The Court nonetheless analyzes the evidence and objections to recognition raised by Alperton. This requires the Court to analyze whether a proceeding should be recognized as main, nonmain, or not recognized at all, *regardless of whether objections have been raised. See In re Ocean Rig UDW Inc.*, 570 B.R. at 692 (considering an objecting party's arguments to deny recognition on the merits, even though the Court found the objecting party had failed to establish standing because the Court had an independent obligation to establish that recognition was proper).

The ultimate issue presently before the Court is how to apply the Chapter 15 COMI standards to each Chapter 15 Debtor in a highly interrelated enterprise group whose management and operations are increasingly becoming detached from any specific locale as the business aims towards increased globalization.[9] For the reasons further discussed below, the Court now grants recognition as a foreign nonmain proceeding for Parent/Constellation, and grants recognition as a foreign main proceeding for Petróleo Constellation, Constellation Overseas, Alpha Star, Gold Star, Lone Star, Star Int'l, and Snover.

---

[9]    This Court recently recognized a foreign proceeding for a group of debtors in another large, global enterprise group in *Agrokor. See In re Agrokor d.d.*, 591 B.R. 163, 165 (Bankr. 2018). In *Agrokor*, a parent company and eight debtor affiliates filed for recognition under chapter 15; these debtors were part of a larger group of 77 companies based in Croatia and approximately 80 affiliates not located in Croatia who were all part of the Croatian restructuring proceeding. (*Id.* at 169.) The Court made it clear that its further discretionary relief, like its recognition of the settlement agreement ultimately reached in that proceeding, was only recognized and enforced with respect to the Chapter 15 entities within the group. (*Id.* at 197.)

## II.    BACKGROUND[10]

There is a total of ten Chapter 15 Debtors seeking recognition in these consolidated Chapter 15 Cases.  The Chapter 15 Debtors (and their countries of incorporation in parenthesis) are: (1) Servicos de Petróleo Constellation S.A. (Brazil), (2) Lone Star Offshore Ltd. (BVI), (3) Gold Star Equities Ltd. (BVI), (4) Olinda Star Ltd. (BVI), (5) Star International Drilling Limited, (Cayman Islands) (6) Alpha Star Equities Ltd. (BVI), (7) Snover International Inc. (BVI), (8) Arazi S.a.r.l. (Luxembourg), (9) Constellation Oil Services Holding S.A. (Luxembourg), and (10) Constellation Overseas Ltd (BVI).  (Verified Petition at 1 n.1.)

### A.  Events Leading Up to the Brazilian RJ Proceeding

The sharp decline in oil prices over recent years led to reduced capital spending and credit as well as an oversupply of rigs in the oil and gas industry.  Oil prices began to decline rapidly in mid-2014, eventually reaching less than $30 per barrel in early 2016.  (*Id.* ¶ 24.)  As a consequence, exploration and production companies reduced their capital spending, yielding an oversupply in the offshore rig industry and a corresponding decrease in the daily fees earned by each individual drilling unit (referred to as "dayrates" in Parent/Constellation's notes offering memoranda discussed below) and revenues generated from them.  (*Id.*)  Reduced revenues that resulted from reduced dayrates in turn further damaged oil and gas companies by reducing their creditworthiness and restricting their access to the credit markets.  (*Id.*)  At roughly the same time as oil prices began plummeting, the Brazilian economy entered a recession.  (*Id.* ¶¶ 24-25.)  The recession, political instability, and budget deficits affecting Brazil chilled foreign investments in Brazilian operations.  (*Id.* ¶ 25.)

---

[10]    The Background section includes the Court's findings of fact pursuant to FED. R. BANKR. P. 7052, which incorporates FED. R. CIV. P. 52.

The Constellation Group's key assets are nine onshore drilling rigs,[11] eight offshore rigs and drillships,[12] and five FPSO units[13] (the "JV FPSOs").  (*Id.* ¶¶ 8-9.)  Of the twenty-two drilling rigs that the Constellation Group owns, twenty were located in Brazil as of the petition date and either served, or had recently served, customers in the Brazilian market under Brazilian law governed contracts.  (*Id.* ¶¶ 9, 62, 69.)  This is why the Constellation Group was profoundly affected by the Brazilian market's downturn.  As of the petition date, only one of the Constellation Group's nine onshore drilling rigs was under contract and only five of the Constellation Group's eight offshore rigs were under contract.  (*Id.* ¶ 17; *see also* "Certified Translation of the RJ Petition," ECF Doc. # 7-2, Pet'r Ex. 2 at 39.)[14]

The Constellation Group's losses in new investments and lowered dayrates meant that the Constellation Group was no longer able to fund the investments it incurred when the oil market was in an upswing.  In 2012, when the price of a barrel of oil had risen to over $125, the Constellation Group, along with much of the industry, experienced tremendous growth and incurred new debt obligations to expand its operations and investments, including the A/L/B Project Financings, which are discussed below and were used to finance the acquisition of the *Amaralina Star*, *Laguna Star*, and *Brava Star* drillships.  (*Id.*)  The Constellation Group's

---

[11]    The onshore rigs are: the *QG-I*, the *QG-II*, the *QG-III*, the *QG-IV*, the *QG-V*, the *QG-VI*, the *QG-VII*, the *QG-VIII*, and the *QG-IX*).  (Verified Petition ¶ 8.)

[12]    These consist of three ultra-deepwater semi-submersible rigs (the *Alpha Star*, the *Lone Star*, and the *Gold Star*), one deepwater semi-submersible rig (the *Olinda Star*) and three ultra-deepwater drillships (the *Amaralina Star*, the *Laguna Star*, and the *Brava Star*). (Verified Petition ¶ 8.)

[13]    These include the *Capixaba*, the *Cidade de Paraty*, the *Cidade de Ilhabela*, the *Cidade de Marica*, and the *Cidade de Saquarema*.  (Verified Petition ¶ 8.)

[14]    The three offshore drilling rigs were that were no longer under contract—*Alpha Star, Gold Star*, and *Lone Star*—are each owned by a Chapter 15 Debtor—Alpha Star, Gold Star, and Lone Star.  (Verified Petition ¶ 14.)  Of the nine onshore drilling rigs, the Verified Petition notes that these rigs are owned by either Petróleo Constellation or Snover, which does not provide a clear understanding of which of these two Chapter 15 Debtors—whether the Brazilian based Chapter 15 Debtor or the BVI based Chapter 15 Debtor, respectively—owns more of these largely non-operational rigs.  (*Id.* ¶ 17.)

incurring of greater leverage prior to the oil downturn compounded cash flow issues for the group enterprise.

### B. The Parties

#### 1. The Chapter 15 Debtors

Each Chapter 15 Debtor will be described *individually* in detail in section II.I below. However, a brief overview of the Constellation Group as an enterprise group is discussed first in this overview of the parties. Although the Court must make a COMI determination for each Chapter 15 Debtor individually, shared functions of the group are relevant to that analysis to the extent they exist, and an understanding of the holding structure of the group is also necessary.

##### a. Structure of the Constellation Group

Parent/Constellation serves as the ultimate parent holding company at the apex of the entire Constellation Group. (Verified Petition ¶ 4 (Organizational Chart).) Parent/Constellation is an entity organized under the laws of Luxembourg with its registered office in Luxembourg, and is the direct or indirect parent to the other nine Chapter 15 Debtors in these Chapter 15 Cases. (*Id.*)

Parent/Constellation is the indirect parent of the BVI incorporated entity Constellation Overseas. Constellation Overseas, in turn, holds all of the remaining seven Chapter 15 Debtors that presently remain subject to the Brazilian RJ Proceeding. (*Id.*) Constellation Overseas holds the five BVI incorporated Chapter 15 Debtors, the Cayman Chapter 15 Debtor, and is the indirect parent of Petróleo Constellation, the Brazilian Chapter 15 Debtor. (*Id.*)

10

b. <u>Management of the Constellation Group</u>

The Foreign Representative argues that the Constellation Group shares a single senior executive management team.  This is supported by the evidence.  One of Parent/Constellation's notes offerings, for instance, describes a group of "senior management" who will be "responsible for the day to day management of *our* operations."  ("2019 Offering Memorandum," ECF Doc. #42-1, Pet'r Ex. 4 at 118 (emphasis added); *see also* 2019 Offering Memorandum at 4 (defining "our" as referring to Parent/Constellation together with its affiliates throughout the document).)[15] The senior management team listed in the 2019 Notes Offering Memorandum consists of a CEO, CFO, COO, Chief FPSO Operations Officer, CCO, Chief Administrative Director, and General Counsel.  (*Id.* at 118.)  This group of senior management is listed first in the 2019 Notes Offering Memorandum's section titled "Management," before the document goes on to discuss the board of directors of Parent/Constellation.  This objective evidence in the record makes it clear that a senior executive management team does, in fact, govern the operations of the entire enterprise group.

The CEO and the CFO—each described as serving the entire Constellation Group—are based in London and are employed by a non-Chapter 15 Debtor Constellation Oil Services U.K. Ltd.  (Stipulation ¶ 4; Verified Petition at 14 n.14.)  The CCO, COO and General Counsel are based in Brazil; these Brazilian based individuals exercise their activities from the Chapter 15 Debtor Petróleo Constellation.  (Stipulation ¶ 5.)  The other two members of the senior management team described in the 2019 Notes Offering Memorandum—the Chief FPSO Operations Officer and the Chief Administrative Director—are not mentioned in the Stipulation. However, both individuals received degrees from Brazilian institutions, had most of their work

---

[15]    All page numbers in this opinion refer to ECF pagination rather than internal document pagination.

experience in Brazil, and appeared to be based in Brazil at the time of the issuance of the

offering memorandum.  (2019 Notes Offering Memorandum at 119.)

The Foreign Representative also argues that the operational and day-to-day management

of the entire Constellation Group are predominately conducted from Brazil.  (Verified Petition ¶

63.)  This is supported by the Offering Memorandum for the 2019 Notes.  It provides, "*[w]e* are

a market leading *Brazilian-controlled* provider of offshore oil and gas contract drilling and FPSO

services in Brazil."  (2019 Notes Offering Memorandum at 15 (emphasis added); *see also* 2019

Notes Offering Memorandum at 4 (defining "we" as the entire Constellation Group.).)  Another

of Parent/Constellation's debt documents shows that the Constellation Group's drilling rigs,

which are the primary revenue drivers for the group, were predominately located in Brazil and

chartered to Brazilian customer Petrobras.  ("Original Exchange Offer Memorandum," ECF Doc.

# 43-1, Pet'r Ex. 6, at 230, 296.)  Further evidence of the location of daily operations will be

discussed in greater detail with respect to each entity.

### c. Employees of the Constellation Group

The Petitioner describes the entire Constellation Group as "employ[ing] over 1,200

individuals, with the vast majority (approximately 93%) located in Brazil."  (Verified Petition ¶

7.)  Although there is a lack of clarity provided by the Foreign Representative regarding which

Chapter 15 Debtors employ these individuals, this lack of clarity is echoed in the various offering

memoranda of the notes issued by Parent/Constellation.  For example, one memorandum states

"*[w]e* employ skilled personnel to operate and provide support for our rigs.  As of December 31,

2016, *we* had a total of 1,885 employees, 99% of which were Brazilian nationals."  (Original

Exchange Offer Memorandum at 23 (emphasis added).)  Parent/Constellation's notes offerings

all explain that "[t]he terms 'our company,' 'we,' 'our,' or 'us,' as used herein, refer to

[Parent/Constellation] *and its consolidated subsidiaries unless otherwise stated or indicated by context.*"  (*Id.* at 6 (emphasis added); *see also* "Supplemental Exchange Offer Memorandum," ECF Doc. #42-2, Pet'r Ex. 5 at 3 (including the same quote in the introduction); 2019 Notes Offering Memorandum (also including the same quote in the introduction).)

The Original Exchange Offer Memorandum of Parent/Constellation also explains, "[a]s of December 31, 2016, *we* had a total of 1,885 employees working across six sites, four of which are located in Brazil and one of which is located in the United Kingdom."  (Original Exchange Offer Memorandum at 123 (emphasis added).)  The Original Exchange Offer Memorandum goes on to provide a table with a breakdown of employees of the Constellation Group by location.  In 2016, "QGOG-Brazil" employed 1,850 workers across three Brazilian locations, "Constellation Services" employed 16 workers in Brazil, "Constellation Panama Corp." employed 15 workers in Panama, and "QGOG Constellation UK" employed 4 workers in the United Kingdom.  (*Id.* at 124.)  The table makes no reference to any employees located in Luxembourg.  (*Id.*)

2.  Alperton

Alperton is a family investment vehicle that entered into a joint venture with Constellation Overseas to build two ultra-deepwater drillships.  (*See* Alperton Objection ¶ 1.)  Alperton is a contingent and unliquidated creditor of the Chapter 15 Debtor Constellation Overseas, pending the outcome of arbitration in the United States.  (*See* Hr'g Tr. at 59:4-9, 59:12-14.)  Alperton is incorporated in the BVI, but all beneficial owners and/or principals of Alperton are Brazilian citizens and/or residents of Brazil.  (Stipulation ¶ 12.)

Pursuant to the joint venture, Alperton and Constellation Overseas established two special purpose offshore holding companies organized under the laws of the BVI, the Amaralina Star Ltd. and Laguna Star Ltd. (together, the "Disputed Companies").  (Alperton Objection ¶ 1.)

Two substantially similar shareholders' agreements governed by New York law (together, the "Shareholders' Agreements" or "SHAs")[16] apply to the Disputed Companies. (Alperton Objection ¶ 1.) Prior to the events that are subject to the arbitration described below, Constellation Overseas owned 55% and Alperton owned 45% of each of the Disputed Companies. (Original Exchange Offer Memorandum at 108.)

In addition, the Shareholders' Agreements include covenants relating to the separateness and corporate governance of the Disputed Companies. For example, section 4.8 of each of the Shareholders' Agreements states that each of Constellation Overseas and Alperton will cause the directors each appoints to act in the best interests of each Disputed Company (as opposed to the best interests of the Constellation Group as a whole). (*See* "SHA 1," ECF Doc. # 36-1 § 4.8; *see also* SHA 1 at 1 (defining Company for purposes of the SHA 1); "SHA 2," ECF Doc. #36-2 § 4.8; SHA 2 at 1 (defining Company for purposes of SHA 2.) Furthermore, the SHAs provide that decisions regarding the "corporate reorganization, liquidation or dissolution of either [Disputed Company]," any change in the business[17] of the company, and any investments in other companies are fundamental business decisions that require the unanimous consent of both Alperton and Constellation. (SHA 1 § 4.9(b); SHA 2 § 4.9(b).)

Although the Disputed Companies are not debtors in these Chapter 15 Cases, the Disputed Companies are RJ Debtors. (Certified Translation of the RJ Petition at 35-36.) Under the PSA (discussed below), the Disputed Companies are "Subsequent Chapter 15 Filing

---

[16]    The Shareholders' Agreements related to the Star Unit I Drilling Vessel (*Amaralina Star*) and Star Unit II Drilling Vessel (*Laguna Star*), dated as of June 24, 2010 and as subsequently amended on September 10, 2010, September 28, 2010, November 10, 2011, April 12, 2012 and January 17, 2013 are exhibits to the first Dietderich Declaration. (ECF Doc. ## Nos. 36-1, 36-2.)

[17]    The business of each Disputed Company is defined as "(i) the chartering of the Unit to the Charterer under the Charter Contract and the borrowing of the Project Loan from the Project Lenders or (ii) such other business as the Shareholders [Alperton and Constellation] may agree from time to time in writing." (SHA 1 § 12.1; SHA 2 § 12.1.)

14

Entities," which means that they are to be filed as debtors in these Chapter 15 Cases at a later

date.  ("PSA," ECF Doc. # 6-1, Pet'r Ex. 1 at 10 ("Subsequent Chapter 15 Filing Entities' shall

mean Amarlina Star Ltd., Laguna Star Ltd. and Brava Star Ltd. and those other Filing Entities

that may be included in the Chapter 15 Proceedings . . . .").)  The subsequent filing of the

Disputed Companies in these Chapter 15 Cases is a mandatory milestone under the PSA.  (PSA §

11.01(p)(viii)(C) (located at page 31).)

### C.  Arbitration Between the Parties

The Shareholders' Agreements include an arbitration clause, pursuant to which the

Shareholders agreed to binding arbitration in New York under the International Chamber of

Commerce (the "ICC") Rules of all disputes, controversies or differences related to

the Shareholders' Agreements.  (SHA 1 § 18.2; SHA 2 § 18.2.)  As a result of an ongoing

dispute between Alperton and Constellation Overseas, arbitration concerning the joint venture

commenced on August 7, 2018 and a panel (the "Tribunal") was constituted on December 19,

2018.  (Alperton Objection ¶ 3.)  The case name and number is *Constellation Overseas Ltd. v.*

*Alperton Capital Ltd., Capinvest Fund Ltd., Universal Investment Fund Ltd., Comercial*

*Perfuradora Delba Baiana Ltda. and Interoil Representação Ltda.*, International Chamber of

Commerce International Court of Arbitration, Case No. 23856/MK (the "Arbitration").  (*Id*. at 3

n.3.)  In the arbitration, Constellation Overseas asserts that a "deadlock" occurred and it is

allowed to buyout Alperton's interests under the Shareholders' Agreements.  (*Id*. ¶ 3.)  Alperton

asserts that there is no "deadlock," that Alperton's rights as a shareholder have been ignored and

that Constellation Overseas committed fraud and overcharged the Disputed Companies by

"potentially hundreds of millions of dollars over a multi-year period."[18]  (*Id.*)

---

[18]    On April 26, 2019, the arbitral Tribunal issued an interim award that prevents Constellation Overseas from
taking actions that would effectively destroy Alperton's potential interest in the Disputed Companies prior to the

### D. Brazilian RJ Proceeding

On December 6, 2018, each of the Chapter 15 Debtors and the RJ Debtors initiated

bankruptcy proceedings in Brazil by filing the RJ Petition with the Brazilian Court. (Verified

Petition at 8; *see also* Certified Translation of the RJ Petition at 64.) The RJ Petition requests

that the Brazilian Court substantially consolidate the judicial reorganization of the entire group;

this request is based upon the support of creditors. (Certified Translation of the RJ Petition ¶

69.)

The Brazilian Court entered an order formally accepting the RJ Debtors into the Brazilian

Proceeding and authorizing the requested "substantial consolidation." (*Id.* at 8.) Although the RJ

Debtors are being consolidated for the purposes of voting on the RJ Debtors' plan of

reorganization in the RJ Proceeding (the "RJ Plan"), the RJ Plan is not premised on "substantive

consolidation," as that term is used in the United States (*i.e.*, the RJ Plan does not pool all

debtors' assets and liabilities for purposes of pro rata distributions). ("Petitioner's March 25,

2019 MOL," ECF Doc. # 72 ¶ 4.) Whether the creditors will, in fact, vote as a group will be put

to the vote of the group of creditors; consolidating group voting will not be ordered by the

Brazilian court. ("Majority Opinion English Translation," ECF Doc. # 79-1 at 70.)[19] However,

the purpose of this opinion is to determine the COMI of each of the Chapter 15 Debtors and that

---

ultimate resolution of the arbitration. ("Interim Award," ECF Doc. # 81-1, Neuhaus Decl. Ex. 1.) The Interim Award prevents Constellation Overseas from taking certain actions such as, *inter alia*, "pledging, transferring or otherwise encumbering [Alperton's 45% shareholding in the Disputed Companies] pending a final Award." (*Id.* at 50.) Alperton filed a motion seeking an order granting Alperton leave to seek relief from the United States District Court for the Southern District of New York confirming and enforcing the Interim Award. ("Alperton's Motion for Leave to Seek Confirmation of Interim Award," ECF Doc. # 80 at 4.) A hearing on that motion is currently scheduled to take place on May 17, 2019.

[19]    The English Translation of the Brazilian Court of Appeals' majority opinion concludes, "My vote, therefore, is to give partial relief to the appeal to . . . 2) determine the separate presentation of lists of creditors, to be voted separately in the respective meetings of creditors, which shall approve or reject the proposed substantive consolidation . . . ." (Majority Opinion English Translation at 70.)

determination is separate from this Court's decision whether to recognize and enforce any plan that may be approved by creditors and the Brazilian Court in the Brazilian RJ Proceeding. If a future plan is approved in Brazil and includes substantive consolidation of the debtors' assets and liabilities, such that interest owners and creditors of any of the substantively consolidated entities are unfairly diluted, this Court will need to scrutinize whether the plan can be recognized and enforced in the United States consistent with principles of comity.[20]

Appellate proceedings are still pending in Brazil. Several recent decisions appear to have determined that the Brazilian RJ Proceedings of several of companies within the group must be dismissed because they are not eligible to file within Brazil. On January 28, 2019, Alperton filed an interlocutory appeal in the Brazilian Proceeding with the Court of Appeals of the State of Rio de Janeiro (the "Brazilian Court of Appeals"). (Hr'g Tr. 132:22-23.) Among other relief, Alperton requests that the Brazilian Court of Appeals: (i) dismiss the Brazilian Proceeding as it applies to each Disputed Company on the ground that there was no proper corporate authority to file the Disputed Companies (neither of which are Chapter 15 Debtors) in the RJ Proceeding, (ii) enter an order declaring that the Brazilian Court is not competent to process the Brazilian RJ Proceeding as a main proceeding, and (iii) to order the RJ petitioners to produce the

---

[20]    These considerations are currently premature as no plan has so far been approved in Brazil. Alperton has raised the issue of substantive consolidation in Brazil, alleging that it could wipe out Alperton's equity interest in certain solvent subsidiaries of the group. A plan with such an effect might not be recognized and enforced in the U.S. *Cf. Bank of New York v. Treco (In re Treco)*, 240 F.3d 148 (2d Cir. 2001). The issue in *Treco*, decided under former section 304, arose because the priority scheme of the foreign jurisdiction differed from the priority scheme in the U.S., with a very substantial impact on the objecting secured U.S. creditor. Importantly, the court made clear that "we begin by recognizing that the priority rules of a foreign jurisdiction need not be identical to those in the United States." *Id.* The court concluded that "[w]e expect that the case-specific analysis required by section 304 [and now by sections 1507(b)(5) and 1522(a)] will in many cases support the granting of the requested relief." *Id.* at 161. In other words, deviation from the U.S. priority scheme may be acceptable. *See also In re Rede Energia S.A.*, 515 B.R. 69, 93 (Bankr. S.D.N.Y. 2014) (recognizing and enforcing Brazilian plan that included substantive consolidation and that authorized distributions with priorities that differ from those provided in the U.S. Bankruptcy Code).

documentation required under Brazilian bankruptcy law, which Alperton alleges they have failed to provide the Brazilian Court. (Alperton Objection ¶ 29.) In the alternative, Alperton says that it requests that the Brazilian Court of Appeals overturn the "substantive consolidation order" and separate the Brazilian Proceeding of the Disputed Companies from the Brazilian Proceeding of the other RJ Debtors. (*Id.*) Alperton also requests that the Brazilian Court of Appeals recognize the primacy of the arbitral Tribunal constituted on December 19, 2018 in New York to resolve the ownership dispute between Alperton and Constellation Overseas and not authorize the consummation of any restructuring that would be irreconcilable with an arbitral award confirming Alperton's ownership interest in the Disputed Companies. (*Id.*)

Additionally, the *Procuradoria de Justiça do Ministério Público do Estado do Rio de Janeiro* (the "Brazilian Public Prosecutor") filed an appeal challenging the Brazilian Court's acceptance order, which challenges both the grounds for RJ eligibility for the RJ Debtors incorporated outside of Brazil and the matter of consolidation of the RJ Debtors. ("April 3 Status Update," ECF Doc. # 73 ¶ 2.)

The Brazilian Court of Appeals held a hearing to rule on the merits of the Brazilian Public Prosecutor's appeal on March 26, 2019. (*Id.*) The English Translation of the Brazilian Court of Appeals hearing was filed before the Court. (Majority Opinion English Translation.) In advance of the filing of the English translation resulting from that hearing, the Foreign Representative informed the Court that at the March 26 hearing, the Brazilian Court of Appeals determined that three of the RJ Debtors should be removed from the Brazilian RJ Proceeding. (*Id.* ¶ 3.)[21] Two of these RJ Debtors are also Chapter 15 Debtors—Olinda Star and Arazi. Given

---

[21] The later filed Majority Opinion English Translation confirms that the Brazilian Court of Appeals dismissed Arazi, Olinda Star, and Lancaster Projects from the Brazilian RJ Proceedings. (Majority English Opinion Translation at 59.)

the Brazilian Court's decision to dismiss Olinda Star and Arazi from the Brazilian RJ

Proceedings, it is unnecessary for the Court to determine whether Brazilian proceedings should

be recognized with respect to these two Chapter 15 Debtors.

On February 28, 2019, the RJ Debtors filed a revised reorganization plan with the

Brazilian RJ Court. ("March 14 Update," ECF Doc. # 60.)  The English translation of the

Amended and Restated RJ Plan was filed on March 22, 2019.  ("Amended and Restated RJ

Plan," ECF Doc. # 71-1.)  The Foreign Representative is to keep the Court informed of any

developments or further amendments to this plan.  ("March 22 Update," ECF Doc. # 71.)

On February 13, 2019, the Brazilian RJ Court issued an order scheduling the general

meeting of creditors for March 25, 2019 in Rio de Janeiro, Brazil.  ("February 19 Update," ECF

Doc. # 50.)  The Brazilian RJ Court subsequently issued two orders, each further postponing

these meetings; currently the first meeting is rescheduled for April 30, 2019 and the adjourned

meeting, if necessary, is scheduled for May 9, 2019.  ("April 9 Update," ECF Doc. # 74 ¶ 2.)

### E.  Joint Provisional Liquidators

On December 7, 2018, a subset of the Chapter 15 Debtors which are incorporated in the

British Virgin Islands (the "BVI")—(i) Constellation Overseas, (ii) Lone Star, (iii) Gold Star,

(iv) Olinda Star, (v) Snover and (vi) Alpha Star (the "BVI Debtors")—each filed an Originating

Application and Ordinary Application (the "BVI Applications") in the BVI Commercial Court

(the "BVI Court") pursuant to section 170 of the BVI Insolvency Act 2003 seeking the

appointment of Eleanor Fisher ("Fisher") of Kalo (Cayman) Limited and Paul Pretlove

("Pretlove") of Kalo (BVI) Limited as Joint Provisional Liquidators for each of the BVI Debtors

(such BVI proceedings, the "BVI Proceedings").  (*Notice of Change in Status Pursuant to 11*

*U.S.C. § 1518 and 28 U.S.C. § 1746,* ECF Doc. # 21, Pet'r Ex. 18.)  The BVI Proceedings were

19

commenced to (i) protect the BVI Debtors in that jurisdiction, (ii) provide support to the Brazilian RJ Proceeding pending in the Brazilian RJ Court, and (iii) otherwise ensure the successful and global implementation of the Constellation Group's restructuring. (*Id.* ¶ 2.) Following a hearing on December 13, 2018, the BVI Court appointed Fisher and Pretlove as Joint Provisional Liquidators over each of the BVI Debtors (as appointed, the "JPLs"). ("BVI JPL Appointment Orders," ECF Doc. # 31-1, Pet'r Ex. 7-11.) The JPLs are conducting the BVI Proceedings as so-called "soft-touch" provisional liquidations in which the JPLs will independently oversee the restructuring of the BVI Debtors while leaving the form and terms of that restructuring to be proposed by the BVI Debtors in the Brazilian RJ Proceeding. (*See id.* at 27-28 (explaining the Brazilian RJ Debtors' duty to keep the JPL's informed of their continuing management decisions); "JPL Statement in Support," ECF Doc. #31-3, Pet'r Ex. 13 ¶ 1 ("The BVI JPLs are presently conducting the BVI Proceedings as 'soft-touch' proceedings pursuant to the BVI JPL Appointment Orders.").)

The JPLs are officers of the BVI Court whose function is to represent the collective interests of the creditors of each debtor for which they are appointed, in particular by overseeing and protecting from undue dissipation the assets of that debtor and protecting the interests of creditors in the course of restructuring negotiations. ("BVI JPL Appointment Decision," ECF Doc. # 48-1 at 26-27.) In this way, they are a voice for the collective creditors of each BVI Debtor—including Constellation Overseas.

The JPLs support the efforts of the Foreign Representative in obtaining recognition in the United States of the Brazilian RJ Proceeding pursuant to Chapter 15 of the Bankruptcy Code. (JPL Statement in Support ¶¶ 2, 4.) Fisher is based in the Cayman Islands and Pretlove is based in the BVI. ("JPL Protocol," ECF Doc. # 31-2, Pet'r Ex. 12 at 2.) Subject to the

JPLs' oversight and monitoring, and unless ordered otherwise by the BVI Court,

Constellation Overseas is "operat[ing] [its] [business] in the ordinary course . . . subject

to limitations within the Brazilian RJ Proceeding," which was commenced prior to the

appointment of the JPLs. (JPL Protocol ¶ 2.) "It is the understanding of the BVI JPLs that

Brazil is the *principal estabelecimento* or 'principal place of business' of the Chapter 15

Debtors' group for purposes of Brazilian law, and that Brazil is the 'centre of main interests' or

'COMI' of each of the BVI Debtors for the purposes of U.S. restructuring law." (JPL

Statement in Support ¶ 2.) Further, the JPLs "understand that both the BVI JPL Proceedings

and these Chapter 15 Cases were commenced in support of the Chapter 15 Debtors' global

restructuring centered in Brazil [and] the BVI Proceedings are intended to work alongside the

Chapter 15 Cases in providing support to the Brazilian RJ Proceeding." (*Id.* ¶ 3.)

### F. The Constellation Group's Capital Structure

#### 1. Capital Stock

The Verified Petition contains a single paragraph describing the capital structure of the

Constellation Group, which seems to use its defined terms referring Parent/Constellation and the

entire Constellation Group interchangeably. (*See* Verified Petition ¶ 19.) For instance, the

Verified Petition begins by providing that the Constellation Group's controlling shareholder is

LUX Oil and Gas International S.a.r.l. ("LuxCo"), an entity organized under the laws of

Luxembourg and indirectly wholly-owned by the private equity fund SUN STAR [Fundo de

Investimento em Participacoes Multiestrategia Investimento no Exterior] ("SUN STAR"). (*Id.*)

The next sentence goes on to explain:

> As of the RJ Petition Date, LuxCo owned 74.14% of the total capital
> stock and 75.10% of the voting stock of *Constellation*, and various
> holding companies and limited partnerships that are affiliates of
> and/or ultimately managed by Capital International, Inc. ("Capital")

owned the remaining 25.86% and 24.90% of the *Company's* total
capital and voting stock, respectively.

(*Id.* (emphasis added).)  Notably, while this excerpt begins by discussing the owner of the

majority of *Parent/Constellation's* stock (which is defined as "Constellation" in the Verified

Petition), it goes on to discuss the minority owners of the entire *Constellation Group's* stock (the

Constellation Group is defined as the "Company" in the Verified Petition).  In doing so, the

sentence implicitly presumes that *Parent/Constellation* and the *Constellation Group* are

equivalent entities (indeed, it combines their stocks to reach 100% ownership for each of capital

and voting stock).  While these statements may be derivatively true, since Parent/Constellation

owns all of the other members of the Constellation Group, meaning the shareholding of one

could be equated with the other, the imprecision in this presentation of facts for the purposes of

recognition should also be noted.

## 2.  Prepetition Debt Structure

The evidence provided by the Petitioner related to the Chapter 15 Debtors' debt

obligations was also presented to the Court predominately in terms of the entire Constellation

Group, rather than by each entity.  The Verified Petition explains that as of November 30, 2018,

the Constellation Group, as a whole, "was liable for approximately $1.5 billion in aggregate

outstanding third-party financial indebtedness (including accrued interest) under four credit

facilities and two bond issuances (the 'Prepetition Debt')."  (*Id.* ¶ 20.)  The Prepetition Debt is as

follows:

> (a)    "secured syndicated credit facility to finance the *Amaralina Star* and *Laguna Star*
> drillships (the 'A&L Project Loan Facility') with  an aggregate principal amount of $943.9
> million entered into with various banks and financial parties and governed by New York
> law, and secured by mortgages over these drillships, assignments  of certain receivables,
> and other collateral" (Verified Petition ¶ 20); Amaralina Star Ltd. and Laguna Star Ltd.
> (*i.e.* the Disputed Companies, both of which are Brazilian RJ Debtors) were the initial
> borrowers (PSA at 6 (discussed as part of the definition of Credit Agreements under the
> PSA)); Parent/Constellation is now a guarantor of this debt (Stipulation ¶ 8);

22

(b)      "secured syndicated credit facility to finance the *Brava Star* drillship (the 'Brava Project Loan Facility' and, together with the A&L Project Loan Facility, the 'A/L/B Project Financings') with an aggregate principal amount of $475 million entered into with various banks and financial parties and governed by New York law, and secured by a mortgage over the *Brava Star,* assignments of certain receivables, and other collateral" (Verified Petition ¶ 20); Brava Star Ltd., the borrower (PSA at 6), is a Brazilian RJ Debtor; Parent/Constellation is now a guarantor of this debt (Stipulation ¶ 8);

(c)      6.25% senior unsecured notes due November 2019 (the "2019 Notes") issued by Parent/Constellation in an aggregate principal amount outstanding of $95,432,000 under a New York law-governed indenture[22] (Verified Petition ¶ 20);

(d)      9.00% Cash/0.500% PIK senior secured notes due 2024 (the "2024 Notes") issued by Parent/Constellation in an aggregate principal amount outstanding of $604,568,000 under a New York law-governed indenture, and secured by mortgages over "certain of the Offshore Drilling Rigs," pledges on "certain accounts," and "other collateral" (Verified Petition ¶ 20)[23]; and

(e)      two unsecured working capital facilities under which Banco Bradesco S.A., Grand Cayman Branch ("Bradesco") made available advances in principal amount of up to $150 million (the "Bradesco I Working Capital Facility") and $75 million (the "Bradesco II Working Capital Facility" and, together with the Bradesco I Working Capital Facility, the "Bradesco Working Capital Facilities"), respectively, and which are governed by New York law. (Verified Petition ¶ 20.) Constellation Overseas was the borrower and Parent/Constellation became a guarantor of the Bradesco Working Capital Facilities. (PSA at 4.)

The 2024 Notes were the result of negotiations and two separate offering memoranda—

the Original Exchange Offer Memorandum and the Supplemental Exchange Offer

Memorandum. Parent/Constellation's noteholders rejected the exchange as proposed in the

Original Exchange Offer Memorandum and an ad hoc group of holders formed (the "2019

Group") to seek better terms for new notes. (Verified Petition ¶ 26.) Following multiple rounds

of negotiations, Parent/Constellation issued the Supplemental Exchange Offer Memorandum

---

[22]      Deutsche Bank Trust Company Americas (the "2019 Notes Trustee") serves as trustee, paying agent, transfer agent, and registrar for the 2019 Notes. Prior to the Exchange Offer (defined below), the principal amount of the 2019 Notes totaled $700 million. (Verified Petition at 14 n.17.)

[23]      Wilmington Trust, National Association (the "2024 Notes Trustee" and, together with the 2019 Notes Trustee, the "Notes Trustees") serves as trustee, paying agent, transfer agent, and registrar for the 2024 Notes. (Verified Petition at 14 n.18.)

setting forth the revised terms of the 2024 Notes, including changes to interest rates, guarantees, security, disclosures, and covenants. (*Id.* ¶ 26; *see also* Supplemental Exchange Offer Memorandum at 10-17.) The Supplemental Exchange Offer Memorandum updated and amended the Original Exchange Offer Memorandum with the terms set forth therein, and otherwise maintained the terms of the Original Exchange Offer Memorandum, which were not modified. (Supplemental Exchange Offer Memorandum at 2 ("[E]xcept as set forth herein, the contents of the Offering Memorandum, including the terms of the Exchange Offer and Consent Solicitation, remain as set forth therein.").) The noteholders accepted this revised exchange offer, which ultimately exchanged 86.4% of Parent/Constellation's 2019 Notes for an equal aggregate principal amount of the 2024 Notes. (*See* Verified Petition ¶ 26.)

Unfortunately, the maturity extensions achieved by the exchange were not sufficient to solve all of the Constellation Group's financial issues. (*Id.* ¶ 27.) Thus, in the months leading up to the commencement of the Brazilian RJ Proceeding, the Constellation Group sought to obtain a comprehensive restructuring of its debt obligations. Those restructurings ultimately resulted in the PSA. Under the PSA, the Constellation Group essentially entered the Brazilian RJ Proceeding with a pre-negotiated restructuring deal. (*Id.* ¶ 31.) On November 29, 2018, (i) 16 entities in the Constellation Group (including all Chapter 15 Debtors), (ii) the shareholders of the Constellation Group, (iii) 97.5% of the A/L/B Lenders (the "Consenting A/L/B Lenders"), and (iv) Bradesco entered into the PSA. (PSA at 2.)

In another example of entity blurring, the Verified Petition explains the terms of the PSA as:

> Consenting A/L/B Lenders have agreed to re-lend approximately $39 million in funds that were escrowed in August and September of 2018, Bradesco agreed to provide a $15 million letter of credit, and the shareholders agreed to invest $27 million of new money at closing, all to

> ensure that the Constellation Group had ample liquidity to survive a prolonged downturn in the market post-restructuring.

(*Id.* ¶ 31.)  Notably, the Verified Petition does not clarify the specific entities or accounts that received access to funds or letters of credit through the PSA.  Again, the Petitioner presented the evidence to the Court in terms of the Constellation Group as a whole.

Alperton also noted several provisions in the PSA that affect their potential interests in the Disputed Companies.  (*See* Alperton FOF ¶ 32.)  The PSA provides for cross-collateralizing the Brava Project Loan Facility and the A&L Project Loan Facility.  (*See* PSA at 54-63 (Schedule 1).)  If performed in accordance with its terms, the PSA would provide lenders under the Brava Project Loan Facility with liens on each of the *Amaralina Star* and *Laguna Star* vessels and a pledge on 100% of the shares of each of Laguna Star Ltd. and Amaralina Star Ltd. (*Id.*)

The PSA requires as a condition precedent to the implementation of the restructuring transactions that the Chapter 15 Debtors (and later another group of the RJ Debtors) receive an order from this Court granting recognition of the Brazilian RJ Proceeding with respect to those entities.  (Verified Petition ¶ 31; *see also* PSA at 8 (defining the Chapter 15 Debtors as the Initial Chapter 15 Filing Entities); *see also* PSA at 9 (defining the Subsequent Chapter 15 Filing Entities).)

In parallel with the negotiations towards the PSA, the Constellation Group also engaged in negotiations with Bradesco that led to Parent/Constellation becoming a guarantor of Constellation Overseas debt.  Specifically, Bradesco agreed to several extensions of the final maturity payments under the Bradesco Working Capital Facilities in exchange for, *inter alia*, Parent/Constellation becoming a guarantor for the obligations of Constellation Overseas under

the Bradesco Working Capital Facilities.  (Verified Petition ¶ 29; *see also* Verified Petition at 24 n.22.)

### G.  Galdino Declaration on Brazilian Bankruptcy Law

Flavio Galdino, counsel for the Constellation Group in the Brazilian Proceeding, provided a declaration pursuant to 28 U.S.C. § 1746.  ("Galdino Declaration," ECF Doc. # 4, Pet'r Ex. 15.)  Galdino declares that "Brazil has not adopted the UNCITRAL Model Law on Cross-Border Insolvency and currently has no statutory definition of center of main interests ('COMI') for the purposes of establishing the competent country of jurisdiction for the main insolvency proceedings either of a company or of a group of companies."  (*Id.* ¶ 9.)  According to Galdino, under Brazilian law, "[a]n entity commences an RJ by filing a petition with the business court (the 'RJ Court') in the jurisdiction in which it maintains its principal place of business . . . ."  (*Id.* ¶ 8.)  Galdino further explains that the Brazilian Court's jurisdictional requirement is referred to as *principal estabelecimento,* and Brazilian Court's must find that a debtor or group of debtors have their *principal estabelecimento* in Brazil.  (*Id.* ¶ 9.)  That said, he also explains that *principal estabelecimento* is interpreted broadly and that the RJ Court can focus on either the location of a debtor's assets and operations or on the location of management and decision makers.  (*Id.* ¶ 10.)

With respect to what Galdino refers to as "substantive consolidation" as it is "referred to in the United States," Galdino notes that while some RJ Courts have allowed substantive consolidation, "[w]hether a court will allow substantive consolidation is a fact-intensive determination heavily dependent upon the nature of the relationship among the affiliated debtors and any interrelated debt subject to restructuring."  (*Id.* ¶ 12.)

Alperton's Proposed Findings of Fact highlights this portion of the Galdino Declaration and emphasizes that substantive consolidation of creditors for negotiation and voting on a single plan has, in fact, been allowed in Brazil and could be allowed here.  (Alperton FOF ¶ 38.) However, the Court emphasizes that this opinion will only determine recognition of the *proceedings*; the decisions reached in this opinion do not assure that further discretionary relief will follow—such as this Court's recognition and enforcement of any plan that may be approved in Brazil.  Indeed, ample precedent dictates that the Court may refuse to recognize and enforce a plan if approval was obtained by an unfair voting system, even when the plan is approved in a country that usually enjoys comity from the United States.  *See, e.g., Ad Hoc Grp. of Vitro Noteholders v. Vitro S.A.B. de C.V. (In re Vitro S.A.B. de C.V.)*, 701 F.3d 1031 (5th Cir. 2012); *In re Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 108-113 (Bankr. S.D.N.Y. 2012).

### H.  Analysis of Individual Chapter 15 Debtors

#### 1.  Parent/Constellation

Parent/Constellation is a tax resident of Luxembourg with its central administration in Luxembourg as a matter of Luxembourg tax law.  (Stipulation ¶ 7.)  Parent/Constellation is a holding and financing company that owns equity interests in subsidiaries in the Constellation Group and engages in the necessary activities for borrowing and guaranteeing debt.  (Verified Petition ¶ 75.)  The Court finds that Parent/Constellation's registered office is in Luxembourg.

Parent/Constellation's board of directors is composed of six members.  (Stipulation ¶ 1.)  Three directors are residents and citizens of Brazil; two are residents and citizens of Luxembourg; and one is a resident and citizen of Switzerland.  (*Id.*)  Parent/Constellation holds its board of directors' meetings and shareholder meetings in Luxembourg, as required for companies incorporated under Luxembourg law.  (Stipulation ¶ 6; Hr'g Tr. 50: 6-10.)  The Original Exchange Offer Memorandum states, "[i]n accordance with Luxembourg law,

27

[Parent/Constellation's] Board of Directors is the sole responsible body for managing [Parent/Constellation and its consolidated subsidiaries'] affairs and ensuring that [Parent/Constellation and its consolidated subsidiaries'] operations are organized in a satisfactory manner." (Original Exchange Offer Memorandum at 131.) The 2019 Notes Offering Memorandum further states that Parent/Constellation's "Board of Directors is empowered to take any action necessary or desirable for carrying out [its] corporate objective, except for the powers specifically allocated to the general meeting of [its] shareholders by Luxembourg law and/or by [its] Articles." (2019 Notes Offering Memorandum at 121.) The Court finds that Parent/Constellation's management is located in Luxembourg, where the board of directors conducts business.

As a holding company, Parent/Constellation does not have any assets other than its ownership interests in its subsidiaries. (*Id.* at 39.) The 2019 Notes Offering Memorandum explains: "The issuer is a holding company, and all of its assets are held by its direct and indirect subsidiaries." (*Id.*) The Supplemental Exchange Offering Memorandum describes Parent/Constellation's operations by explaining, "[Parent/Constellation] is incorporated in the laws of the Grand Duchy of Luxembourg, *and [Parent/Constellation] conducts most of its business from Brazil*." (Supplemental Exchange Offering Memorandum at 21 (emphasis added).) The Original Exchange Offer Memorandum states, "[t]he issuer is a holding company with no independent operations or assets and it is dependent on cash flow generated by its subsidiaries." (Original Exchange Offer Memorandum at 53.) It goes on to explain, "[r]epayment of our indebtedness, including the New Notes, is dependent on the generation of cash flow by our subsidiaries and their ability to make such cash available to us, by dividend, debt repayment or otherwise." (*Id.*) Parent/Constellation's key indirect assets are its drilling rigs, which, with the

exception of the *Olinda Star* and one of its onshore drilling rigs, were all located in Brazil as of

the Petition Date.  (Verified Petition ¶¶ 9, 14-18.)  At the Hearing, Alperton suggested that, as of

the Petition Date, several of the drilling rigs were operating on the high seas and were not located

in Brazil.  (Hr'g Tr. 108:18-24.)  However, the evidence in the record demonstrates that 20 of the

22 drilling rigs were located in Brazil as of the petition date; the two that were not in Brazil were

in India and Paraguay.  (Verified Petition ¶¶ 9, 14-18; *see also* Certified Translation of the RJ

Petition at 39.)  The Verified Petition explains: "The Offshore Drilling Rigs and Onshore Drilling

Rigs are the Company's primary operating assets.  Seven of the eight Offshore Drilling Rigs are

presently located in Brazil, eight of its nine Onshore Drilling Rigs are located in Brazil, and all of

the JV FPSO Units in which it holds an interest are located in Brazil."  (Verified Petition ¶ 9.)

Based on the foregoing evidence, the Court finds that Parent/Constellation's assets are primarily

located in Brazil.

Parent/Constellation has no officers.  (2019 Offering Memorandum at 118 ("There are no

statutory officers under Luxembourg law . . . members of senior management set forth below

currently serve as senior managers of QGOG *and will be responsible for the day-to-day

management of our operations*.") (emphasis added); *see also* Stipulation ¶¶ 4-5.)

Parent/Constellation makes use of the Constellation Group's shared corporate management team,

its operational management team, and its employees, who are employed by Parent/Constellation's

direct or indirect subsidiaries.  As discussed above, the shared corporate management team are

located in both London and Brazil.  The court finds that the location of executive management

team of Parent/Constellation is split between London and Brazil.

Parent/Constellation is the issuer of the 2019 Notes and the 2024 Notes; it is also

guarantor of the A/L/B Project Financings and guarantor of the Bradesco Working Capital

Facilities.  (Stipulation ¶¶ 8-11.)  The indenture trustees of the 2019 Notes and the 2024 Notes are

located in New York and there is no evidence in the record regarding the location of the beneficial

holders of the 2019 Notes and 2024 Notes, other than a holder of 2019 Notes that is a Brazilian

national located in New York.  (*See* "Noteholder Letter," ECF Doc. # 38.)  There  is  no  evidence

in the record  that  any  of Parent/Constellation's creditors are located in Luxembourg or Brazil.

(*See* "Notice List," ECF Doc. # 7-6 at 8-9.)  As such, the Court finds that the location of most of

Parent/Constellation's creditors is indeterminate.

> The Supplemental Exchange Offer states:

> The Company [defined to be the issuer, Parent/Constellation][24] and
> Arazi are incorporated under the laws of Luxembourg, and as such,
> any  insolvency  proceedings  applicable  to  them  are  in  principle
> governed by Luxembourg law.

(Supplemental Exchange Offer Memorandum at 21.)  Further, the Supplemental Exchange Offer

explains that the section titled "Certain Luxembourg Insolvency Law Considerations" in the

2019 Notes Offering Memorandum should be read as applicable to "both the Company and

Arazi." (Supplemental Exchange Offer Memorandum at 22.)  The Supplemental Exchange Offer

Memorandum also explicitly explains to investors that restructuring proceedings could be

commenced in Brazil due to the Constellation Group's significant ties there, stating:

> [I]n  the  event  of  any  bankruptcy,  insolvency,  liquidation,
> dissolution, reorganization or similar proceedings involving us or
> any  of  our  subsidiaries,  bankruptcy  laws  other  than  those  of  the
> United States could apply. . . .  [I]n the event that we do experience
> financial  difficulty,  it  is  not  possible  to  predict  with  certainty  in
> which jurisdiction insolvency proceedings would be commenced or
> the outcome of such proceedings, but it may include, among other

---

[24]    The Original Exchange Offer Memorandum explains "by the 'Company,' we mean QGOG Constellation S.A., and not its Subsidiaries")."  (Original Exchange Offer OM, ECF Doc. # 43-1 at 140.)

jurisdictions, Brazil, where certain decisions of the Company[25] are made, certain members of the Company's management are located and the location of substantially all of the Company's business is conducted (and, therefore, from which substantially all of the operating revenues that may be available to service the Company's obligations under the New Notes are currently derived).

(Supplemental Exchange Offer Memorandum at 21.)

The Supplemental Exchange Offer Memorandum further explains risks associated with

Brazilian insolvency proceedings:

In Brazil, the right of the Collateral Trustee to repossess and dispose of the Collateral securing the New Notes upon acceleration may be significantly impaired by applicable bankruptcy law if bankruptcy proceedings were commenced by or against the issuer or the Subsidiary Guarantors prior to or possibly even after the time that the Collateral Trustee repossesses and disposes of the Collateral. In the event of a cross-border insolvency, Brazilian courts may impair the seizure of the Drilling Rigs located in Brazil, in order to protect the business activities in Brazil and/or ensure the payment of the relevant debt in accordance with Brazilian laws.

In addition, in case of judicial reorganization or liquidation under Brazilian law, it is impossible to estimate the period that payments under the New Notes could be delayed following commencement of a bankruptcy proceeding. With respect to the judicial reorganization, the debtor may continue to retain and to use the collateral and the proceeds, products, rents or profits therefrom. The judicial reorganization proceeding binds all pre-filing secured debts, even those not yet due, and they will be paid in accordance with the restructuring plan submitted by the debtor, which must be approved by the majority of creditors in a creditors' meeting and, subsequently, ratified by the Brazilian court. In certain circumstances, the Brazilian bankruptcy law also grants the debtor the possibility to cram down the plan. The reorganization plan results in the replacement and renewal of all debts existing prior to the filing of the reorganization, and is binding on the debtor and all creditors subject to it.

In relation to a bankruptcy proceeding, the Collateral Trustee is prohibited from repossessing or disposing of the Collateral securing

---

[25] The Supplemental Exchange Offer Memorandum defines the "Company" as QGOG Constellation S.A. (Exchange Offer Memorandum at 10.)

> the New Notes because all assets of the debtor, including the
> Collateral, will be sold in order to pay the creditors according to the
> priority order established in the Brazilian bankruptcy law.  Secured
> debt have priority in the ranking and are paid just after labors'
> claims, up to the amount of the Collateral.  Any shortfall will be
> classified as "unsecured debt".

(*Id.*)

The Court therefore finds that the objective indicia of Parent/Constellation's creditors'

expectations of an insolvency proceeding's location could be in either Brazil or Luxembourg.

However, unlike Parent/Constellation's subsidiaries, Parent/Constellation is the original issuer of

both the 2019 and 2024 Notes.  Even though the memoranda for these notes frequently discusses

the entire Constellation Group, which it refers to as "we," "us," *etc.*, this does not change the fact

that the issuer listed at the beginning of each of the notes is described as a public limited liability

company incorporated in the Grand Duchy of Luxembourg.  (*See* 2019 Notes Offering

Memorandum at 3; Original Exchange Offer Memorandum at 2; Supplemental Exchange Offer

Memorandum at 2.)  As such, the Court finds that the objective expectations of creditors with

respect to Parent/Constellation's COMI should be determined to be predominately in

Luxembourg.

New York law is the governing law of all of the Prepetition Debt of the Constellation

Group, which Parent/Constellation either issued or now guarantees.  (Verified Petition ¶ 20;

Alperton FOF ¶ 62.)  Alperton asserts that New York is the jurisdiction whose law would apply

to most of Parent/Constellation's disputes.  (Alperton FOF ¶ 101.)  The documentation relevant

to all prepetition debt is in English.  While there is no evidence in the record of a current dispute

about Luxembourg law, Luxembourg law is an unavoidable part of the reorganization for

Parent/Constellation, because Luxembourg law will determine, *inter alia*: (i) the fiduciary duties

applicable to Parent/Constellation's board, (ii) the extent to which foreign proceedings outside

Luxembourg are consistent or inconsistent with these fiduciary duties, and (iii) the authority for and validity of any actions taken by Parent/Constellation under corporate law.  (Alperton FOF ¶ 102.)  The Court therefore determines that while many countries laws could govern the range of feasible disputes that Parent/Constellation could be involved in, Luxembourg law should be considered the most relevant law governing Parent/Constellation's disputes for purposes of the COMI determination.

## 2.  Alpha Star

Chapter 15 Debtors Alpha Star, Gold Star, Olinda Star, Lone Star, and Star Int'l are the offshore rig owners ("Offshore Rig Owner Debtors").  (Verified Petition at 13.)  Alpha Star owns the *Alpha Star* offshore drilling rig, which is not presently under contract and is being maintained in a shipyard in Brazil.  (*Id.* ¶¶ 9, 14.)  The Alpha Star is classified as capable of ultra-deepwater drilling.  (Certified Translation of the RJ Petition at 38.)

Alpha Star is organized under the laws of the BVI; it maintains its registered office in the BVI.  (Verified Petition ¶ 73.)  The sole director of Alpha Star is Michael Pearson, a citizen of the United Kingdom, who resides in the Cayman Islands.  (Stipulation ¶ 2.)

The Alpha Star's offshore rig is operated and maintained by Chapter 15 Debtor Petróleo Constellation and other Brazilian subsidiaries pursuant to operating and maintenance agreements, through its operational management team and operational staff located in the Brazilian offices.  (Verified Petition ¶ 70.)  The Original Exchange Offer Memorandum explains that QGOG (which is the former name of Chapter 15 Debtor Petróleo Constellation)[26] agreed to manage, be technically responsible for, and/or perform the activities and works of maintenance

---

[26]    Page 17 of the Original Exchange Offer Memorandum defines "QGOG" as "Queiroz Galvao Oleo and Gas S.A., one of our Brazilian subsidiaries."  The Plan Support and Lock Up Agreement explains on page 2 that Petróleo Constellation was formerly known Queiroz Galvao Oil & Gas S.A.

necessary to maintain and preserve *Alpha Star* and all its parts, components, and equipment. (Original Exchange Offer Memorandum at 118.)  The operations of Alpha Star are therefore predominately in Brazil.

Alpha Star is a guarantor of the 2024 Notes issued by Parent/Constellation.  (Stipulation ¶ 10.)  The indenture trustees of the 2024 Notes are in New York.  Otherwise, there is no evidence in the record regarding the location of the beneficial holders of the 2024 Notes.

The expectations of the creditors of the 2024 Notes, the key creditor constituency of the offshore drilling rigs, may be objectively determinable by reference to the offering memoranda related to the 2024 notes.  The initial offering document described the Constellation Group by explaining "[w]e are a market leading provider of offshore oil and gas contract drilling and FPSO services in Brazil."  (Original Exchange Offer Memorandum at 20.)  The overview section of the document further explains "[i]n particular, we believe that we are well positioned to benefit from the ultra-deepwater drilling activity in Brazil . . . ."  (*Id.*)  Since Alpha Star owns an ultra-deepwater rig, this would have put 2024 Note purchasers on notice that *Alpha Star* was not only located in Brazil, but also had its future operations in Brazil.  Indeed, a map provided in the same document shows that *Alpha Star* is located off the coast of Brazil.  (*Id.* at 108.)  The document states that all of the Offshore Drilling Rigs other than *Olinda Star* are under charter contracts with Petrobras.  (*Id.*)  Finally, the offering expressly refers several times to the chartering and operations of the offshore drilling rigs, explaining that those rigs operated "mainly in Brazil" and were currently chartered "mainly to [Petrobras]."  (*Id.* at 230, 296.)

The Supplemental Exchange Offer to the Original Exchange Offer Memorandum conveys to the holders of the 2024 Notes that insolvency proceedings may be commenced in Brazil and explains the consequences that a Brazilian restructuring or liquidation proceeding

could have on their ability to enforce their collateral, including the mortgages granted to them over the offshore drilling rigs.  (Supplemental Exchange Offer Memorandum at 21 (describing Brazil as the location "from which substantially all of the operating revenues that may be available to service [Parent/Constellation's] obligations under the New Notes are currently derived.").)

The Supplemental Exchange Offer Memorandum also contains evidence of the laws applicable to *Alpha Star* and other rigs.  For example, because the *Alpha Star* rig is in Brazil, the arrest and seizure of the rig would take place under Brazilian law and require a judicial order issued by a Brazilian Court.  (*Id*. at 22.)  The same paragraph explains that there could be third-party claims under maritime liens such as ports and maritime costs and taxes; seamen's wages; salvage and general average; repairs, supplies and necessaries contracted outside the mortgaged drilling rigs' home port; collision and tort liens; and simple and general damages to the drilling rigs.  (*Id*.)

The JPLs have been appointed with respect to each of Lone Star, Gold Star, Olinda Star, and Alpha Star, and function to protect the interests of the collective creditors of each.  (JPL Statement in Support ¶ 2.)  They have expressed support for the Brazilian RJ Proceeding and for a finding of COMI in Brazil for each of these BVI Debtors.  (*Id*.)

3.  Gold Star

Gold Star is an offshore rig owner organized under the laws of the BVI and maintains its registered office in the BVI.  (Verified Petition ¶ 73.)  The sole director is Michael Pearson, a citizen of the United Kingdom, who resides in the Cayman Islands.  (Stipulation ¶ 2.)  Gold Star owns the *Gold Star* offshore drilling rig, which is not presently under contract and is being

maintained in a shipyard in Brazil.  (Verified Petition ¶¶ 9, 14.)  The Gold Star is classified as

capable of ultra-deepwater drilling.  (Certified Translation of the RJ Petition at 38.)

The Gold Star's offshore rig is operated and maintained by Chapter 15 Debtor Petróleo

Constellation and other Brazilian subsidiaries pursuant to operating and maintenance

agreements, through its operational management team and operational staff located in the

Brazilian Offices.  (Verified Petition ¶ 70.)  The Original Exchange Offer Memorandum explains

that QGOG (defined as one of "our Brazilian subsidiaries" on page 17 of the Original Exchange

Offer Memorandum) agreed to manage, be technically responsible for, and/or perform the

activities and works of maintenance necessary to maintain and preserve *Gold Star* and all its parts,

components, and equipment.  (Original Exchange Offer Memorandum at 118.)

Gold Star is a guarantor of the 2024 Notes issued by Parent/Constellation.  (Stipulation ¶

10.)  The indenture trustees of the 2024 Notes are located in New York; otherwise, there is no

evidence in the record regarding the location of the beneficial holders of the 2024 Notes.

The expectations of the creditors of the 2024 Notes, the key creditor constituency of the

offshore drilling rigs, may be objectively determinable by reference to the offering memoranda

related to the 2024 notes.  The Original Exchange Offer Memorandum describes the

Constellation Group as "[w]e are a market leading provider of offshore oil and gas contract

drilling and FPSO services in Brazil."  (Original Exchange Offer Memorandum at 20.)

Additionally, the overview paragraph states "[i]n particular, we believe that we are well

positioned to benefit from the ultra-deepwater drilling activity in Brazil . . . ."  (*Id.*)  Since Gold

Star owns an ultra-deepwater rig, this would have put 2024 Note purchasers on notice that *Gold

Star* was not only located in Brazil, but had its future operations in Brazil.  Indeed, a map

provided in the Original Exchange Offer Memorandum shows that *Gold Star* is located off the

36

coast of Brazil.  (*Id.* at 108.)  The same page of the document states that all the offshore drilling

rigs other than *Olinda Star* are under charter contracts with Petrobras.  (*Id.*)  Finally, the Original

Exchange Offer Memorandum expressly refers several times to the chartering and

operations of the offshore drilling rigs, explaining that those rigs operate mainly in Brazil

and were currently chartered "mainly to [Petrobras]."  (*Id.* at 230, 296.)

The Supplemental Exchange Offer to the Original Exchange Offer Memorandum

conveys to the holders of the 2024 Notes that insolvency proceedings may be commenced in

Brazil and explains the consequences that a Brazilian restructuring or liquidation proceeding

could have on their ability to enforce their collateral, including the mortgages granted to them

over the offshore drilling rigs.  (Supplemental Exchange Offer Memorandum at 21 (describing

Brazil as the location "from which substantially all of the operating revenues that may be

available to service [Parent/Constellation's] obligations under the New Notes are currently

derived.").)

The Supplemental Exchange Offer Memorandum also contains evidence of the laws

applicable to *Gold Star* and other rigs.  For example, because the *Gold Star* rig is in Brazil, the

arrest and seizure of the rig would take place under Brazilian law and require a judicial order

issued by a Brazilian Court.  (*Id.* at 22.)  The same paragraph explains that there could be third-

party claims under maritime liens such as ports and maritime costs and taxes; seamen's wages;

salvage and general average; repairs, supplies and necessaries contracted outside the mortgaged

drilling rigs' home port; collision and tort liens; and simple and general damages to the drilling

rigs.  (*Id.*)

The JPLs have been appointed with respect to each of Lone Star, Gold Star, Olinda Star,

and Alpha Star, and function to protect the interests of the collective creditors of each.  (FRFOF

¶ 79.)  They have expressed support for the Brazilian RJ Proceeding and for a finding of COMI in Brazil for each of these BVI Debtors.  (FRFOF ¶ 79.)

### 4.  Olinda Star

The Brazilian Court of Appeals determined that Olinda Star should be removed from the Brazilian RJ Proceeding.  Thus, discussion of this Chapter 15 Debtor's possible recognition is unnecessary.

### 5.  Lone Star

Lone Star is an offshore rig owner organized under the laws of the BVI and maintains its registered office in the BVI.  (Verified Petition ¶ 73.)  The sole director is Michael Pearson, a citizen of the United Kingdom, who resides in the Cayman Islands.  (Stipulation ¶ 2.)  Lone Star owns the *Lone Star* offshore drilling rig, which is not presently under contract and is being maintained in a shipyard in Brazil.  (Verified Petition ¶¶ 9, 14.)  The *Lone Star* rig is classified as capable of ultra-deepwater drilling.  (Certified Translation of the RJ Petition at 38.)

The Lone Star's offshore rig is operated and maintained by Chapter 15 Debtor Petróleo Constellation and other Brazilian subsidiaries pursuant to operating and maintenance agreements, through its operational management team and operational staff located in the Brazilian Offices.  (Verified Petition ¶ 70.)  The Original Exchange Offer Memorandum explains that QGOG (defined as one of "our Brazilian subsidiaries" on page 17 of the Original Exchange Offer Memorandum) agreed to manage, be technically responsible for, and/or perform the activities and works of maintenance necessary to maintain and preserve *Lone Star* and all its parts, components, and equipment.  (Original Exchange Offer Memorandum at 118.)

38

Lone Star is a guarantor of the 2024 Notes issued by Parent/Constellation.  (Stipulation ¶ 10.)  The indenture trustees of the 2024 Notes are located in New York; otherwise, there is no evidence in the record regarding the location of the beneficial holders of the 2024 Notes.  The expectations of the creditors of the 2024 Notes, the key creditor constituency of the offshore drilling rigs, may be considered to be objectively determinable by reference to the offering memoranda related to the 2024 notes.  The Original Exchange Offer Memorandum explains the Constellation Group, as a whole, as "[w]e are a market leading provider of offshore oil and gas contract drilling and FPSO services in Brazil."  (Original Exchange Offer Memorandum at 20.)  Additionally, the overview paragraph states "[i]n particular, we believe that we are well positioned to benefit from the ultra-deepwater drilling activity in Brazil . . . ."  (*Id.*)  Since Lone Star owns an ultra-deepwater rig, this would have put 2024 Note purchasers on notice that a rig like *Lone Star* was not only located in Brazil but had its future operations in Brazil.  Indeed, a map provided in the Original Exchange Offer Memorandum shows that *Lone Star* is located off of the coast of Brazil.  (*Id.* at 108.)  The same page of the document states that all of the offshore drilling rigs other than *Olinda Star* are under charter contracts with Petrobras.  (*Id.*)  Finally, the Original Exchange Offer Memorandum expressly refers several times to the chartering and operations of the offshore drilling rigs, explaining that those rigs operate "mainly in Brazil" and were currently chartered "mainly to [Petrobras]."  (*Id.* at 230, 296.)

The Supplemental Exchange Offer to the Original Exchange Offer expressly conveys to the holders of the 2024 Notes that insolvency proceedings may be commenced in Brazil and explains the consequences that a Brazilian restructuring or liquidation proceeding could have on their ability to enforce their collateral, including the mortgages granted to them over the offshore drilling rigs.  (Supplemental Exchange Offer at 21 (describing Brazil as "the location . . . from

which substantially all of the operating revenues that may be available to service the Company's

obligations under the New Notes are currently derived.").)

The Supplemental Exchange Offer also contains evidence of the laws applicable to *Lone*

*Star* and other rigs.  For example, because the *Lone Star* rig is in Brazil, the arrest and seizure of

the rig would take place under Brazilian law and require a judicial order issued by a Brazilian

Court.  (*Id*. at 22.)  The same paragraph explains that there could be third-party claims under

maritime liens such as ports and maritime costs and taxes; seamen's wages; salvage and general

average; repairs, supplies and necessaries contracted outside the mortgaged drilling rigs' home

port; collision and tort liens; and simple and general damages to the drilling rigs.  (*Id*.)

The JPLs have been appointed with respect to each of Lone Star, Gold Star, Olinda Star,

and Alpha Star, and function to protect the interests of the collective creditors of each.  (FRFOF

¶ 79.)  They have expressed support for the Brazilian RJ Proceeding and for a finding of COMI

in Brazil for each of these BVI Debtors.  (FRFOF ¶ 79.)

6.  Star Int'l

Star Int'l is an offshore rig owner organized under the laws of the Cayman Islands and

maintains its registered office there.  (Verified Petition ¶ 73.)  The sole director is Michael

Pearson, a citizen of the United Kingdom, who resides in the Cayman Islands.  (Stipulation ¶ 2.)

Star Int'l owns the *Atlantic Star* offshore drilling rig; as of the petition date, the *Atlantic Star* was

under contract with Petrobras and operating in Brazilian waters.  (Verified Petition ¶ 14.)  The

*Atlantic Star* rig is classified as a midwater drilling rig.  (Certified Translation of the RJ Petition

at 38.)

Star Int'l's offshore rig is operated and maintained by Chapter 15 Debtor Petróleo

Constellation and other Brazilian subsidiaries pursuant to operating and maintenance

agreements, through its operational management team and operational staff located in the Brazilian Offices. (Verified Petition ¶ 70.) The Original Exchange Offer Memorandum explains that QGOG (defined as one of "our Brazilian subsidiaries" on page 17 of the Original Exchange Offer Memorandum) agreed to manage, be technically responsible for, and/or perform the activities and works of maintenance necessary to maintain and preserve *Atlantic Star* (the rig owned by Star Int'l) and all its parts, components, and equipment. (Original Exchange Offer Memorandum at 118.)

Star Int'l is a guarantor of the 2024 Notes issued by Parent/Constellation. (Stipulation ¶ 10.) The indenture trustees of the 2024 Notes are located in New York; otherwise, there is no evidence in the record regarding the location of the beneficial holders of the 2024 Notes.

The expectations of the creditors of the 2024 Notes, the key creditor constituency of the offshore drilling rigs, may be considered to be objectively determinable by reference to the offering memoranda related to the 2024 notes. The Original Exchange Offer Memorandum describes the Constellation Group, as a whole, as "[w]e are a market leading provider of offshore oil and gas contract drilling and FPSO services in Brazil." (Original Exchange Offer Memorandum at 20.) A map provided in the Original Exchange Offer Memorandum shows that the *Atlantic Star* is located off of the coast of Brazil. (*Id.* at 108.) The same page of the document states that all of the offshore drilling rigs other than *Olinda Star* are under charter contracts with Petrobras. (*Id.*) Finally, the Original Exchange Offer Memorandum expressly refers several times to the chartering and operations of the offshore drilling rigs, explaining that those rigs operate "mainly in Brazil" and were currently chartered "mainly to [Petrobras]." (*Id.* at 230, 296.)

The Supplemental Exchange Offer Memorandum conveys to the holders of the 2024 Notes that insolvency proceedings may be commenced in Brazil and explains the consequences that a Brazilian restructuring or liquidation proceeding could have on their ability to enforce their collateral, including the mortgages granted to them over the offshore drilling rigs. (Supplemental Exchange Offer at 21 (describing Brazil as "the location . . . from which substantially all of the operating revenues that may be available to service the Company's obligations under the New Notes are currently derived.")

The Supplemental Exchange Offer Memorandum also contains evidence of the laws applicable to Star Int'l and other rig owners. For example, because the *Atlantic Star* rig is in Brazil, the arrest and seizure of the rig would take place under Brazilian law and require a judicial order issued by a Brazilian Court. (*Id*. at 22.) The same paragraph explains that there could be third-party claims under maritime liens such as ports and maritime costs and taxes; seamen's wages; salvage and general average; repairs, supplies and necessaries contracted outside the mortgaged drilling rigs' home port; collision and tort liens; and simple and general damages to the drilling rigs. (*Id*.)

7. <u>Snover</u>

All of Snover's rigs were located in Brazil as of the petition date. (Verified Petition ¶ 71.) Snover sits within the Constellation Group's onshore drilling operation segment. It serves as the owner of three Onshore Drilling Rigs (the *QG-V*, the *QG-VIII* and the *QG-IX*). (FRFOF ¶ 81.) The Court therefore finds that Snover's primary assets are in Brazil.

Snover's sole director is Michael Pearson, a citizen of the United Kingdom, who resides in the Cayman Islands. (Stipulation ¶ 2.) The record contains no evidence that any of Snover's decisions are made from Luxembourg. (FRFOF at 42 n.29.) Snover's active Onshore Rig is

operated by, and its inactive Onshore Rigs are maintained by, Debtor Petróleo Constellation

through the Group's operational management team located in Brazil.  (*Id.* ¶ 83.)  The Court

therefore finds that Snover's day-to-day management, like that of other drillship owning entities

is in Brazil.  Snover's senior management is best described as the senior executive team of the

Constellation Group, which is located in both London and Brazil.  Cumulatively, given that this

entity is a drillship owner and makes use of predominately Brazilian employees, daily

management, and given that most of the Constellation Group's executive management team is

located in Brazil, the Court finds that Snover's senior management is best described as located in

Brazil.

     All of Snover's onshore drilling rigs are located in Brazil.  (*Id.* ¶ 84.)  As in its offshore

operational segment, the Constellation Group charters its onshore drilling rigs to oil and gas

customers and provides corresponding operating services.  (*Id.* ¶ 84.)  Snover is a fully integrated

participant in the Constellation Group's onshore drilling operations—operations that take place

primarily in Brazil, utilize Brazilian employees, and are accordingly subject to certain Brazilian

legal and regulatory regimes.  (*Id.* ¶ 84.)  Its assets, consisting of onshore drilling rigs, are all

located in Brazil, and its revenues ultimately derive from operations with primarily Brazilian

customers under the customer contracts which historically have been primarily governed by

Brazilian law.  (*Id.* ¶ 84.)

     Snover is a guarantor of the 2024 Notes.  (Stipulation ¶ 10.)  The indenture trustees of the

2024 Notes are located in New York and there is no evidence in the record regarding the location

of the beneficial holders of the 2024 Notes.  (FRFOF ¶ 45.)  The location of the majority of

Snover's creditors is therefore not strong evidence in favor of any particular COMI for Snover.

As a guarantor of the 2024 Notes, Snover's creditors were advised that their investment was essentially an investment in Brazil and were expressly cautioned that insolvency proceedings could take place in Brazil due to the strong ties to Brazil disclosed in the various offering memoranda.  (Supplemental Exchange Offer Memorandum at 21 (stating that the jurisdiction of insolvency proceedings could be in Brazil); *see also* Original Exchange Offer Memorandum at 20 ("We are a market leading provider of offshore oil and gas contract drilling and FPSO services in Brazil.").)

In their appointment with respect to Snover, the JPLs speak for the interests of its collective creditors, and have expressed support for the Brazilian RJ Proceeding and for a finding of COMI in Brazil for each of these Debtors.  (JPL Statement in Support ¶ 2.)  Given that the 2024 notes offering memoranda heavily emphasize Brazil as the location of the Constellation Group's rigs and daily operations and given that the JPLs support a COMI in Brazil for Snover, the Court finds that creditor expectations and interests weigh in favor of a COMI in Brazil.

## 8.  Arazi

Arazi is not discussed at this time.  The Brazilian Court of Appeals determined that this company should be removed from the Brazilian RJ Proceeding, thus no consideration by this Court is necessary.

## 9.  Petróleo Constellation

Petróleo Constellation is an entity organized under the laws of Brazil with its registered office at the Rio Office in Rio de Janeiro, Brazil.  (Verified Petition ¶ 70.)  No objections were filed to the recognition of the Brazilian RJ Proceeding for Petróleo Constellation, and Alperton does not object to foreign main recognition in respect of Petróleo Constellation. (Hr'g Tr. at 95:13-17.)

Petróleo Constellation participates in all three of the Constellation Group's business segments—onshore, offshore, and FPSO investments.  (Verified Petition ¶¶ 15, 17, 18.)  It is the owner of six of the nine Onshore Drilling Rigs, the operator of all of the offshore drilling rigs and also provides a limited number of employees to the JV FPSO Units. (*Id.*)  It employs the majority of the Constellation Group's employees and serves as the counterparty on the largely Brazilian law-governed Customer Service Agreements for the offshore drilling rigs.  (*Id.* ¶ 70.)  It owns several of the Constellation Group's Onshore Drilling Rigs and in most cases has historically served as the operator for the Constellation Group's onshore drilling rigs.  (*Id.*)

Petróleo Constellation is not a guarantor of any indebtedness for borrowed money of other entities of the Constellation Group. (Stipulation ¶ 9.)

### 10.    Constellation Overseas

Constellation Overseas is incorporated in the British Virgin Islands and has its registered office in the BVI.  (Verified Petition ¶¶ 75, 76.)  Constellation Overseas is the direct owner of 100% of the equity of Lone Star, Gold Star, Olinda Star, Snover and Alpha Star and is an indirect wholly owned subsidiary of Parent.  (*Id.* ¶ 37.) The sole director of Constellation Overseas is Michael Pearson, who resides in the Cayman Islands and is a citizen of the United Kingdom.  (Stipulation ¶ 2.)

Constellation Overseas is the Chapter 15 Debtor in the dispute with Alperton.  Alperton and Constellation Overseas entered into a joint venture to build two ultra-deepwater drillships.  They established two special purpose offshore holding companies organized under the laws of the BVI: Amaralina Star Ltd. and Laguna Star Ltd.  Constellation Overseas' relationship with Alperton is discussed more fully above, in sections I.B.2 and I.C of this opinion.

Constellation Overseas is either the primary obligor or the guarantor for each category of

Prepetition Debt set forth in the Verified Petition.  (Verified Petition ¶¶ 20- 21; Stipulation ¶¶

10-11.)  Parent/Constellation is a guarantor of the obligations of Constellation Overseas under

the Bradesco Working Capital Facilities.  (Stipulation ¶ 8.)

## III.    DISCUSSION

### A.  The Debtors Satisfy Section 109(a) and Venue Is Proper in this District

Foreign debtors seeking relief under chapter 15 must satisfy the debtor eligibility

requirements set forth in section 109(a) of the Bankruptcy Code.  *See In re Ocean Rig UDW*

*Inc.*, 570 B.R. at 698 (citing *Drawbridge Special Opportunities Fund*

*LP v. Barnet (In re Barnet)*, 737 F.3d 238, 247-51 (2d Cir. 2013)).  Section 109(a) provides that

"only a person that resides or has a domicile, a place of business or property in the United States,

or a municipality, may be a debtor" under the Bankruptcy Code.  11 U.S.C. § 109(a).  Courts in

this Circuit have held that section 109(a) can be satisfied by bank accounts in the United States,

including by an undrawn retainer.  *See, e.g., In re U.S. Steel Can. Inc.*, 571 B.R. 600, 610 (Bankr.

S.D.N.Y. 2017) ("Some courts, including this one, have held that an undrawn retainer in a

United States bank account qualifies as property in satisfaction of section 109(a).").  This Court

has previously held that a debtor's contract rights, including rights pursuant to debt that contains

a New York governing law and forum selection clause, constitute intangible property of the

debtor in New York for purposes of section 109(a).  *See, e.g., In re Berau Capital Res. PTE Ltd.*,

540 B.R. 80, 83-84 (Bankr. S.D.N.Y. 2015) ("Contracts create property rights for the parties to

the contract.  A debtor's contract rights are intangible property of the debtor. . . . The Court

concludes that the presence of the New York choice of law and forum selection clauses . . .

satisfies the section 109(a) 'property in the United States' eligibility requirement") (internal

46

citations omitted); *see also In re Cell C Proprietary Ltd.*, 571 B.R. 542, 552 (Bankr. S.D.N.Y.

2017) (finding that a debtor's issuance of notes governed by New York law and containing a

New York forum selection clause as an "independently sufficient bas[is] for jurisdiction")

(internal quotations omitted); *In re Inversora Eléctrica de Buenos Aires S.A.*, 560 B.R. 650, 655

(Bankr. S.D.N.Y. 2016) ("[D]ollar-denominated debt subject to New York governing law and a

New York forum selection clause is independently sufficient to form the basis for jurisdiction.")

(citation omitted).

Each of the Chapter 15 Debtors has property in the United States.  (Hr'g Tr. 42:25, 43:1-

3.)  All of the principal documents setting forth Parent/Constellation's prepetition debt

obligations are governed by New York law and generally contemplate New York as a venue for

disputes.  Second, each of the Chapter 15 Debtors owns $1,000 cash in U.S. bank accounts

principally located in Manhattan, New York.  (FRFOF ¶ 107.)  Together, this property

constitutes the principal U.S. assets of each of the Chapter 15 Debtors, in satisfaction of section

109(a).  Additionally, because of the location of these accounts, venue is also proper pursuant to

section 1410(1) of title 28 of the United States Code.

### B.  The Debtors Satisfy the Recognition Requirements Contained in Sections 1517(a)(2) & 1517(a)(3)

Section 1517(a) provides the remaining requirements for the recognition of a foreign

proceeding under chapter 15.  *In re Ocean Rig UDW Inc.*, 570 B.R. at 698.  Subject to the public

policy exception contained in section 1506, a foreign proceeding must be recognized if the

following requirements are met:

> (1) such foreign proceeding for which recognition is sought is a
> foreign main proceeding or foreign nonmain proceeding within the
> meaning of section 1502;
> (2) the foreign representative applying for recognition is a person or
> body; and

(3) the petition meets the requirements of section 1515.

11 U.S.C. § 1517(a); *see also In re Ocean Rig UDW Inc.*, 570 B.R. at 698–99.

Therefore, recognition of the foreign proceeding is statutorily mandated if the three

requirements of section 1517(a) are met and no exception applies. *See In re Millard*, 501 B.R.

644, 651 (Bankr. S.D.N.Y. 2013). The first of section 1517(a)'s three factors requires that the

Court determine that a proceeding is either foreign main proceeding or a foreign nonmain

proceeding before it can recognize the proceeding. 11 U.S.C. § 1517(a). That determination is

the more complex issue which will be further discussed below. The other two requirements of

section 1517 are more straightforward on these facts and are both met.

1.   The Foreign Representative Meets 1517(a)(2)'s Requirements

A chapter 15 case is properly commenced by the filing of a petition for recognition by a

"foreign representative." *See* 11 U.S.C. §§ 1504, 1515(a). The Bankruptcy Code defines a

"foreign representative" as "a person or body, including a person or body appointed on an

interim basis, authorized in a foreign proceeding to administer the reorganization or liquidation

of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11

U.S.C. § 101(24). The Petitioner is a "person" as defined under 11 U.S.C. § 101(41) and,

pursuant to the resolutions authorizing the commencement of the RJ and the appointment of the

Foreign Representative, which are located in Exhibit D to the Verified Petition, is authorized to

commence a Brazilian RJ Proceeding and a Chapter 15 Case on behalf of each of the Debtors

and to take all necessary actions as the Foreign Representative. (*See* "Resolutions," ECF Doc. #

7-4.) Therefore, the Petitioner is a proper "foreign representative" within the meaning of section

101(24) with respect to each of the Chapter 15 Debtors, and thus section 1517(a)(2) is satisfied.

48

2.    The Petition Meets the Additional Requirements of Section 1515

These Chapter 15 Cases were properly commenced with respect to each of the Chapter 15

Debtors in accordance with sections 1504, 1509(a) and 1515.  The Verified Petition was filed

pursuant to section 1515(a) and included all disclosures and documents required by sections

1515(b) and (c).

The Brazilian RJ Proceeding is a "foreign proceeding" as set forth in 1517(a)(1) of the

Bankruptcy Code.  Section 101(23) defines a "foreign proceeding" as (1) a collective judicial or

administrative proceeding under a law relating to insolvency or adjustment of debt, (2) pending

in a foreign country, (3) in which the assets and affairs of the debtor are subject to control or

supervision of a foreign court, and (4) for the purpose of reorganization or liquidation.  11 U.S.C.

§ 101(23).  Courts in this Circuit have long agreed that the Brazilian RJ process satisfies these

standards.  *See, e.g., In re Oi S.A.*, Case No. 16-11791 (SHL), ECF Doc. # 38 (Bankr. S.D.N.Y.

July 22, 2016); *In re OAS S.A.*, 533 B.R. 83, 83 (Bankr. S.D.N.Y. 2015); *In re Aralco S.A.*

*Industria e Comercio, et al.*, No. 15-10419 (REG), ECF Doc. # 22 (Bankr. S.D.N.Y. Apr. 21,

2015).

**C.  Recognition Under Chapter 15**

In order to grant recognition, the Court must first find that the Brazilian RJ Proceeding

constitutes either a main or nonmain proceeding with respect to each Chapter 15 Debtor.  *See,*

*e.g., In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R.

122, 126-27 (Bankr. S.D.N.Y. 2007) (hereinafter *Bear Stearns I*), *aff'd,* 389 B.R. 325 (S.D.N.Y.

2008) (hereinafter *Bear Stearns II*) ("[T]he recognition must be coded as either main or

nonmain.").  When a debtor seeks recognition of a foreign proceeding, the Court may (i)

recognize the proceeding as a *foreign main proceeding*, (ii) recognize the proceeding as a *foreign*

49

*nonmain proceeding*, or (iii) refuse recognition. *See id.* (refusing to recognize foreign

proceedings as main or nonmain proceedings since the debtors did not meet the nonmain

proceeding requirement of having an "establishment" in the location of the proceeding).

Courts determine if a proceeding is main or nonmain using section 1502's definitions of

each term. Section 1502 defines a "foreign main proceeding" as a "foreign proceeding pending

in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502(4). A

foreign nonmain proceeding is defined as a "foreign proceeding, other than a foreign main

proceeding, pending in a country where the debtor has an *establishment*." 11 U.S.C. § 1502(5)

(emphasis added). Establishment is defined in Chapter 15 as "any place of operations where the

debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2).[27]

If a proceeding does not qualify as a main or nonmain proceeding, it cannot be

recognized under chapter 15. The *Bear Stearns* court explained:

> [T]he process of recognition of a foreign proceeding is a simple
> single step process incorporating the definitions in sections 1502
> and 101(23) and (24) to determine recognition as either a main or
> nonmain proceeding or nonrecognition. *See* Jay Lawrence
> Westbrook, *Locating the Eye of the Financial Storm,* 32 BROOK. J.
> INT'L L. 3, 6 (2007 publication pending) hereinafter ("Westbrook
> Article") ("The Model Law grants great discretion as to specific
> relief, but imposes a fairly rigid procedural structure for recognition
> of foreign proceedings.")

*Bear Stearns I,* 374 B.R. at 126; *see In re Iida*, 377 B.R. 243, 253–54 (9th Cir. BAP 2007); *see*

*also Halo Creative & Design Ltd. v. Comptoir Des Indes Inc.*, No. 14 C 8196, 2018 WL

---

[27]    The UNCITRAL "Guide to Enactment" provides a slightly different definition of establishment. Article
2(f) explains that "'Establishment' means any place of operations where the debtor carries out a non-transitory
economic activity with human means and goods or services."

4742066, at *2 (N.D. Ill. Oct. 2, 2018); *Reserve Intern. Liquidity Fund Lt. v. Caxton Intern. Ltd.*,

2010 WL 1779282, at *5 (S.D.N.Y. 2010).

      The Court in *In re Oi Brasil Holdings* further explained that the recognition decision is

one of the few pieces of the chapter 15 process in which courts are *not* to be guided by the

general principles of comity, since the text of the statute "provides the standard for a court's

determination" and therefore "comity does not enter the equation." *In re Oi Brasil Holdings*

*Cooperatief U.A.,* 578 B.R. 169, 213 (Bankr. S.D.N.Y. 2017), *reconsideration denied*, 582 B.R.

358 (Bankr. S.D.N.Y. 2018).  The *Oi* court explained:

> In the case of recognition under Chapter 15, "[b]oth the plain
> language and legislative history of Chapter 15 . . . requires [a
> bankruptcy court to make] a factual determination with respect to
> recognition before principles of comity come into play." *In re Bear
> Stearns*, 389 B.R. at 334.  So while comity governs recognition of a
> foreign judgment (*see Rapture Shipping*, 350 F.Supp.2d at 373), it
> does not govern the initial recognition of a foreign proceeding under
> Chapter 15.  Recognition of a proceeding requires the application of
> "objective criteria," and it is only post-recognition relief which
> "turns on subjective factors that embody principles of comity." *In
> re Atlas Shipping*, 404 B.R. at 738 (*quoting In re Bear Stearns,* 389
> B.R. at 333 (*citing* 11 U.S.C. §§ 1507, 1517, 1521, 1525; Model
> Law Art. 7, 17, 21, 25)); *see also In re Ran*, 390 B.R. 257, 292
> (Bankr. S.D. Tex. 2008) ("By arguing comity without satisfying the
> conditions for recognition, [the foreign trustee] urges this Court to
> ignore the statutory requirements of 11 U.S.C. § 1517 . . . comity is
> not an element of recognition; it is rather, a consideration once
> recognition is granted.").

*Id.* at 214.

      However, once the decision to grant recognition is made, principles of comity and the

provisions of chapter 15 can provide substantially similar relief to a debtor—whether a

proceeding is recognized as main or nonmain.  This Court repeatedly emphasized during the

Recognition Hearing that there may be no statutory and practical effects of distinguishing

recognition as a foreign main proceeding, as opposed recognition as a foreign nonmain

proceeding.  Indeed, a foreign nonmain proceeding can be granted nearly identical relief as the

relief provided to a main proceeding.  The *SPhinX* Court explained:

> Under either approach, the Court would be able to grant the [foreign
> representatives] the same significant relief upon a proper showing,
> given the Court's view that Congress separated the concept of
> "recognition" under Bankruptcy Code section 1517(a) from the
> concept of "recognition as a foreign nonmain proceeding" under
> section 1517(b)(2).  (Indeed, as noted above, except for the
> applicability of the automatic stay, the potential relief available to
> the [foreign representatives] under chapter 15 in almost all respects
> does not depend on whether the Cayman Islands proceedings are
> recognized as "main" or "nonmain.")

*In re SPhinX, Ltd.,* 351 B.R. 103, 122 (Bankr. S.D.N.Y. 2006), *aff'd,* 371 B.R. 10 (S.D.N.Y.

2007).

As previously noted, however, further discretionary relief beyond the decision of the

form of recognition of the foreign proceeding for each Chapter 15 Debtor is a separate

determination based on different factors and is not the main subject of this opinion.  This opinion

solely seeks to establish the appropriate form of recognition (*e.g.,* main or nonmain) for each

Chapter 15 Debtor as required by chapter 15.  Since Brazil has not adopted the Model Law, the

fact that Brazil recognizes the eligibility of particular debtors to reorganize under Brazil law does

not control the COMI determination here.  *In re Oi Brasil*, 578 B.R. at 216 (explaining that no

issues of deference or comity arise in countries that have not adopted the Model Law, including

Brazil).  On the other hand, if the Brazil court dismisses a debtor from the Brazilian RJ

Proceeding, as has now occurred, it does preclude a decision by this Court that the Brazilian RJ

Proceeding of a dismissed debtor is either a foreign main or nonmain proceeding.

### D.  Recognition as a Foreign Main Proceeding

While the statute provides that a foreign main proceeding is one where the debtor has its

COMI, the statute does not further define the term COMI.  *See* 11 U.S.C. §§ 1501–1532.  There

is a rebuttable presumption that COMI is where the debtor has its "registered office."  11 U.S.C.

§ 1516(c) ("In the absence of evidence to the contrary, the debtor's registered office . . . is

presumed to be the center of the debtor's main interests.").  However, the COMI presumption is

rebuttable where other factors suggest that the true COMI of a debtor lies elsewhere.  *See, e.g., In*

*re Bear Stearns II*, 389 B.R. at 335 ("[S]ection 1516(c) creates no more than a rebuttable

evidentiary presumption, which may be rebutted notwithstanding a lack of party opposition.").

    1.  The *SPhinX* Factors

Courts in this District have developed a widely adopted list of factors for determining

COMI.  *In re Fairfield Sentry Ltd.*, 714 F.3d at 137 (referring to and citing the factors from *In re*

*SPhinX, Ltd.*, 351 B.R. at 117).  These factors, enumerated below (hereinafter, "*SPhinX*

Factors"), are not to be applied mechanically and are nonexclusive.  In fact, a consideration of

the factors is neither required nor dispositive.  *Id*.  The factors are, however, helpful.  The

*SPhinX* Court explained:

> Various factors, singly or combined, could be relevant to such a
> [COMI] determination: [1] the location of the debtor's headquarters;
> [2] the location of those who actually manage the debtor (which,
> conceivably could be the headquarters of a holding company); [3]
> the location of the debtor's primary assets; [4] the location of the
> majority of the debtor's creditors or of a majority of the creditors
> who would be affected by the case; [5] and/or the jurisdiction whose
> law would apply to most disputes.

*In re SPhinX, Ltd.,* 351 B.R. at 117.

When determining the "location of those who actually manage the debtor," courts

consider more than the location of the board of directors of the debtor in isolation, and their

analysis of the location of management is somewhat flexible to reflect the realities of the

management of a particular business.  For example,

> The headquarters of a corporate entity is more than the location of
> its board of directors.  The term headquarters, or head office,

> contemplates the place where the primary management of an entity's business is undertaken. Management of a corporate entity includes all relevant business functions, such as the financial, administrative, marketing, information technology, investment, and legal functions. Other functions may be relevant depending on the nature of the debtor's business. Here, because [the debtor] operated as an insurance company, actuarial tasks, underwriting, and claims adjustment should be considered.

*In re British Am. Ins. Co. Ltd.,* 425 B.R. 884, 911 (Bankr. S.D. Fla. 2010).

### 2. International Interpretations

In addition to the *SPhinX* Factors, the Court also considers foreign case law interpreting identical provisions of the Model Law when interpreting chapter 15's provisions. Because each section within chapter 15 is based on a corresponding article in the Model Law, "if a textual provision of Chapter 15 is unclear or ambiguous, the Court may then consider the Model Law and foreign interpretations of it as part of its interpretive task." *In re OAS S.A.*, 533 B.R. 83, 92 (Bankr. S.D.N.Y. 2015) (internal quotations omitted) (quoting *O'Sullivan v. Loy (In re Loy)*, 432 B.R. 551, 560 (E.D. Va. 2010)). The Court also considers the UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation (2013) ("Guide to Enactment") when interpreting chapter 15. *In re OAS S.A.*, 533 B.R. at 92; *see* H.R. Rep. No. 109–31, at 105 (2005); Leif M. Clark, Ancillary & Other Cross-Border Insolvency Cases Under Chapter 15 of the Bankruptcy Code § 3[1][a][i], at 17 (2008). As this Court stated in *Ocean Rig*, because section 1508 of the Bankruptcy Code directs a court interpreting chapter 15 to "consider its international origin, and the need to promote application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions," 11 U.S.C. § 1508, it is therefore appropriate for U.S. bankruptcy courts to consider interpretations from other international jurisdictions that have adopted the Model Law. *In re Ocean Rig*, 570 B.R. at 702 n.6; *see also In re Fairfield Sentry*, 714 F.3d at 136 (holding that international sources may be

considered to the extent they assist in "carry[ing] out the congressional purpose of achieving

international uniformity in cross-border insolvency proceedings").

### 3. Third Party Expectations

Additionally, because there is no statutory definition of COMI, courts have some latitude

to consider the factors that may be relevant, given the facts in a particular case.  *In re Creative*

*Fin., Ltd. (In Liquidation)*, 543 B.R. 498, 517 (Bankr. S.D.N.Y. 2016); *see also In re Fairfield*

*Sentry Ltd.*, 714 F.3d at 137 ("The absence of a statutory definition for a term that is not self-

defining signifies that the text is open-ended, and invites development by courts, depending on

facts presented, without prescription or limitation.").

Beyond the *SPhinX* Factors, the Second Circuit and other courts have examined as an

additional relevant factor whether there exists any objective evidence that could provide

interested parties with notice that a debtor's COMI was in a particular jurisdiction other than the

place of its registered office.  *See In re Fairfield Sentry*, 714 F.3d at 130 ("[T]he relevant

principle . . . is that the COMI lies where the debtor conducts its regular business, so that the

place is ascertainable by third parties . . . .").  As the Second Circuit explained, by examining

factors "in the public domain," courts are readily able to determine whether a debtor's COMI is

in fact "regular and ascertainable [and] not easily subject to tactical removal."  *See In re*

*Fairfield Sentry*, 714 F.3d at 136-37; *see also Bear Stearns I*, 374 B.R. at 129-30 (looking at

whether the proposed COMI was ascertainable by third parties as part of its COMI analysis).

The Second Circuit's focus on readily ascertainable evidence of COMI derives from the

regulation adopting the European Union Convention on Insolvency Proceedings, where the

COMI concept (which corresponds to that of the Model Law) is elaborated upon as "the place

where the debtor conducts the administration of his interests on a regular basis and is therefore

ascertainable by third parties." *In re Fairfield Sentry*, 714 F.3d at 136 (citing the Council Reg.

(EC) No. 1346/2000 of May 29, 2000 on Insolvency Proceedings).

### 4. Expectations of Creditors

Courts in the Second Circuit also look to the expectations of creditors with regard to the

location of a debtor's COMI. For example, "[c]reditor expectations can be evaluated through

examination of the public documents and information available to guide creditor understanding

of the nature and risks of their investments." *In re Oi Brasil Holdings Cooperatief U.A.*, 578

B.R. at 228. In practice, the evaluation of creditor expectations has focused on reviewing

disclosures in offering memoranda and indentures. *See id.* at 228-32 (reviewing offering

memorandum to establish noteholder expectations as part of a COMI analysis); *In re OAS S.A.*,

533 B.R. at 101-03 (same); *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 474 B.R.

88, 93-4 (S.D.N.Y. 2012) (same); *In re Suntech Power Holdings Co., Ltd.*, 520 B.R. 399, 418

(Bankr. S.D.N.Y. 2014) (considering terms of indenture to establish creditor expectations

regarding likely location of a restructuring as part of a COMI analysis). The *SPhinX* Court

explained:

> [T]he flexibility inherent in chapter 15 strongly suggests, however,
> that the Court should not apply such factors mechanically. Instead,
> they should be viewed in light of chapter 15's emphasis on
> protecting the reasonable interests of parties in interest pursuant to
> fair procedures and the maximization of the debtor's value. Because
> their money is ultimately at stake, one generally should defer,
> therefore, to the creditors' acquiescence in or support of a proposed
> COMI. It is reasonable to assume that the debtor and its creditors
> (and shareholders, if they have an economic stake in the proceeding)
> can, absent an improper purpose, best determine how to maximize
> the efficiency of a liquidation or reorganization and, ultimately, the
> value of the debtor, assuming also, of course, that chapter 15
> requires the court to protect the legitimate interests of dissenters
> (even to the extent of enabling the modification of a recognition
> order under Bankruptcy Code section 1517(d)), particularly where
> other objective factors point to a different COMI. Relatedly, if the

> parties in interest are in a legitimate dispute over the debtor's COMI, it is probably safe to assume that promoting cooperation among courts and the parties will play a greater role than artificially choosing one proceeding as a "primary" proceeding. At least this is what the Court takes away from the stated objectives and structure of the statute.

*In re SPhinX, Ltd.*, 351 B.R. at 117–18.

The court in *In re Chiang*, 437 B.R. 397 (Bankr. C.D. Cal. 2010), explained, that "the location of the COMI is an objective determination based on the viewpoint of third parties (usually creditors)." *Id.* at 403. The *OAS* Court found that notice to creditors of "Risk Factors" contained within offering memoranda of a debtor's notes were particularly important. *In re OAS S.A.*, 533 B.R. at 102–03. The Court explained:

> [T]he "Risk Factors" that all note purchasers were warned to "carefully consider" before deciding to purchase the notes described the risks associated with the businesses of the OAS Group, not OAS Investments, and included a separate discussion focusing on the special risks relating to investments that could be affected by the Brazilian economy and Brazilian government actions. Potential purchasers were also warned that if OAS and its subsidiaries could not pay their indebtedness, including the obligations under the guarantees, they might become subject to bankruptcy proceedings in Brazil, and Brazilian laws might be less favorable to creditors compared to the laws of the United States or other jurisdictions. In contrast, the offering memoranda do not discuss the risks of operating in Austria. The only risk factor that mentioned Austria stated that Austria would not enforce U.S. judgments, the U.S. securities laws or awards of punitive damages.

*Id.* (internal citations omitted).

The *OAS* Court concluded that the creditors would have understood that they were investing in a Brazilian based business, even though (i) the offering memoranda provided that their rights were governed by New York law and they consented to jurisdiction and service of process in New York and (ii) the creditors expected to receive payment from cash generated by the operations of the group and in the event of default were only warned that they "might

ultimately have to enforce their rights in a Brazilian bankruptcy proceeding" as opposed to an

Austrian proceeding, where the holding company was incorporated. *Id.* at 103. Despite the

foreign debtor's Austrian incorporation, the *OAS* Court found that "OAS Investments' place of

incorporation, or for that matter its very existence, was immaterial to their decision to purchase

their notes." *Id.* Ultimately, the court found that the creditors' expectation of COMI should

weigh in favor of a Brazilian COMI where "OAS Investments had no separate, ascertainable

presence in Austria; it was part of, and inseparable from, the OAS Group located in Brazil.

Finally, the 2019 Noteholders had no legitimate expectation that the Austrian courts would play

any role in the determination or payment of their claims." *Id.*

### 5. PPB or Nerve Center Analysis

Additionally, some courts have employed the concept of "principal place of business" to

guide their COMI analysis and, accordingly, have applied the Supreme Court's definition of that

concept, which looks at a corporation's "nerve center," *i.e.*, "where a corporation's *officers*

direct, control, and coordinate the corporation's activities." *See In re Fairfield Sentry Ltd.,* 714

F. 3d at 138 n.10 (emphasis added) (citing *Hertz Corp. v. Friend*, 130 S.Ct. 1181, 1192 (2010)).

The Second Circuit clarified in *Fairfield Sentry* that given Congress's choice to use "COMI"

instead of "principal place of business" in chapter 15, the "nerve center" concept does not

control, "[b]ut to the extent that the concepts are similar, a court may certainly consider a

debtor's 'nerve center,' including from where the debtor's activities are directed and controlled,

in determining a debtor's COMI." *See id.* at 138.

The "nerve center" analysis, like most other factors in the COMI analysis, is not at all a

straightforward standard when applied to most international conglomerates. However, it can

provide a helpful reminder that courts should not perfunctorily rely upon the place of

58

incorporation or location of board meetings to establish the corporation's ultimate COMI.  *See,
e.g., In re OAS S.A.,* 533 B.R. at 102 (finding Brazil as the nerve center where "[t]here is no
evidence that its Board of Directors ever convened a meeting except to pass the resolution
appointing Tavares as its foreign representative, and that resolution was executed by its Brazilian
directors in Brazil.").

6.  Additional Considerations

There are circumstances that make the COMI analysis more complicated with respect to
certain of the Chapter 15 Debtors.  For example, in *In re OAS S.A.*, the court noted that "the
COMI analysis when applied to a special purpose financing vehicle proves less straightforward
than the typical case."  *Id.* at 101.  Additionally, in *In re Ocean Rig UDW Inc.,* this Court
discussed the COMI of another group of international drilling rigs and explained that "the
Foreign Debtors are holding companies of the Group and conduct their business throughout the
world, principally on the high seas.  Accordingly, the nature of the Group's business and the
mobility of their assets complicate the COMI analysis."  *In re Ocean Rig UDW Inc.*, 570 B.R. at
704.  Also discussed by the Court in *Ocean Rig* are the possible complications that arise when a
group of debtors have shifted their COMI over time.  *Id.*

While the above complications are all present in the analysis before the Court, it is
nonetheless true that every debtor has one and only one COMI.  *See In re Millennium Glob.
Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 79 (Bankr. S.D.N.Y. 2011) ("[E]very entity has
a center of main interests."); *In re Chiang*, 437 B.R. at 403 ("[A] debtor may not have more than
one COMI. . . .  In addition, a debtor must have a COMI and it must be in a specific country.").

**E.  Recognition as a Foreign Nonmain Proceeding**

An alternative form of recognition is recognition as a foreign nonmain proceeding.  To be
recognized as a nonmain proceeding, the foreign debtor must establish a degree of stable

connections with the jurisdiction to constitute a nontransitory "establishment."  11 U.S.C. §

1502(2).  An article in the Norton Journal of Bankruptcy Law and Practice summarizes:

> Before *Bear Stearns*, it seems fair to say that many practitioners
> believed—based on section 1515—that by making these two
> showings, the statutory requirements for commencing a valid and
> proper Chapter 15 proceeding had been met.  *Bear Stearns* revealed,
> however, that when a foreign debtor commences a proceeding in a
> jurisdiction where it has no real "presence"—i.e., no nontransitory
> business activity—the foreign proceeding will not be recognized
> under Chapter 15, either as a "main" or "nonmain" proceeding.  The
> "establishment" requirement for "nonmain" status requires, as a
> prerequisite for any relief under Chapter 15, a base level of
> connection between the foreign debtor and the foreign jurisdiction
> that prevents a debtor from commencing a case in a jurisdiction
> where it has nothing more than a mail-drop presence.

William H. Schrag, William C. Heuer, and Robert E. Cortes, *Cross-Border Insolvencies and

Chapter 15: Recent U.S. Case Law Determining Whether a Foreign Proceeding Is "Main" or

"Nonmain" or Neither*, 17 J. BANKR. L. & PRAC. 5 Art. 4 (Aug. 2008).

Thus, on one end of the spectrum, a debtor may have activities so centered in the location

of the foreign proceeding that the location is the debtor's COMI, and on the other end of the

spectrum, the debtor may be so disconnected from the location of the proceeding that courts

should refuse to recognize it at all.  Somewhere between these two extremes are companies that

have sufficient non-transitory business connections with the jurisdiction of the proceeding to

determine that the proceeding is nonmain.

The English judgment in *In the Matter of Videology Limited, [2018] EWHC 2186 (Ch)*

(Snowden J.), provides a helpful example of a company that falls into this middle category of

recognition as a nonmain proceeding.  Justice Snowden was asked to recognize a chapter 11 case

of Videology Ltd.  Videology was incorporated and had its registered office in England but was

part of a larger, international corporate group that was incorporated in Delaware.  *Videology*,

EWHC 2186 (Ch) ¶ 4.  The sole director of the parent and Videology was a resident of the

United States, who conducted regular business on behalf of the group of companies from the

United States.  A shared "senior executive team" for the group of the companies was also located

in the United States.  Nevertheless, the court refused to find a COMI in the United States for

Videology.  The court explained:

> Taking all of these factors together, I was not persuaded that the
> presumption that the COMI of [Videology Ltd.] is located in the
> place of its registered office had been displaced.  In addition to
> being the place of its registered office, the UK is where the
> [Videology Ltd.'s] trading premises and staff are located, where its
> customer and creditor relationships are established, where it
> administers its relations with its trade creditors on a day-to-day
> basis using those premises and local staff, and where its main assets
> (the receivables and cash at bank) are located.  All of those factors
> will be visible and immediately ascertainable by the customers, and
> in particular by the trade creditors, of the Company.  The UK is
> also, importantly, where representations were made to the
> Company's main finance creditor that its COMI was situated.

*Videology* ¶ 72.

Thus, even though the ultimate COMI analysis resulted in a COMI in the UK, shared

aspects of the management of the international corporate group provided enough presence in the

United States to find that the chapter 11 case was a nonmain proceeding.

Moreover, the *Videology* judgment shows that courts should be wary of using the location

of the senior management of groups of internationally operated companies as evidence of the

COMI of one subsidiary company within the international group.  For example, after noting that

the CEO and senior executive team were permanently based in the United States, Justice

Snowden dismissed this evidence as non-persuasive in changing Videology Ltd.'s COMI by

explaining that there was no evidence suggesting that the senior management of Videology Ltd.

were "in fact separately employed by, or only hold their positions within" Videology Ltd.

*Videology* ¶ 57.  Rather, the senior management of the group of companies, like that of the

Constellation Group's executive team, was apparently responsible for certain high-level business

decisions on behalf of the whole group of companies.  This evidence regarding the senior

management was sufficient to establish a nonmain proceeding in the U.S., but insufficient to

establish Videology Ltd.'s COMI in the U.S.

### F.  Non-Recognition

There are circumstances in which courts applying chapter 15 should refuse to recognize

foreign proceedings, whether as main or nonmain proceedings.  For instance, where a foreign

debtor seeking recognition under chapter 15 maintains only what can be described as a "letter

box" company in the location of the foreign proceeding.  *See, e.g., Bear Stearns I*, 374 B.R. at

129-31.  The *Bear Stearns* opinion explains that if the only business done in the jurisdiction

where a proceeding is sought to be recognized consists of "those steps necessary to maintain the

[companies] in good standing as registered . . . companies" in those jurisdictions, this is a close

approximation of a "letterbox" company.  *Id.* at 129 n.8.

However, even in cases of letterbox companies or other cases where the court refuses to

grant any recognition of the foreign proceeding, the foreign representative may still obtain

certain forms of relief from U.S. Courts.  *Id.* at 132.  Other forms of relief that the foreign

representative may obtain after the court refuses to recognize a foreign proceeding include (i)

filing a case under Title 11 in coordination with the foreign proceeding and (ii) suing in a court

in the United States to collect or recover a claim which is the property of the debtor.  *Id.* at 132–

33.  In this case, it is not clear that each of the Chapter 15 Debtors has its COMI or an

establishment within Brazil.

### G. COMI Analysis Applied to Each Chapter 15 Debtor

As the *SPhinX* court explained, "[o]n the issue of recognition of foreign proceedings as 'main' or 'nonmain,' the Bankruptcy Code provides considerable but not complete discretion. 351 B.R. at 117. Based on the legal discussion above and the understanding that COMI is a flexible determination and not a rigid application of factors, the Court will now review the COMI of Chapter 15 Debtors and in the process consider any COMI-relevant evidence that is available in the evidentiary record regarding each Chapter 15 Debtor individually, *inter alia*: (1) the *SPhinX* Factors, (2) international interpretations of COMI, (3) the reasonable expectations of interested third parties, (4) the expectations or support of creditors, and (5) interpretations of a corporation's "principal place of business" as the "nerve center" of a corporation. In assessing these factors, the Court is mindful that a Chapter 15 Debtor's COMI is determined as of the filing date of the chapter 15 petition, without regard to the debtor's historic operational activity.[28] *See In re Fairfield Sentry Ltd.,* 714 F. 3d at 137. The ultimate aim of the analysis is to locate the "real seat" of each of the Chapter 15 Debtors. *See Bear Stearns I.*, 374 B.R. at 130.

Although Alperton recognizes that COMI must be determined on a company-by-company basis, the crux of its argument for the majority of the Chapter 15 Debtors is that "an examination of the evidentiary record shows that each International Company is controlled and managed by Parent from Luxembourg, and as a result, the COMI of each International Company also lies in Luxembourg, not in Brazil." (Alperton FOF ¶ 122.) While the Court and all parties recognize that these entities are highly inter-related, each debtor entity must be considered, rather than making a single top-down decision on the basis of the COMI of the parent company of the group. *See In re Oi Brasil*, 578 B.R. at 206. Additionally, the Court has an independent

---

[28] The dates used for determining COMI differ under the Model Law (using the date when the foreign proceeding was filed) and under Chapter 15 (using the date when the Chapter 15 petition was filed).

obligation to determine COMI before recognizing a foreign proceeding as a foreign main

proceeding. *See In re Alpha Fund (Master)*, 381 B.R. 37, 40 (Bankr. S.D.N.Y. 2008) ("[A] court

engaging in a recognition determination under section 1517 is not bound by parties' failures to

object; may, if it is so advised, consider any and all relevant facts (including facts not yet

presented); and that the circumstances here make further factual inquiry necessary and

appropriate."); *Bear Stearns I*, 374 B.R. at 126 ("[R]ecognition under section 1517 is not to be

rubber stamped by the courts. This Court must make an independent determination as to whether

the foreign proceeding meets the definitional requirements of sections 1502 and 1517 of the

Bankruptcy Code.").

The evidentiary burden to show where each debtor has its COMI is on the foreign

representative. H. Report No. 109-31, 112-13 ("The ultimate burden as to each element is on the

foreign representative"); *see In re Oi Brasil*, 578 B.R. at 194 (stating that "the burden rests on the

foreign representative to prove each of the requirements of Section 1517"). The rebuttable

presumption that COMI lies in the place of the registered office "at no time relieves a petitioner

of its burden of proof/risk of non-persuasion" and it imposes "on the party against whom it is

directed the burden of going forward with evidence to rebut or meet the presumption." *Bear

Stearns II.*, 389 B.R. at 335. The legislative history of chapter 15 further indicates that the

evidentiary burden lies with the foreign representative. Chapter 15 is modeled after the Model

Law, but chapter 15 changed the standard that established the presumption in "the absence of

*proof* to the contrary," to a presumption in "the absence of *evidence* to the contrary." *Id.* at 128.

The legislative history of chapter 15 explains that the word "proof" was changed to "evidence"

to make it clearer, using United States terminology, that the foreign representative has the

ultimate burden of showing where each debtor has its COMI. *See H. Report No. 109-31, 112-13*

(2005); *see also In re Tri-Continental Exchange Ltd.*, 349 B.R. 627, 635 (Bankr. E.D. Cal. 2006). The evidentiary burden for the foreign representative is the same whether or not there is a creditor objection. *See In re Basis Yield Alpha Fund (Master)*, 381 B.R. at 40; *Bear Stearns I*, 374 B.R. at 126.

### 1.  Parent/Constellation's COMI is Luxembourg

Based upon the Court's foregoing findings of fact related to Parent/Constellation and the most relevant COMI factors, discussed below, the Court finds that Parent/Constellation's COMI is located in Luxembourg.

#### a.  The Location of the Debtor's Headquarters is Luxembourg

The location of Parent/Constellation's headquarters is Luxembourg, where it is incorporated, is a tax resident, and has its registered office. (*See supra* § II.H.1.)

#### b.  The Location of those who Actually Manage the Debtor is Luxembourg

As noted in the discussion section, Parent/Constellation's board of directors meets in Luxembourg. (*Id.*) Parent/Constellation's board of directors appoints the executives, based in London and Brazil, who serve the entire Constellation Group. (*Id.*) Because Parent/Constellation is ultimately a parent company that exists for the task of high level management of all subsidiaries, it makes sense that the location from which the board of directors conducts its activities should weigh more heavily than the daily operational staff's location— which is spread between two nations, in any case and therefore would not provide a strong weight against finding management to be principally located in Luxembourg. Thus, the Court finds that the location of those who manage Constellation is Luxembourg.

c.    The Location of the Debtor's Primary Assets is Brazil

For a holding company, the location of its subsidiaries and the location of their principal

assets is relevant to the COMI analysis.  *See In re Inversora Electrica de Buenos Aires S.A.*, 560

B.R. at 656 (recognizing COMI in Argentina where a holding company's assets were located in

Argentina).  As noted in the background section, Parent/Constellation's physical assets are

primarily located in Brazil.  (*See supra* § II.H.1.)

d.    The Location of the Majority of the Debtor's Creditors or of a
         Majority of Creditors who would Be Affected by the Case is Neutral

The Court found that the location of most of Parent/Constellation's creditors is

indeterminate, as a matter of fact.  (*Id.*)  Therefore, this factor does not impact the COMI analysis

of Parent/Constellation.

e.    The Jurisdiction Whose Law Would Apply to Most Disputes is
         Luxembourg

As discussed above, an array of international law could apply to Parent/Constellation

since it is the parent of an international group of companies and since all of the debt it issued is

written in English and governed by New York law.  (*Id.*)  However, because Parent/Constellation

is a Luxembourg incorporated entity, that depends upon Luxembourg law for its existence and its

corporate operations, the Court found that Luxembourg law should be considered the law that

would apply to *most* of Parent/Constellation's disputes.  (*Id.*)

f.    The Reasonable Expectations of Interested Third Parties and Creditors
         is Luxembourg

The Chapter 15 Debtors have stipulated that Parent/Constellation has its "central

administration" in Luxembourg for purposes of Luxembourg tax law.  (Stipulation ¶ 7.)  The

meaning of the phrase "central administration" under Luxembourg tax law is not before the

Court, but the fact that Parent/Constellation takes the position with Luxembourg authorities that

66

its "central administration" is in Luxembourg, for tax or any other purpose, is itself readily

ascertainable evidence to third parties of a connection to Luxembourg beyond a letter box.

Additionally, when the Constellation Group makes important decisions, it issues press

releases from its Luxembourg office.  These press releases are available to the public on the

Constellation Group's website and are therefore in the "public domain."  (Alperton FOF ¶ 94.)[29]

For example, when the Constellation Group announced its restructuring on December 6, 2018, it

issued a press release from Luxembourg.  When an issue was identified with the 2017

consolidated financial statements for Parent (encompassing the financial statements for its

subsidiaries, including each of the Chapter 15 Debtors), Parent issued a press release from

Luxembourg notifying users of the financial statements that they should not place reliance on

them.  (*Id*.)  Therefore, an interested third party that visits and reads these press releases would

readily ascertain that the Parent/Constellation is headquartered in, and makes key decisions from,

Luxembourg.  (*See id*.)  As an extension, it seems reasonable that—at the very least—these press

releases would put interested third parties on notice that Parent/Constellation makes key

decisions from Luxembourg.

In sum, while creditors were notified of the underlying operations of the Constellation

Group as being in Brazil, the offering memoranda clearly express that Parent/Constellation is a

Luxembourg company.  Given that Luxembourg was chosen and well publicized to creditors as

the jurisdiction from which ultimate board meetings, tax laws, and corporate laws would take

---

[29]    Since the Recognition Hearing, the Constellation *Group's* website appears to have changed.  If one visits the web address discussed by Alperton for the group, qgogconstellation.com, a pop-up box appears notifying users that the investor relations portion of the website is under construction, but for more information about Constellation, it directs users to a link to theconstellation.com.  The Constellation Group's main website, which now appears to be located at theconstellation.com, loads in Portuguese but provides a link to convert the website to English.  The contacts portion of this website provides Brazilian phone numbers.  The website details the business of the "the Constellation" as onshore rigs, offshore rigs, and FPSOs; thus the website now predominately represents the entire Constellation Group as a Brazilian enterprise group.  Its vision statement beings with the vision to "Consolidate the Company's leadership position in Brazil."    *See* Constellation, qgogconstellation.com (last visited Apr. 26, 2019.).

67

place, the Court found that objective creditors expectations of Parent/Constellation's COMI weighs in favor of a Luxembourg COMI.  (*Supra* § II.H.1.)

       g.   The Nerve Center Analysis Weighs in Favor of COMI in Luxembourg

Parent/Constellation's activities are directed, controlled and coordinated in Luxembourg. (*Id.*)  Luxembourg therefore meets the criteria for a "principal place of business" set forth by the Supreme Court in *Hertz Corp.  See Hertz Corp.*, 130 S. Ct. at 1193-94.  The Court therefore finds that Parent/Constellation's nerve center is in Luxembourg.

       h.   Parent/Constellation has Sufficient Ties to Brazil for Foreign Nonmain Proceeding Recognition

Although Parent/Constellation's COMI is in Luxembourg, all of its subsidiaries have substantial and ongoing business connections in Brazil.  These non-transitory ties to Brazil are sufficient to recognize the Brazilian Proceeding as a foreign nonmain proceeding with respect to Parent/Constellation.  Alperton does not argue otherwise.

       2.   Constellation Overseas' COMI is Brazil

Based upon the Court's foregoing findings of fact related to Constellation Overseas and the most relevant COMI factors, discussed below, the Court finds that Contellation Overseas' COMI is located in Brazil as a matter of law.

       a.   Location of the Debtor's Incorporation and Registered Office is the BVI

Constellation Overseas is incorporated in the BVI and has registered office in the BVI. (*Supra* § II.H.10.)

       b.   Location of those who Actually Manage the Debtor is Neutral

Constellation Overseas' sole director (Michael Pearson) is a resident of the Cayman Islands and a citizen of the United Kingdom.  (Stipulation ¶ 2.)  It benefits from the day-to-day

operational management of the Brazilian Offices, which, together with those in the Panama

offices, co-ordinate its operational management activities with the activities of its affiliates.

(FRFOF at 66.)

The Brazilian Offices are of particular importance to the management of Constellation

Overseas, because its role in the Constellation Group—in addition to acting as a holding and

financing company—is to centralize treasury services.  (FRFOF ¶ 143.)  As holding company of

several Chapter 15 Debtors and an integrated member of the Constellation Group, Constellation

Overseas relies on persons employed by its affiliates, most of whom are Brazilian citizens

working at Brazilian Offices.  (*Supra* § II.B.1(c).)  Although the Brazilian office's functions are

carried out predominately by Petróleo Constellation, this does not fully detract from the Brazilian

office's inclusion in the COMI consideration for Constellation Overseas or other affiliates.  *See*

*In re British Am. Ins. Co.*, 425 B.R. at 911 (where debtor "outsourced essentially all of its central

management" to a wholly-owned subsidiary in Trinidad, the debtor's "administrative hub" was

located in Trinidad); *see also In re Ocean Rig UDW Inc.*, 540 B.R. at 697-98 (finding COMI in

Cayman Islands where, *inter alia*, debtors were managed by a non-debtor affiliate that performed

operations for the debtors in the Cayman Islands).

Because the various forms of Constellation Overseas management are so diffuse—

ranging across a sole director who is a citizen of the UK, day-to-day management in Brazil, and

ultimate legal control of a Parent company incorporated in Luxembourg—this factor does not

strongly indicate any particular COMI.

c.  The Location of the Debtor's Primary Assets is Brazil

Constellation Overseas is the sole owner of Lone Star, Gold Star, Olinda Star, Snover,

and Alpha Star.  Its direct ownership of assets is therefore the equity in these companies that it

holds in the BVI.  Given its role as a holding company, it has no employees, officers, or

customers of its own, instead its limited functions are to own equity in subsidiaries, guarantee

debt and centralize certain treasury functions to support subsidiaries operating and generating

revenue in Brazil.  (FRFOF ¶ 150.)  However, for a holding company, the location of its

subsidiaries and the location of their principal assets is relevant to the COMI analysis.  *See In re*

*Inversora Electrica de Buenos Aires S.A.*, 560 B.R. at 656.  Through Constellation Overseas'

holdings of the Offshore Rig Owners incorporated in the Cayman Islands and BVI, Constellation

Overseas indirectly owns the Group's drilling rigs that were principally located in Brazil at the

time of the chapter 15 filing.  (*Supra* § II.B.1(a).)  Additionally, the vast majority of the dividends

it receives from its subsidiaries are generated in Brazil.  (FRFOF ¶ 150.)

Because the assets held by Constellation Overseas are all of the Constellation Group's

rigs, which with the exception of Olinda Star are located in Brazil, this factor weighs in favor of

a COMI in Brazil.

> d. The Location of the Majority of the Debtor's Creditors or of a
> Majority of Creditors who would Be Affected by the Case is Neutral

Constellation Overseas has obligations under the 2024 Notes and is an obligor under the

2019 Notes.  (FRFOF ¶ 166.)  There is no evidence in the record regarding the location of the

beneficial holders of the 2019 Notes and the 2024 Notes (except one holder of the 2019 Notes

that is a Brazilian national located in New York).  (FRFOF ¶ 166.)  Thus, the Court draws no

conclusion relevant to a finding of COMI for obligors of this debt.

Constellation Overseas is also an obligor under the Bradesco Working Capital Facility.

(FRFOF ¶ 167.)  Bradesco is a local Brazilian bank and the Group's ongoing unsecured working

capital lender.  (FRFOF ¶ 167.)  The Bradesco Working Capital Facility was advanced by

Bradesco's Cayman branch, but originated by principals based in Brazil.  (*Id.*)  Bradesco filed a

support statement which states, *inter alia*, that it is a "local Brazilian bank." ("Bradesco Support Statement," ECF Doc. # 16 at 2.)  Thus, the location of this creditor may either weigh in favor of a COMI in Brazil or the Cayman Islands.

Constellation Overseas also has obligations under the A/L/B facility.  The lenders on the A/L/B facility are a syndicate of various international financial institutions, none of which are located in Luxembourg or Brazil.

Finally, Alperton is a contingent, unliquidated creditor of Constellation Overseas.  (*Supra* § II.B.2.)  Alperton's principals and beneficial owners are Brazilian nationals and their business with Constellation Overseas is rooted in serving Brazilian customers and accessing Brazilian markets.  (FRFOF ¶ 168.)  Thus, for purposes of this element in the COMI analysis, the potential creditor Alperton is located in Brazil.

In sum, there is no clear location of a majority of Constellation Overseas' creditors.  This factor is neutral in the COMI analysis.

> e.  The Jurisdiction Whose Law Would Apply to Most Disputes Weighs
>      Weakly in Favor of a COMI in BVI

Constellation Overseas has a primary interest in the operational business activities of the Constellation Group, which are almost exclusively centered in Brazil and, therefore, is greatly impacted by Brazil's regulations and laws.  (FRFOF ¶ 158.)  By virtue of being incorporated in the BVI, Constellation Overseas is subject to the BVI's laws, regulations, and jurisdiction, including with respect to potential corporate disputes.  It is also subject to BVI law with respect to potential tax disputes.  (FRFOF ¶ 158.)

New York is the governing law of all of the Prepetition Debt of the Constellation Group.  (Verified Petition ¶ 20; Alperton FOF ¶ 62.)  New York law also governs the Shareholders' Agreement between Alperton and Constellation Overseas.  (Alperton FOF ¶ 63.)  Alperton's

claims against Constellation Overseas to be resolved by the arbitral tribunal are, therefore, New York law governed claims.[30]  (Alperton FOF ¶ 63.)

As an entity that is ultimately owned (though through a non-debtor intermediary) by a Parent incorporated and acting under the Law of Luxembourg, Constellation Overseas is also impacted by Luxembourg law.  Thus, one could view Constellation Overseas as receiving a trickle-down effect from Luxembourg law and a bottom-up effect from Brazilian law, but the company always maintains the direct governance of BVI law.  Thus, on balance, this factor likely loosely weighs in favor of a BVI COMI.

> f.    The Reasonable Expectations of Interested Third Parties Weighs in Favor of a COMI in Brazil

An important element for each of the BVI incorporated Chapter 15 Debtors is the support of the JPLs.  The JPLs are independent, court-appointed officers who favor recognition of the Brazilian RJ Proceeding as a foreign main proceeding.  (FRFOF ¶ 176.)  The JPLs are officers of the BVI Court whose function is to represent the collective interests of the creditors of each debtor for which they are appointed by overseeing and protecting their interests in the restructuring process.  In this way, they arguably serve as a collective voice for the creditors of the BVI debtors.  The JPLs Support Statement provided that "It is the understanding of the BVI JPLs . . . that Brazil is the 'center of main interests' or 'COMI' of each of the BVI Debtors for the purposes of U.S. restructuring law."  (JPL Support Statement, ECF Doc. # 31-3 ¶ 2.)

Creditors' reasonable expectations are a factor in COMI analysis.  The Offering Memoranda are indicia of the Noteholders' objectively ascertainable expectations.  Many

---

[30]    Although the arbitral Tribunal issued the Interim Award aimed at preserving Alperton's potential 45% shareholding in the Disputed Companies during the pending arbitration, the ultimate determination of whether Alperton was wrongfully deprived of its 45% interest in the Disputed Companies has not been reached.  The Interim Award is described as "interim relief . . . pending a final Award in this arbitration . . . ."  (Interim Award at 4.)

disclosures within the Offering Memoranda would have put Noteholders on notice that their investment was, in substance, Brazilian-centered.  The Offering Memoranda also informed Noteholders that the vast majority of revenues that would repay their notes were derived in Brazil from Brazilian operations with Brazilian customers and contracts and operations governed and regulated by Brazilian laws.  (FRFOF ¶ 170.)  That said, Noteholders were also aware of the ultimate reality described in the Notes—that the Constellation Group is a highly integrated group of companies with its parent in Luxembourg, its main source of revenues in Brazil, and several of its subsidiaries place of incorporation in the BVI.  Thus, Noteholders could have reasonably foreseen Brazilian, Luxembourg, and BVI proceedings affecting Constellation Overseas.

If anything weighs heavily for Constellation Overseas' COMI to be located in Brazil, it is the factor of creditor support.  As the *SPhinX* Court explained, "[b]ecause their money is ultimately at stake, one generally should defer . . . to the creditors' acquiescence in or support of a proposed COMI . . . [they] can . . . best determine how to maximize the efficiency . . . of a reorganization and ultimately, the value of the debtor."  351 B.R. at 117.  Bradesco and the Consenting A/L/B Lenders collectively hold over 60% of the Constellation Group's debts and Constellation Overseas is an obligor and/or grantor to both the A/L/B Lenders and Bradesco. These two groups of creditors collectively, therefore, have the most at stake in these proceedings. Each of them expressed their support of COMI in Brazil.  (*See* Bradesco Support Statement ("Bradesco's expectation and understanding is, and always has been, that Constellation Overseas' and its Debtor affiliates' center of main interests is in Brazil."); "A/L/B Lender Support Statement," ECF. Doc. # 8 ¶ 3 ("The A/L/B Lenders have always understood and operated with the expectation that the center of main interests ('COMI') of each Debtor was and remains located firmly in Brazil.").)  Further, the 2024 Ad Hoc Group—who hold a majority of

the 2024 Notes—also support the finding of COMI in Brazil for each of the Debtors incorporated outside of Brazil. (FRFOF ¶ 175.)

Because the offering memoranda of the notes heavily discuss the Constellation Group's economic base in Brazil, the BVI JPLs have expressed their support of a Brazilian COMI, and all creditors other than Alperton have expressed support for Brazil as the COMI of Constellation Overseas, this factor weighs in favor of a COMI in Brazil.

> g.   The Nerve Center Analysis Weighs in Favor of Brazil

Constellation Overseas is a holding/financing company that centralizes treasury and financial services for certain companies in the Constellation Group. (FRFOF at 66.) It is a mid-level holding company that Parent/Constellation fully owns through a non-debtor intermediary. (Alpterton FOF ¶ 124.) In *OAS*, the SPV debtor's parent was the debtor's sole shareholder and had the power to "determine the outcome of any action requiring shareholder approval, including transaction with related parties, acquisitions and dispositions of assets and the timing and payment of any future dividends." *In re OAS*, 533 B.R. at 101-02. In noting that the COMI of the SPV depended upon the location of the nerve center of the corporate group the SPV served, the *OAS* Court held that the SPV debtor's COMI was with its parent. *Id.* Here, Constellation Overseas is an SPV that is controlled and partially managed by its parent (management is described as partial, since day-to-day operations of the Constellation Group entities takes place in Brazil and Constellation Overseas' sole director is not located in Luxembourg). Thus, the nerve-center test should point towards Luxembourg, as in *OAS*, since the Parent of this SPV is in Luxembourg.

Ultimately, determining the COMI of Constellation Overseas is the most difficult of the Court's recognition determinations. From the perspective of technical, top-down legal control,

the Parent/Constellation, which is based in Luxembourg "controls" the company.  That said,

from a realistic consideration of the perspective of the true seat of Constellation Overseas, it is

difficult to overlook the fact that its revenues used to pay creditors *and* the day-to-day

management of those revenue streams come from Brazil.  Essentially, the Court is asked, with

respect to Constellation Overseas, to choose between the importance of high-level management

or the location of the management of the generation of actual positive cash flows (as opposed to

debt incursion) for the group of companies.  Given the relatively equal pulls of the analysis in

favor of Luxembourg or Brazil, the Court's determination here essentially makes one of two

conclusions: (1) a determination that senior management should always be considered more

important in similar cases or (2) a determination that when a proper analysis of COMI has been

conducted and it leads to essentially a toss-up between locales as the "ultimate-seat," the Court

should allow the weight of the relevant factors in evidence to determine the outcome.  Because

there appears to be such strong creditor support in favor of a Brazilian COMI *and* Constellation

Overseas has significant management, interest, and revenue generation in Brazil, the Court finds

that the weight of evidence favors a COMI in Brazil.  Although Constellation/Parent indirectly

owns Constellation Overseas and the Court found Constellation/Parent's COMI to be in

Luxembourg, this location of the parent company's management should not be a strong enough

factor to sway all of the other factors that point toward Brazilian recognition (particularly when

half of Parent's Board of Directors are Brazilian citizens) for Constellation Overseas.

Indeed, Alperton seeks to oversimplify the COMI analysis for the Group of companies by

essentially equating the COMI of the ultimate parent as the de-facto COMI for the group.  In its

proposed findings of fact, where it argues that all Chapter 15 Debtors other than Petróleo

Constellation have a Luxembourg COMI, Alperton asserts:

> The fact that each of Constellation Overseas, the Drillship Subsidiaries and Snover has the same sole director illustrates that the decision making for these entities is not done at the Drillship Subsidiary or the Constellation Overseas levels. Instead, they are ultimately wholly owned, controlled and managed by Parent and, as a result, the COMI of each of these entities also lies with Parent in Luxembourg.

(Alperton FOF ¶ 128.)

However, this would be fundamentally improper as a governing rule; it is simply untrue that looking at the location of the board of directors for a group of companies, in isolation, can be determinative of the COMI of each company within the group. It overlooks the important fact that board meetings are for most large companies, far less routine or central to management than the work performed by the executives of a company. It overlooks the fact that 98.7% of the Constellation Group's revenue is generated in Brazil, the vast majority of the Group's 1,200 employees are in Brazil, Brazil law regulates the operation of most of the Group's physical assets, most of the strategic day to day operations for the Group take place in Brazil, and more of Parent/Constellation's board members reside in Brazil than in Luxembourg. To suggest that the true COMI of the entire group is in Brazil based on the number and location of board members of the subsidiaries combined with the fact that the Parent's COMI is Luxembourg misinterprets the law. If anything, the case law asks the Court to look at a spectrum of factors—including non-board management, the location of assets, the expectations of creditors, the desires of creditors, and the jurisdiction with the greatest interest in the outcome etc. When the Court considers the spectrum of these factors with respect to Constellation Overseas, Brazil seems to be the real COMI.

### 3. Alpha Star's COMI is in Brazil

Based upon the Court's foregoing findings of fact related to Alpha Star and the most relevant COMI factors, discussed below, the Court finds that Alpha Star's COMI is located in Brazil at this time as a matter of law.

#### a. Location of the Debtor's Place of Incorporation is the BVI

Alpha Star is incorporated in the BVI. (*Supra* § II.H.2.)

#### b. The Location of those who Actually Manage the Debtor is Brazil

Alpha Star's sole director is Michael Pearson, who resides in the Cayman Islands and is a citizen of the United Kingdom. (*Id.*)

As discussed above, the Brazilian Offices are of particular importance to the rig-owning entities insofar as all operation and management of their rigs—their primary assets—are run from those locations. The Court found that Alpha Star's operations, including day-to-day operations are managed by the Brazilian Offices. (*Id.*) Alpha Star also benefits from the Constellation Group's shared management in Brazil that is responsible for its shared financial, legal, investor relations services and operational co-ordination activities. (*Supra* § II.B.1(b).) Petróleo Constellation, the Brazilian incorporated Chapter 15 Debtor, maintains and operates Alpha Star's sole asset—the offshore drilling rig. (*Supra* § II.H.2.) As such, the Court finds that the location of those who actually manage Alpha Star is Brazil.

#### c. Location of the Debtor's Primary Assets is in Brazil

Alpha Star's function is to own an offshore drilling rig, which is presently located in Brazil and typically operates in Brazilian waters. (*Id.*) This factor points towards Brazil.

d.  Location of the Majority of the Debtor's Creditors or of a Majority of
Creditors who would Be Affected by the Case is Indeterminate

Alpha Star has obligations under the 2024 Notes.  There is no evidence in the record regarding the location of the beneficial owners of the 2024 Notes.  (*Id.*)

e.  The Jurisdiction Whose Law Would Apply to Most Disputes Weighs
Moderately in Favor of Brazil

The operation of Alpha Star's Brazilian located assets are subject to Brazilian regulatory regimes (including contract law, maritime law, employee law, environmental law, and Brazilian regulatory approvals necessary for the operation of drilling rigs).  (*Id.*)

By virtue of being incorporated in the BVI, Alpha Star is also subject to the BVI's laws, regulations, and jurisdiction, including with respect to potential corporate disputes.  It is also subject to BVI law with respect to potential tax disputes.  (FRFOF ¶ 158.)

Because operations are more likely to create legal disputes, this factor weighs moderately in greater favor of a COMI in Brazil.

f.  Relevant International Interpretations Weigh in Favor of Brazil

As discussed in *Videology*, a parent company's management and the fact that a parent's board of directors operate the high-level management of a group of companies does not dictate the COMI of all subsidiaries where other evidence suggests that the subsidiaries' real operations take place elsewhere.  Like *Videology*, most of the drill ship corporations within the Constellation Group have day-to-day management in Brazil, a location of assets in Brazil, and the group as a whole has a substantial presence in Brazil.  As such, *Videology* reminds, with respect to all the drillship companies in the group that the location of the management of the parent holding companies should not be given undue weight.  Thus, evidence showing the majority of the Constellation Group's employees and day-to-day management in Brazil weigh

more heavily on the Court's COMI analysis than evidence regarding Parent/Constellation's COMI for drillship owning debtors, such as Alpha Star.

### g. The Reasonable Expectations of Interested Third Parties Weighs in Favor of COMI in Brazil

The debt documents for the 2024 Notes for which Alpha Star is a guarantor explain that operations and customers are located in Brazil. The 2024 Notes documents also explain potential restructurings in Brazil. (*Supra* § II.H.2.) Additionally, the JPLs support a finding of COMI in Brazil. (*Id*.) Based on these facts, the Court finds that the reasonable expectations of interested third parties weighs in favor of recognizing Alpha Star's COMI in Brazil.

### h. The Nerve Center Analysis Favors a COMI in Brazil

The central coordination of the rigs is particularly important to the nerve center concept in a business where asset ownership and asset operation are separated, as is the case here. The location of the sole director of each of these entities in the Cayman Islands is outweighed by the importance of the day-to-day management in Brazil, particularly where few factors point to the Cayman Islands and no party in interest (including the JPLs) suggests the Cayman Islands as the COMI.

The central coordination of the rigs in Brazil is also important as weighed against Alperton's suggestion that the COMI of these drillship subsidiary entities should be in Luxembourg. In addition to arguing that their sole director located in the Cayman Islands suggests that these entities should have a COMI in Luxembourg, Alperton argues that *Oi* supports a finding of COMI in Luxembourg for these entities, because in *Oi* the court considered that the larger corporate group was "headquartered and managed from the principal executive office of Oi in Rio de Janeiro Brazil." (Alpteron FOF ¶ 129 (citing *In re Oi Brasil*, 578 B.R. at 227).) However, Alperton's own quote seems to support a COMI in Brazil for these entities in

the sense that the *Oi* court looked to the principal *executive office* of the group of companies (not

the location of the headquarters).  There are no executives of any of the Constellation Group of

companies located in Luxembourg.  Rather, all of the executives of the Constellation Group are

either in London or Brazil.[31]  The weight of the evidence also supports the fact that the day-to-

day operations of the management, the Chief Operational Officer, Chief Commercial Officer,

Chief Legal Officer, and additional staff in charge of operational finances and investor relations

are located in Brazil.  The Court finds that the nerve center analysis weighs in favor of a COMI

in Brazil for Alpha Star.

### 4.  Lone Star's COMI is in Brazil

Based upon the Court's foregoing findings of fact related to Lone Star and the most

relevant COMI factors, discussed below, the Court finds that Lone Star's COMI is located in

Brazil at this time as a matter of law.

### a.  Location of the Debtor's Place of Incorporation is the BVI

Lone Star is incorporated in and subject to the jurisdiction of the BVI.  (*Supra* § II.H.5.)

### b.  Location of those who Actually Manage the Debtor is Brazil

Lone Star's sole director is Michael Pearson, who resides in the Cayman Islands and is a

citizen of the United Kingdom.  (*Id.*)

As discussed above, the Brazilian Offices are of particular importance to the rig-owning

entities insofar as all operation and management of their rigs—their primary assets—are run

from those locations.  The Court found that Lone Star's operations, including day-to-day

---

[31]     Alperton notes that members of senior management are appointed from time to time by vote of the Parent's board of directors.  (Alperton FOF ¶ 49.)  However, this is not persuasive that Luxembourg is the true seat of management of the drillship subsidiaries since: (1) the majority of the board of directors of even the Parent/Constellation are citizens of Brazil and (2) the facts at the time of filing the Chapter 15 Petitions were that *no* executives were located in Luxembourg, while many were located in Brazil.

operations are managed by the Brazilian Offices. (*Id.*) Lone Star also benefits from the

Constellation Group's shared management in Brazil that is responsible for its shared financial,

legal, investor relations services and operational co-ordination activities. (*Supra* § II.B.1(b).)

Petróleo Constellation, the Brazilian incorporated Chapter 15 Debtor, maintains and operates

Lone Star's sole asset—the offshore drilling rig. (*Supra* § II.H.5.) As such, the Court finds that

the location of those who actually manage Lone Star is Brazil.

c.   The Location of the Debtor's Primary Assets is in Brazil

Lone Star maintains and operates an offshore drilling rig. (FRFOF at 78.). The rig is

located in Brazil.

d.   The Location of the Majority of the Debtor's Creditors or of a Majority of
Creditors who would Be Affected by the Case is Indeterminate

Lone Star has obligations under the 2024 Notes. There is no evidence in the record

regarding the location of the beneficial owners of the 2024 Notes. (FRFOF at 79.)

e.   The Jurisdiction Whose Law Would Apply to Most Disputes Weighs
Moderately in Favor of Brazil

The Operation of its Brazilian located assets are subject to Brazilian regulatory regimes

(including contract law, maritime law, employee law, environmental law, and Brazilian

regulatory approvals necessary for the operation of drilling rigs.) (FRFOF at 67.)

By virtue of being incorporated in the BVI, Lone Star is subject to the BVI's laws,

regulations, and jurisdiction, including with respect to potential corporate or tax disputes.

(FRFOF ¶ 158.)

f.   Relevant International Interpretations

As discussed in *Videology*, a parent company's management and the fact that a parent's

board of directors operate the high-level management of a group of companies does not dictate

the COMI of all subsidiaries where other evidence suggests that the subsidiaries real operations take place elsewhere. Similar to *Videology*, most of the drill ship corporations within the Constellation Group have day-to-day management in Brazil, a location of assets in Brazil, and the group as a whole has a substantial presence in Brazil. As such, *Videology* reminds, with respect to all the drillship companies in the group that the location of the management of the parent holding companies should not be given undue weight.

### g.  The Reasonable Expectations of Interested Third Parties

The debt documents for the 2024 Notes for which Lone Star is a guarantor explain that operations and customers are located in Brazil. The 2024 Notes documents also explain potential restructurings in Brazil. (FRFOF at 68.) Additionally, the JPLs support a finding of COMI in Brazil. (*Id.*)

### h.  The Nerve Center Analysis

The nerve center analysis for Lone Star is the same as that applied to Alpha Star, as such, the Court finds that this factor weighs in favor of COMI in Brazil.

### 5.  Gold Star's COMI is in Brazil

Based upon the Court's foregoing findings of fact related to Gold Star and the most relevant COMI factors, discussed below, the Court finds that Gold Star's COMI is located in Brazil at this time as a matter of law.

### a.  The Location of the Debtor's Place of Incorporation is the BVI

Gold Star is incorporated in and subject to the jurisdiction of the BVI. (*Supra* § II.H.3.)

### b.  Location of those who Actually Manage the Debtor is Brazil

The Brazilian Offices are of particular importance to the rig-owning entities insofar as all operation and management of their rigs—their primary assets—are run from those locations.

Gold Star's day-to-day operations are managed by the Brazilian Offices, responsible for its shared financial, legal, investor relations services and operational co-ordination activities. (*Id.*) Petróleo Constellation, the Brazilian incorporated Chapter 15 Debtor, maintains and operates its sole asset—the offshore drilling rig. (*Id.*)

The sole director is Michael Pearson, a citizen of the United Kingdom, who resides in the Cayman Islands. (*Id.*)

Based upon the foregoing, the Court finds that Gold Star's management is best described as located in Brazil for COMI purposes.

### c.    The Location of the Debtor's Primary Assets is in Brazil

Gold Star owns the *Gold Star* offshore drilling rig, which is not presently under contract and is being maintained in a shipyard in Brazil. (*Id.*) The offshore rig is operated and maintained by Debtor Petróleo Constellation pursuant to operating and maintenance agreements, through its operational management team and operational staff located in the Brazilian Offices. (*Id.*) The Court finds that this factor weighs in favor of a COMI in Brazil.

### d.    The Location of the Majority of the Debtor's Creditors or of a Majority of Creditors who would Be Affected by the Case is Indeterminate

Gold Star has obligations under the 2024 Notes. There is no evidence in the record regarding the location of the beneficial owners of the 2024 Notes. (*Id.*)

### e.    The Jurisdiction Whose Law Would Apply to Most Disputes is Brazil

Gold Star's Brazilian located assets are subject to Brazilian regulatory regimes (including contract law, maritime law, employee law, environmental law, and Brazilian regulatory approvals necessary for the operation of drilling rigs.) (*Id.*) However, by virtue of being incorporated in the BVI, Gold Star is subject to the BVI's laws, regulations, and jurisdiction, including with respect to potential corporate or tax disputes. (FRFOF ¶ 158.)

On balance, the Court finds that this factor weighs in favor of a COMI in Brazil.

### f.    Relevant International Interpretations Favor Gold Star's COMI in Brazil

As discussed in *Videology*, a parent company's management and the fact that a parent's board of directors operate the high-level management of a group of companies does not dictate the COMI of all subsidiaries where other evidence suggests that the subsidiaries real operations take place elsewhere.  Similar to *Videology*, most of the drill ship corporations within the Constellation Group have day-to-day management in Brazil, a location of assets in Brazil, and the group as a whole has a substantial presence in Brazil.  As such, *Videology* reminds, with respect to all the drillship companies in the Constellation Group, that the location of the management of the parent holding companies should not be given undue weight.

### g.    The Reasonable Expectations of Interested Third Parties Weighs in Favor of Finding COMI in Brazil

The debt documents for the 2024 Notes for which Gold Star is a guarantor explain that operations and customers are located in Brazil.  The 2024 Notes documents also explain potential restructurings in Brazil.  (*Supra* § II.H.3.)

The JPLs have been appointed with respect to each of Lone Star, Gold Star, Olinda Star, and Alpha Star, and function to protect the interests of the collective creditors of each.  (*Supra* § II.E.)  They have expressed support for the Brazilian RJ Proceeding and for a finding of COMI in Brazil for each of these Debtors.  (*Id.*)

### h.    The Nerve Center Analysis Weighs in Favor of Brazil

The nerve center analysis for Gold Star is the same as that applied to Alpha Star.  Thus, the Court finds that the nerve center factor weighs in favor of a COMI in Brazil.

6.  <u>Star Int'l Has a COMI in Brazil</u>

Based upon the Court's foregoing findings of fact related to Star Int'l and the most

relevant COMI factors, discussed below, the Court finds that Star Int'l's COMI is located in

Brazil at this time as a matter of law.

a.  <u>The Location of the Debtor's Place of Incorporation is the Cayman Islands</u>

Star Int'l is incorporated in and subject to the jurisdiction of the Cayman Islands.  (*Supra*

§ II.H.6.)

b.  <u>The Location of those who Actually Manage the Debtor is Brazil</u>

The Brazilian Offices are of particular importance to the rig-owning entities insofar as all

operation and management of their rigs—their primary assets—are run from those locations.

Star Int'l's day-to-day operations are managed by the Brazilian Offices, responsible for its shared

financial, legal, investor relations services and operational co-ordination activities.  (*Id.*)

Petróleo Constellation, the Brazilian incorporated Chapter 15 Debtor, maintains and operates its

sole asset—the offshore drilling rig.  (*Id.*)  The location of those who manage Star Int'l is best

described as Brazil for purposes of Star Int'l's COMI analysis.

c.  <u>Location of the Debtor's Primary Assets is Brazil</u>

Star Int'l owns the *Atlantic Star* offshore drilling rig; as of the petition date, the *Atlantic

Star* was under contract with Petrobras and operating in Brazilian waters.  (*Id.*)  This factor

weighs strongly in favor of Star Int'l's COMI in Brazil.

d.  <u>The Location of the Majority of the Debtor's Creditors is Indeterminate</u>

Star Int'l has obligations under the 2024 Notes.  There is no evidence in the record

regarding the location of the beneficial owners of the 2024 Notes.  (*Id.*)  This factor does not

affect the Court's COMI analysis for Star Int'l.

e.   Brazilian Law Would Apply to Most Disputes

The operation of Star Int'l's drilling rig is subject to Brazilian regulatory regimes

(including contract law, maritime law, employee law, environmental law, and Brazilian

regulatory approvals necessary for the operation of drilling rigs.)  (*Id.*)  Additionally, by virtue of

being incorporated in the Cayman Islands, Star Int'l is subject to the Cayman Island's laws,

regulations, and jurisdiction, including with respect to potential corporate or tax disputes.

(FRFOF ¶ 158.)

The Court finds that this factor weighs in favor of a COMI in Brazil for Star Int'l.

f.   Relevant International Interpretations Weigh in Favor of COMI in Brazil

As discussed in *Videology*, a parent company's management and the fact that a parent's

board of directors operate the high-level management of a group of companies does not dictate

the COMI of all subsidiaries where other evidence suggests that the subsidiaries real operations

take place elsewhere.  Similar to *Videology*, most of the drill ship corporations within the

Constellation Group have day-to-day management in Brazil, a location of assets in Brazil, and

the group as a whole has a substantial presence in Brazil.  As such, *Videology* reminds, with

respect to all the drillship companies in the Constellation Group that the location of the

management of the parent holding companies should not be given undue weight.

g.   The Reasonable Expectations of Interested Third Parties Weigh in Favor
of COMI in Brazil

The debt documents for the 2024 Notes, for which Star Int'l is a guarantor, explain that

the offshore drilling rigs operate "mainly in Brazil" and were currently chartered mainly to

Petrobras.  (*Supra* § II.H.6.)  The 2024 Notes documents also explain potential restructurings in

Brazil.  (*Id.*)  Additionally, Star Int'l operated a drilling rig that was under contract with Petrobas

86

and operating in Brazilian waters as of the petition date.  (*Id*.)  The Court therefore finds that this factor weighs in favor of COMI in Brazil for Star Int'l.

###### h.    The Nerve Center Analysis Weighs in Favor of COMI in Brazil

The nerve center analysis with respect to Star Int'l is the same as that applied with respect to Alpha Star, as above.  Thus, this factor weighs in favor of a COMI in Brazil.

#### 7.    Snover's COMI is in Brazil

Based upon the Court's foregoing findings of fact related to Snover and the most relevant COMI factors, discussed below, the Court finds that Snover's COMI is located in Brazil at this time as a matter of law.

###### a.    The Location of the Debtor's Place of Incorporation is the BVI

Snover is incorporated in and subject to the jurisdiction of the BVI.  (*Supra* § II.H.7.)

###### b.    The Location of those who Actually Manage the Debtor is Brazil

Petróleo Constellation maintains and operates Snover's Onshore Drilling Rigs from Brazil.  (*Id*.)  Snover's rigs are all located, operated, and maintained in Brazil.  (*Id*.)  For this reason, despite two members of the Constellation Group's executive management being located in London and its sole director being located in the Cayman Islands, the Court found that the location of those who actually manage Snover are best described as located in Brazil.  (*Id*.)

###### c.    The Location of the Debtor's Primary Assets is Brazil

Snover's only assets are three Onshore Drilling Rigs (the *QG-V*, *QG-VIII*, and *QG-IX*).  Each of these Onshore Drilling Rigs is located in Brazil.  (*Id*.)  As decided above, the Court finds that Snover's assets are located in Brazil for purposes of COMI.  (*Id*.)

d.  <u>The Location of the Majority of the Debtor's Creditors or of a Majority of
Creditors who would Be Affected by the Case is Indeterminate</u>

The location of the majority of creditors is unclear and does not affect the COMI analysis

of Snover.  (*Id.*)

e.  <u>Brazilian Law Would Apply to Most Disputes</u>

Snover's active onshore rig is operated and maintained by debtor Petróleo Constellation.

Any actions related to the rig or its operations, as well as Snover's non-operational onshore rigs

would therefore be subject to Brazilian law.  The Court therefore finds that the jurisdiction

whose law would apply to most disputes is Brazil.

f.  <u>Relevant International Interpretations Favor Finding Management in
Brazil</u>

As discussed in *Videology*, a parent company's management and the fact that a parent's

board of directors operate the high-level management of a group of companies does not dictate

the COMI of all subsidiaries where other evidence suggests that the subsidiaries real operations

take place elsewhere.  Similar to *Videology*, most of the drill ship corporations within the

Constellation Group have day-to-day management in Brazil, a location of assets in Brazil, and

the group as a whole has a substantial presence in Brazil.  (*Supra* § II.B.1(b).)  As such,

*Videology* reminds, with respect to all the drillship companies in the group that the location of

the management of the parent holding companies should not be given undue weight.  Thus, for

Snover and other entities owning drillships, the location of the day-to-day management in Brazil

should be given greater weight than the location of Parent/Constellation's registered office.

g.  <u>The Reasonable Expectations of Interested Third Parties</u>

Parent/Constellation's offering memoranda for the 2024 Notes, for which Snover is a

guarantor, explain that operations and customers are located in Brazil.  The 2024 Notes

documents also explain potential restructurings in Brazil. (*Supra* § II.H.7.) Additionally, the JPLs support a finding of COMI in Brazil. (*Id.*) The Court therefore found that the reasonable expectations of interested third parties, here creditors or proxies for creditors interests, weighed in favor of finding Snover's COMI in Brazil. (*Id.*)

### h.  The Nerve Center Analysis Weighs in Favor of COMI in Brazil

The nerve center analysis for Snover points strongly in favor of Brazil because it is the owner of three onshore rigs located in Brazil, with operation and management of those rigs emanating from Brazil.

### 8.  Petróleo Constellation's COMI is in Brazil

Petróleo Constellation is an entity organized under the laws of Brazil with its registered office at the Rio Office in Rio de Janeiro, Brazil. (*Supra* § II.H.9.) No objections were filed to the recognition of the Brazilian RJ Proceeding for Petróleo Constellation, and Alperton does not object to foreign main recognition in respect of Petróleo Constellation. (*Id.*) No evidence has been submitted to suggest that the COMI of Petróleo Constellation is located anywhere other than its registered office. (*Id.*) Thus, the COMI presumption holds with respect to this Chapter 15 Debtor. The Court holds that Petróleo Constellation's COMI is in Brazil.

## H.  Discretionary Relief that May be Applied to Foreign Debtors after Recognition as a Non-Foreign Main Proceeding

Debtors who are recognized as participating in foreign nonmain proceedings may be afforded nearly identical relief as those recognized as operating in foreign main proceedings. Section 1521(a) outlines the discretionary relief a court may order upon recognition of a foreign proceeding, whether recognized as main or nonmain. 11 U.S.C. § 1521(a).

In *Winsway Enterprises Holdings Limited*, this Court recognized a proceeding in Hong Kong as a foreign nonmain proceeding.  (*See Order Granting Motion for Related Relief*, the "Winsway Order," Case No. 16-10833, ECF Doc. # 22.).  The Court recognized the Hong Kong proceeding of the BVI incorporated debtor as a foreign nonmain proceeding but fully recognized the scheme of arrangement that was entered by the Hong Kong Court.  (Winsway Order ¶ 2.)[32] The Winsway Order went on to provide that certain aspects of the scheme (such as creditor releases) would be "given full force and effect within the territorial jurisdiction of the United States in accordance with their terms and to the maximum extent enforceable under Hong Kong law; . . . ."  (Winsway Order ¶ 4.)  The Winsway Order went on to clarify that all scheme creditors would be permanently enjoined from, *inter alia*, "commencing any suit, action or proceeding in the territorial jurisdiction of the United States to settle any dispute which arises out of any provision of the Scheme and/or relating to the Scheme."  (Winsway Order ¶ 5(b).)

Thus, Parent/Constellation, although currently recognized as operating in a foreign nonmain proceeding, may receive nearly identical relief as the relief afforded to the Chapter 15 Debtors whose COMI was determined to be in Brazil.  The only discretionary relief granted so far is to extend the stay to the Parent/Constellation within the territorial jurisdiction of the United States.  Of course, the issues of what, if any, further discretionary relief should be granted to the Chapter 15 Debtors will have to await further action in the Brazilian RJ Proceeding.

---

[32]    The Winsway Order states, "The Scheme and the Sanction Order entered by the Hong Kong Court are granted comity and entitled to full force and effect against all entities (as that term is defined in section 101(15) of the Bankruptcy Code) in accordance with their terms, and such terms shall be binding and fully enforceable on all creditors whether or not they actually agreed to be bound by the Scheme or participated in the Hong Kong Proceeding."

### III.    <u>CONCLUSION</u>

In sum, as set forth above, the Court grants recognition as a foreign main as to the following Chapter 15 Debtors: Petróleo Constellation, Constellation Overseas, Alpha Star, Gold Star, Lone Star, Star Int'l, and Snover.

The Court grants recognition as a foreign nonmain proceeding as to Parent/Constellation.

The Court reaches no decision about recognition as to Olinda Star and Arazi since the Brazil courts have ordered the Brazilian RJ Proceeding dismissed as to those two entities.

A determination of the COMI may be revisited and the Court may change its COMI determination if parties provide new evidence of changed circumstances of any of the Chapter 15 Debtors.

**IT IS SO ORDERED.**

Dated:    May 9, 2019
         New York, New York

                                  *Martin Glenn*
                                  MARTIN GLENN
                    United States Bankruptcy Judge